United States District Court
Western Division

Scott Stern )  Notice of Objection
)
v )
)
)
Haddad Dealerships )
of the Berkshires, etal )
)

Now comes Plaintiff Scott Stern, Sui Juris, and does hereby, most respectfully, object to the dismissal of the action aforementioned against defendants EEOC and MCAD.

Wherein ~~your~~ movant has been under extreme emotional distress due to, in part, his document disability, and;

Wherein your movant has been maliciously prosecuted for the past year since Feb. 2006 by the Commonwealth of Massachusetts, under fraudulent and false pretenses in order to prevent, preclude and intimidate your movant from protecting his rights, liberties and privileges under the United States Constitution, and;

Notice of Objection  Page 1

Wherein, your movant, apologizes to the Honorable SDC Judge Michael A. Ponsor and Magistrate Judge Kenneth P. Neiman for not responding to this action in a timely manner, and;

Wherein, I, Scott Stern, apologizes to this Honorable Court, "I am truly sorry.", for filing extraneous, yet not immaterial or irrelevant, actions, before this Honorable Court, due in part to my "Pro Se" status, and my bipolar disorder which may have caused me, your movant, to file excessive litigation, and;

Wherein, your movant discovered the Commission Meeting Transcript of the EEOC which clearly states the EEOC pays the "FEPA", in which, the MCAD is the "FEPA" to close out cases, and;

Wherein, your movant, submits a documentation and evidence this document located at www.eeoc.gov/abouteeoc/meetings/2-15-06/transcript.html, and;

Noticed Objection Page 3

Wherein, your movant, herein notifies the Court that the EEOC/MCAD may attempt to remove this and other publicly accessible weblinks for the Court's perusal, and;

Wherein, your movant, prays that the Honorable United States District Court Judge Michael A. Ponsor will order the EEOC to not remove this weblink aforementioned, or any other weblink, and;

Wherein, your movant has sought certain documents that he doesnotpossess at this time, regarding the contractual relationship between the EEOC and the MCAD, and Moves this Court to allow Plaintiff additional time to reconsider these defendants, in their capacities in this aforementioned action, and;

Wherein, your movant asks and prays the Honorable United States District Court Judge Michael A. Ponsor or Magistrate Judge Kenneth P. Neiman to read, in full, the attached document, and to take judicial notice thereof of said Exhibit, and;

Notice of Objection Page 4

Wherein, your Movant, is under the knowledge and belief, that the EEOC has been paying FEPA'S or "Fair Employment Practice Agencies" to properly close out cases, and, MCAD is the "Massachusetts designated FEPA"

Wherein, your Movant, directs the Honorable Judge Michael A. Ponsor to page 6, page 11, and page 13 of the attached document, and page 12 of said attached document.

Wherefore, your Movant prays that the Honorable Judge Michael A. Ponsor and Magistrate Judge Kenneth P. Neiman grant Plaintiff additional time to submit a Memorandum of law, Affidavit, and other documentary evidence to support this action, be maintained against the Defendants EEOC and MCAD.

Most respectfully submitted this 14th day of March 2007.

Scott Stern
400 West Main St.
North Adams, MA. 01247

# Certificate of Service

I, Scott Stern, do hereby state that I have served a copy of the following:

Copy of "Notice of Objection"

Copy of "Exhibit "A" 2·15·06 Commission Meeting Transcript"

Copy of "Certificate of Service"

to the defendants, and their counsels of record this 14th day of March 2007.

Scott Stern
400 West Main St.
North Adams, MA. 01247
(413) 664·7805

*The U.S. Equal Employment Opportunity Commission*

# Commission Meeting of February 15, 2006

## Transcript

PRESENT:

CARI M. DOMINGUEZ, Chair
NAOMI C. EARP, Vice Chair
LESLIE E. SILVERMAN, Commissioner
STUART J. ISHIMARU, Commissioner
CHRISTINE M. GRIFFIN, Commissioner (by conference call)

ALSO PRESENT:

GERMAINE ROSEBORO, Director,
Financial Management Division,
Office of the Chief Financial Officer and Administrative Services

PIERETTE MCINTIRE, Director,
Technology Planning and Management Division,
Office of Information Technology

NICHOLAS M. INZEO, Director,
Office of Field Programs

MICHAEL DOUGHERTY, Director,
State and Local Programs,
Office of Field Programs

CAROL MIASKOFF, Assistant Legal Counsel for Coordination,
Office of Legal Counsel

BERNADETTE B. WILSON, Program Analyst,
Executive Secretariat, Office of the Chair

## INDEX

Opening Remarks, Cari M. Dominguez, Chair

Announcement of Notation Votes, Bernadette B. Wilson

## Presentations:

Financial Management Systems Support Services:
Germaine Roseboro, Director, Financial Management Division, Office of the Chief Financial Officer and Administrative Services, and Pierette McIntire, Director, Technology Planning and Management Division, Office of Information Technology

FY 2006 Proposed Budget Allocations for the State and Local Program:

Nicholas Inzeo, Director, Office of Field Programs and Michael Dougherty, Director, State and Local Programs, Office of Field Programs

Spring 2006 Regulatory Agenda:
Carol Miaskoff, Assistant Legal Counsel for Coordination, Office of Legal Counsel

Adjourn

## PROCEEDINGS

9:00 A.M.

CHAIR DOMINGUEZ: The meeting will now come to order. Good morning and welcome. In accordance with the Sunshine Act, today's meeting is open to public observation of the Commission's deliberations and voting. And so at this time I'm going to ask Bernadette Wilson to announce any notation votes that have taken place since the last Commission meeting.

Ms. Wilson.

MS. WILSON: Good morning, Madam Chair, Madam Vice Chair, Commissioners. I'm Bernadette Wilson from the Executive Secretariat. We'd like to remind our audience that questions and comments from the audience are not permitted during the meeting and we ask that you carry on any conversations outside the meeting room, departing and re-entering as quietly as possible.

Also, please take this opportunity to turn your cell phones off or to vibrate mode.

During the period January 14, 2006 through February 13, 2006, the Commission acted on eight items by notation vote; approved litigation on three cases; approved resolutions honoring Donna L. Harper and Diane V. Dawson, on the occasion of their retirement; approved closing a series of Commission meetings; and approved the 2006 Atlanta and Chicago TAPS contracts.

CHAIR DOMINGUEZ: Thank you very much, Ms. Wilson. This morning, we have three items on the agenda, starting with the Financial Management Systems Support Services which is going to be presented by Germaine Roseboro, the Director of the Financial Management Division in the Office of the Chief Financial Officer and Administrative Services, and Pierette McIntire, the Director of the Technology Planning and Management Division in the Office of Information Technology.

The second item on the agenda is the FY 2006 Proposed Budget Allocations for the State and Local Program and that's going to be presented by Nicholas Inzeo, Director of the Office of Field Programs and Mike Dougherty, Director of the State and Local Programs in the Office of Field Programs.

The final item on the agenda is the Spring 2006 Regulatory Agenda and that's going to be presented by Carol Miaskoff who is the Assistant Legal Counsel for Coordination in the Office of Legal Counsel.

We have long titles this morning.

It should be noted that Commissioner Griffin is going to be participating by telephone this morning.

Commissioner Griffin, we welcome you. She's in the hospital attending to a leg infection and we wish you a speedy recovery and looking forward to having you back.

COMMISSIONER GRIFFIN: Thank you. I want you to know what great lengths I go to avoid snow.

(Laughter.)

CHAIR DOMINGUEZ: All right, let's begin with Germaine. Please come forward and make your presentation.

MS. ROSEBORO: Good morning, Madam Chair, Madam Vice Chair, Commissioners and guests. I am Germaine Roseboro, Director, Financial Management Division, Office of the Chief Financial Officer and Administrative Services.

Seated next to me is Pierette McIntire, Director, Technology Planning and Management Division, Office of Information Technology.

Thank you for this opportunity to present information on the need for a new interagency agreement for financial management support services.

During Fiscal Year 2000, the Equal Employment Opportunity Commission engaged a consulting firm to recommend a shared services franchise operation to support the financial operations of the Agency. The consultant recommended the Department of the Interior, National Business Center, DOI/NBC in Denver, Colorado.

The Agency approved this recommendation and entered into an inter-agency reimbursable agreement with DOI/NBC to implement the federal financial system, FFS, commercial off-the-shelf software. FFS was successfully implemented on time and within budget on October 1, 2001.

In addition to software support, DOI/NBC provides accounting operations support for accounts and travels payables, inter-agency payables and collections; and miscellaneous collections.

About 18 months ago, the vendor for FFS, CGI-AMS, notified NBC they would no longer support the version of FFS which NBC operated for several customers including EEOC. As a result, NBC has announced they will no longer support this version of the FFS software after September 30, 2008.

Consequently, the Agency must solicit proposals and select a partner to provide these services. The OMB no longer permits small agencies to operate in-house financial systems because of the economies of scale at the Centers of Excellence Shared Services Providers for the Financial Management Line of Business. Therefore, the Agency will look to these directed sources of supply for financial services.

The financial services include, but are not limited to migrating and converting data from the current Integrated Financial Management System to a new financial system, operating, hosting and maintaining an Office of Management and Budget-approved commercial off-the-shelf financial management system to include all necessary hardware, software and communications; developing and maintaining system interfaces, as required; providing help desks and applications securities services, providing functional and technical support to ensure efficient operations and trouble shooting; operating and maintaining back-end regulatory reporting and report distribution software; ensuring compliance with applicable federal security accessibility requirements; and performing full-service accounting operations support for accounts and travel payables; inter-agency payments and collections; commercial collections, reconciliations and internal/external reporting.

With your approval, we will proceed to complete the acquisition to award an inter-agency agreement by April 3, 2006 to ensure that our critical financial service operations are not interrupted. This concludes my statement. Thank you.

CHAIR DOMINGUEZ: Thank you very much, Germaine, and Pierette. At this time, let me open it up for statements and/or questions by my fellow Commissioners, beginning with Madam Vice Chair.

VICE CHAIR EARP: Thank you, Madam Chair. Good morning.

MS. ROSEBORO: Good morning.

VICE CHAIR EARP: Just one question, when you talked about the full-service accounting, including helping us to collect the money, manage the money, will that service, under the new system include the revolving fund accounts?

MS. ROSEBORO: No, it will not.

VICE CHAIR EARP: So what exactly will be included regarding revolving fund? I understand that collections will be used, is that right?

MS. ROSEBORO: No, it will not. It's just our regular miscellaneous type of collections, not revolving funds.

VICE CHAIR EARP: So in the narrative, when we talk about e-travel software and revolving fund collections, what exactly are we describing?

MS. ROSEBORO: I'm describing the collections like Freedom of Information Act collections. We get quite a few of those. And those are the collections that will go to DOI/NBC for processing.

VICE CHAIR EARP: Okay. I'll talk to you off-line about some other questions. That's all I have for now.

MS. ROSEBORO: Okay.

COMMISSIONER GRIFFIN: Commissioner Silverman?

COMMISSIONER SILVERMAN: I have no questions, thanks.

MS. ROSEBORO: Commissioner Ishimaru?

COMMISSIONER ISHIMARU: Thank you, Madam Chair. As many of you may know from earlier meetings, I have an interest in our budget and access to budget information. I've made long statements before on this and I'm not going to belabor the point this morning. And in the past, I've been unable to approve many of our contracts, even though they sounded good to me, because I don't feel that I have overall budget information.

This year, I just received a helpful and candid briefing from our Chief Financial Officer which I found very helpful and he helped paint a picture for me that was helpful for me to understand what we do in the overall aggregate. And for that, Madam Chair, I wanted to thank you personally for making Jeff Smith available for that brief.

But the bottom line is I still haven't seen the operating budget of how we spend our money at the Agency, the allocation decisions made by offices.

I believe that our policy is reflected where our money is being channeled and I simply do not feel that I can determine whether the contracts in front of us make sense without having an overall picture of where the financials are at the Agency.

What Mr. Smith pointed out to me during our briefing was how most of our costs, frankly, are fixed and how if you take compensation and benefits, rent and security, state and local programs, it leaves us with some $40 million in discretionary funds, not a whole lot of money. And when it comes down to that, it's imperative, I believe, for the Commission, as a body, to look carefully at how the money is

being spent.

We talked about a number of programs within the budget where literally a couple hundred thousand dollars would make a huge difference in how the program operates. And on a certain level, a hundred thousand dollars in the grand scheme of the federal budget and even of the Agency's budget is not that large, but for our programs that need the money, for our programs that are consistently strapped, a couple hundred thousand dollars is a lot of money. And it's hard for me, I think, virtually impossible for me to make a decision on these issues, not having an overall feel of how we actually spend our money.

And I realize that there's an inherent tension between the roles of the Chair and Commissioners that span historical times and it's not a partisan matter. And I would hope that at some point we'll be able to have this information shared with us.

So let me ask one question on the system itself. If we adopt this system, will Commissioners have access to see what's in it?

MS. ROSEBORO: Yes.

COMMISSIONER ISHIMARU: So we'd be able to access the information in the system?

MS. ROSEBORO: Yes.

COMMISSIONER ISHIMARU: Thank you. That's all, Madam Chair.

CHAIR DOMINGUEZ: Thank you, Commissioner. Commissioner Griffin, any questions?

COMMISSIONER GRIFFIN: I have no questions, thanks.

CHAIR DOMINGUEZ: Great, thank you very much. At this point, I'd like to see if there's a motion to approve the Financial Management Systems Support Services. Is there a motion to approve?

VICE CHAIR EARP: So moved.

CHAIR DOMINGUEZ: Is there a second?

COMMISSIONER SILVERMAN: Second.

CHAIR DOMINGUEZ: Is there any further discussion? Hearing none, all those in favor, please vote aye.

(Ayes.)

Opposed?

(No response.)

The result is a --

COMMISSIONER ISHIMARU: Could I note for the record, Madam Chair that I abstained from the vote? We don't need to do a roll call.

CHAIR DOMINGUEZ: All right, all right. So the final vote is four (4) in favor and one (1) abstention and the motion carries. Thank you very much.

The second item on the agenda is the FY 2006 Proposed Budget Allocations for the State and Local Program and at this point let me invite both Nick and Mike to come up. Nick Inzeo and Mike Dougherty, please make your presentations.

MR. DOUGHERTY: Good morning, Madam Chair, Madam Vice Chair, Commissioners and guests. I'm Mike Dougherty, the Director of State and Local Programs and I'm here today with Mr. Nicholas Inzeo who is the Director of the Office of Field Programs and more importantly, my boss.

We're pleased today to be able to discuss our proposed budget for the Equal Employment Opportunity Commission's state and local program activities for Fiscal Year 2006.

The relationship between the Commission and state and local agencies is an extremely important one and has contributed significantly to the success over the years of our collaborative effort and shared goal of addressing issues of illegal employment discrimination.

As you are aware, each year Congress includes resources in EEOC's appropriation to fund services to EEOC by the FEPAs and in support of Tribal Employment Rights Organizations, TERO, activities. For Fiscal Year 2006, the level is set at $33 million. However, the Commission, like other federal agencies across the government, was subjected to across-the-board rescissions; in our case, of .28 percent and one (1) percent. As has been the case for a number of years, inasmuch as the rescission affects the Commission's entire budget, including the state and local component, the rescission impacted the level of funding available for state and local. As a result of those rescissions, the amount available to State and Local is $32,578,000.

This year, as in the past, we're presenting for the Commission's consideration our plans for allocating this money across the activities required in support of State and Local Programs. The major difference between this year's proposal and those of past years is that we're recommending that the per charge rate we apply to FEPA resolutions be increased from $500 to $540 per charge.

For many years, we have maintained the $500 level as we attempted to reach a point where the FEPAs could be reimbursed for 100 percent of the resolutions they could produce. We now believe that the FEPAs appear to have reached that point and they have resolved the maximum number of resolutions they're currently capable of doing at least within the context of their own staffing and budgetary constraints.

Based on measurement period data we have and District Director recommendations, FEPAs are projected to be able to resolve 56,155 charges this year. By using the $540 rate, we will still be able to contract for 100 percent of what we project the FEPAs capacity to be. We also recommend that we contract for 3,591 intakes at $50 per charge. The dollar value of the initial charge resolution contract would be $30,323,700 and the intake figure would be $179,550 for a total of $30,503,250. As you can see, by far, the largest single item contained in our budget proposal this year, as in the past, is for the charge resolution contracts with our FEPA partners.

The next most significant amount is set aside for contracts with 64 Tribal Employment Rights Offices, TEROs. Just as was the case relating to the FEPAs, as I noted above, it has been many years since the TEROs have received an increase to their contracted amount. Accordingly, we're recommending that in FY 2006, contracts be approved for the 64 TEROs in the amount of $26,000 per tribe which is up $1,000 from the long-standing $25,000 amount, to assist the tribes in their enforcement of Indian preference agreements pursuant to Section 703(I). The total cost for the TERO contracts at $26,000 would be $1,664,000. In addition to that amount, we also set aside $1,000 per TERO for the respective district offices into which the TEROs fall to conduct localized TERO training. Over the years, we've been apprised that this format of localized training is the one most favored by the TEROs inasmuch as consideration can then be given to certain geographically-dictated and time-sensitive activities by which some of the tribes are constrained, meaning that depending on where they are in the country, they have things like construction which they can only do for certain number of years, when there's not

snow on the ground, etcetera and the district offices work with them to get their stuff done when they can. So that would be another $64,000 to be set aside for this TERO activity for a total of $1,728,000.

The remaining funds are distributed among the EEOC FEPA training conference, ADP support, EEOC-FEPA joint training and outreach and a small amount of contingency reserve. Among those items, the one which is perhaps the most exciting for those of us who have been around state and local for a while is the ADP support. While there isn't much in it this year, there have been expenditures made in prior years and during this fiscal year, there will be the long-awaited roll out eagerly anticipated, I might add, of FEPA IMS which our OIT folks have been planning for a number of years. I think I'd be remiss if I didn't acknowledge at this point the hard work dedicated to this project by Calvin Loving, John Nicholson and their various cohorts in this roll out and to offer my personal and public appreciation for all their efforts.

Finally, these categories for State and Local are identical to those we've approved and which have been approved in past years and we believe that this plan provides an appropriate and worthwhile expenditure of allocated funds in a manner which benefits both the FEPAs and the Commission and we hope that the successful relationship we have forged with the FEPAs over the years can continue.

At this point, Nick and I would be happy to answer any of your questions.

CHAIR DOMINGUEZ: Thank you very much, Mike and Nick. Before I turn it over to Vice Chair Earp for her comments and questions, I have a couple of questions.

I, like my fellow Commissioners, and all of us in this room, are avid readers of Congressional language and what the intent is in the mark up in the writings as they process a budget. Let me ask you this, is your interpretation that the budget is set at $33 million or does the language read up to $33 million?

MR. INZEO: Madam Chair, it's a "not to exceed" figure. So the way that that is written, it would mean that we could spend anything up to that amount, but it could be less than that amount.

CHAIR DOMINGUEZ: Is there, in your experience, is there any discretion as we weigh the different requirements and different program needs that the Commission has?

MR. INZEO: Legally, I think you have that discretion, yes. Historically, the Commission has used that as a target and has spent up to that amount. But I think legally, the Commission does have discretion.

CHAIR DOMINGUEZ: Thank you. Well, as all of you know, I've been a big supporter of the FEPA programs as a good partner to the Commission, but I felt compelled to raise some of these questions because all of us have gotten extensive briefings from our CFO in terms of our current budget situation and so a commitment of the nature that is being proposed is a significant commitment for the Commission requiring trade offs. We fund the FEPAs at a certain amount. Obviously, there's going to have to be a tradeoff involved in terms of what it means for the operations of the Commission's programs.

Thank you for your comments.

Madam Vice Chair?

VICE CHAIR EARP: Madam Chair, I think that you and I may be spending too much time together because your first two questions are exactly what my first two questions were.

I agree completely. I think that we need to be clear, given how austere the budget is for '06 and it's projected to be for '07 on exactly what latitude the Chair, the Commission has to spend the limited funds that are available. So with that in mind, I have a couple of questions.

Why this year, in light of the rescission, are we giving what amounts to an eight (8) percent increase to the FEPAs? I certainly think that they deserve it and compared to how HUD pays them, we have underpaid them for years, but given the fact that this is probably the tightest budget that we've seen for a couple of years, why now the increase?

MR. INZEO: Madam Vice Chair, I'll start and Mike will help if he deems fit. And I think in framing your question, you've provided some of the answer which is, for years we have compared our reimbursement rate to the HUD rate and I would say that the FEPAs remind us every now and then of comparing our rate to the FEPA rate.

COMMISSIONER ISHIMARU: For the record, Nick, could you tell us the approximate figure of what the FEPA rate is or the HUD rate, excuse me.

MR. DOUGHERTY: I'm advised that the base rate now is $2400 a charge.

COMMISSIONER ISHIMARU: Per charge.

MR. DOUGHERTY: Per charge with an administrative add-on up to $500 or $600 per charge, depending on various stuff that they do.

COMMISSIONER ISHIMARU: Versus the $500 or $540 that's in the proposed --

MR. DOUGHERTY: Per charge, yes.

COMMISSIONER ISHIMARU: Thank you.

COMMISSIONER SILVERMAN: Statistically, they get less charges?

MR. DOUGHERTY: Yes.

VICE CHAIR EARP: And also, one could argue that investigation of a housing - an allegation of discrimination in housing is not exactly analytically the same as investigating an allegation of discrimination in employment?

MR. INZEO: I think that's right.

MR. DOUGHERTY: That's true. Some of our FEPA partners have told us that they believe that the employment cases are harder to do.

VICE CHAIR EARP: Okay.

(Laughter.)

MR. DOUGHERTY: That's what they told us.

MR. INZEO: Madam Vice Chair, the part of your question as to why now, as Mike indicated, we've been working to try to be able to fund the FEPA resolutions at the maximum number of resolutions they could produce. And we believe that they're there, that they've reached within the resources that they have, they've reached the maximum number of resolutions and so in order to further our partnership with them, we think that this is a point in time when we're able to raise the reimbursement rate and not have any impact on the number of resolutions that we're able to reimburse for.

VICE CHAIR EARP: When you speak of the maximum number of resolutions, are you talking about what

we project they will do?

MR. INZEO: Yes.

VICE CHAIR EARP: And how accurate are we in the projections compared to the actual performance of the FEPAs?

MR. INZEO: I think Mike has this figure.

MR. DOUGHERTY: Sometimes we're more accurate in our projections than other years. Last year, the FEPAs fell short of our projection as they had the year before. The two years preceding that, they had exceeded what we had projected and the year before that it was very, very close to what we had projected.

VICE CHAIR EARP: And when we fall short, the excess funds that are available, would you agree that in light of the Chair's opening comments about having some flexibility that it's even more important at a time when our overall budget is as tight as it is?

MR. INZEO: Yes.

VICE CHAIR EARP: So that brings me a little bit ahead to the second part of what we're going to vote on today and that's the request for delegation of authority.

In the past, that's always rested at the staff level, is that correct?

MR. INZEO: Within the categories of the budget, Madam Vice Chair, the amount of money could be shifted to any of the categories listed here. They couldn't be shifted to anything not listed in terms of the delegation.

VICE CHAIR EARP: But the determination is made by staff?

MR. INZEO: Yes.

VICE CHAIR EARP: Do you think that it's an appropriate consideration that the larger the amount of money, in other words, the bigger the gap between what we project and what's actual, the larger the amount of money that perhaps in light of how tight the overall budget is, that the Commission itself should get a second chance to review those funds before they're reallocated or reprogrammed?

MR. INZEO: That is something that could be done, yes.

VICE CHAIR EARP: Okay.

MR. DOUGHERTY: Madam Vice Chair, years ago, many years ago and I can't remember how many, there were times where things like that were done, where the Commission did vote on additional stuff.

VICE CHAIR EARP: And can I assume that there was no adverse impact on either the timeliness of what you needed to do or the quality of what you needed to do, vis-à-vis, our relationship with the FEPAs? Come on, Mike, candidly.

MR. DOUGHERTY: Did you include timeliness?

VICE CHAIR EARP: Well, yes.

MR. DOUGHERTY: To the extent that there are things that we do, I mean primarily third quarter modifications that are works in progress and sometimes we don't get that information as quickly as we want, and we do things up to and including the last minute in terms of the eleventh hour modifications where people call and they want 50 cases, 25, whatever, more to do. If that had to come up to the Commission, our ability to divvy up that money to the FEPAs for third quarter mods would be a little more difficult, for sure.

VICE CHAIR EARP: Okay, I mean I think that timeliness is a serious consideration. I have one final question.

Given the tightness of our budget, in a worse case scenario where RIFs or some other draconian action was threatened, would there be latitude, assuming our projection was off and there was a substantial amount of money available, is there latitude to reprogram from the categories listed here to cover some exigent circumstance that we might not be able to foresee today?

MR. INZEO: I think that could always be done, yes.

VICE CHAIR EARP: Okay, thank you.

COMMISSIONER ISHIMARU: And you're talking about a non-state and local FEPA-type program, something else beyond these categories?

VICE CHAIR EARP: I am, but I'm talking about a severe situation.

COMMISSIONER ISHIMARU: Right.

VICE CHAIR EARP: Involving staff or other mission-related impacts.

MR. INZEO: And Vice Chair, let me just clarify. That's something that the Commission, I think, could do. I don't think we could do. I mean under the delegation of authority, we wouldn't be able to do that.

VICE CHAIR EARP: Well, that's exactly why I'm raising the question about the viability of reprogramming, coming back to the Commission for a second look.

CHAIR DOMINGUEZ: Let me just note for the record that we are closely monitoring our budget, as we always have, particularly this year because we do have a flat budget this year which translates into less resources as the rising cost of salaries and rent and everything else continues to increase. So the CFO and I are on speed dial, looking at the situation, making sure that we don't have to exercise the types of scenarios that the Vice Chair has presented. But however, I think it is a very good point.

Madam Vice Chair, I had not planned to separate the delegation of authority component from voting overall and certainly you have my word that if the Commissioners so choose, would be happy to revisit the state of the funding allocations over the next couple of months, two or three months, if that would work.

But let me offer and we'll take it from there.

COMMISSIONER ISHIMARU: That's a good idea. I guess my question would be when in time does that critical point come when Mike's office has a better feel for how the money flow is going?

CHAIR DOMINGUEZ: Mike?

MR. DOUGHERTY: In July and August.

COMMISSIONER ISHIMARU: July and August.

CHAIR DOMINGUEZ: The end of the third quarter.

COMMISSIONER ISHIMARU: Right.

VICE CHAIR EARP: But there's -- I'm sorry, there's nothing that we can learn from the projections that we've done, some trend analysis looking at the last five years that would give us an indication earlier than the third quarter?

MR. DOUGHERTY: We know from month to month how they're doing, vis-à-vis the prior year. And historically, I would say that the processing does not follow an even pattern from one month to the next. FEPAs too have fiscal years and they have the last month of the fiscal year which is in some respects different than ours.

A lot of them finish in June, so we see blips. So we can do a year-to-year comparison, but for the year when FEPAs exceed our projections by 2,000 or 3,000 or 4,000, in many cases relates to a couple usually big agencies, hiring people, being able to hire people or agencies having to consolidate, close down some offices on the converse and do fewer cases. So it's not an exact science. I mean we can monitor, but I can't predict exactly what it's going to be. I mean I know now that they're slightly ahead of where they were last year, but that's only four months into the year. I mean the action happens from May through -- up to and including September.

VICE CHAIR EARP: Have we had a relationship with the FEPAs for as long as EEOC, almost as long as EEOC has been in existence?

MR. DOUGHERTY: Yes.

MR. INZEO: Yes.

MR. DOUGHERTY: Absolutely. And this type of relationship with the contracts, I believe, began in 1980.

VICE CHAIR EARP: We have to do a better job of being able to do trend analysis.

Forty years, we should have gotten it --

COMMISSIONER ISHIMARU: Twenty-five, if they started in 1980. As I understand it, there was no --

VICE CHAIR EARP: No contracts?

COMMISSIONER ISHIMARU: No contract program before --

VICE CHAIR EARP: 706.., in any case, 25 years, 40 years, that's a little money –

COMMISSIONER ISHIMARU: . . . a long time

CHAIR DOMINGUEZ: Well, let me just add, speaking from our experience at the Commission, we too have sensed that there's not a stable approach to the way we process charges. In fact, the last quarter, there's a huge rush to completion, something that we've been trying to get our arms around for quite some time. So I'm hoping that we can do a better job of that, but I can appreciate where the FEPAs are in that sense, because we, ourselves, don't have -- haven't quite been able to overcome that trend which makes it very hard for us to make some further projections in terms of costs in travel and litigation and all these other pieces -- that obviously take a huge dip into our funds.

Commissioner Silverman?

COMMISSIONER SILVERMAN: I just wanted to explore the relationship with HUD just a little bit more. Do they end up paying more to FEPAs than we do proportionately or does it depend where the FEPA is?

MR. DOUGHERTY: There isn't a direct alignment of the FEPAs that we deal with and their FHAPS.

COMMISSIONER SILVERMAN: Right.

MR. DOUGHERTY: I would say, generally, that the total amount of money, I believe, that we have that we use for contracting is more than the total amount of money that HUD deals with with the FEPAs, our $33 million versus, I think when I last looked, theirs was $26 or $25 [million] or something like that for a far lesser number of cases. The last time I talked to my FEPA partners I think it was in the 10, 11, 12,000 cases.

COMMISSIONER SILVERMAN: They just always seem to have much more money than us, much more money for training and --

MR. DOUGHERTY: Absolutely, positively.

COMMISSIONER SILVERMAN: You get agency envy a bit.

You may have answered this already, but you came up with the $40 more per charge by figuring out the maximum number of resolutions and what we could afford? Is that basically --

MR. INZEO: That's right.

COMMISSIONER SILVERMAN: Okay, thank you, I have no further questions.

CHAIR DOMINGUEZ: Commissioner Griffin?

COMMISSIONER GRIFFIN: Yes, you know, one of the things you haven't talked at all about is this reduction in the substantial weight review process for the ADA cases, from 100 percent to 10 percent. Now I understand that the other statutes get a 10 percent review that seems like a big leap to me, so what's involved in the EEOC's substantial weight review process and what are you looking for when you're doing these reviews?

MR. DOUGHERTY: Commissioner, they're looking at cases. They're looking to see whether -- they're looking at the files, the actual files in the cases and to see if the FEPAs have resolved the case in the manner that's consistent with the way we would resolve it under the ADA.

COMMISSIONER GRIFFIN: So tell me the benefit of doing this?

MR. INZEO: Commissioner, this is Nick Inzeo. The benefit for doing this is that having now experience of over 10 years with our offices reviewing all of the files of the ADA cases, and having reached the conclusion that the FEPAs are processing those cases as we would, it then will allow our field staff to do the reviews on a sampling basis to make sure through that sampling that the FEPAs continue to process the cases as we would, but it will help free up some of our staff resources and it will make approval and review of those cases more timely.

MR. DOUGHERTY: Commissioner, Nick correctly pointed out the sampling aspect, but the substantial weight review would also include those cases where charging parties request substantial weight review where they have particular issues. That would still be our practice and we would certainly do that with ADA as well as the others, where charging party has a particular interest or concern and brings that to

our attention. That case would get a substantial weight review.

COMMISSIONER GRIFFIN: Right, so it frees up our resources. Are resources, either at Headquarters or in the field offices, do they come out of the FEPA budget?

MR. INZEO: No, Commissioner.

COMMISSIONER GRIFFIN: I didn't think it did. I mean based on the information we have, I just wanted to hear you say it.

So what do we spend at the EEOC in addition to the FEPA budget to support FEPA contracts?

MR. INZEO: Commissioner, we have about, I think, about 25 people in our field offices who review the cases. Now they're reviewing the cases though, understand, to determine whether EEOC can accept the resolution and to close the EEOC charge. So it's a -- they're doing this for an EEOC purpose.

COMMISSIONER GRIFFIN: They're doing it for an EEOC purpose, as you said, to actually close out the case, and say okay, this is proceeded under the FEPA as a case.

MR. INZEO: Yes.

COMMISSIONER GRIFFIN: I understand that, but are those people -- is that all they do?

Is that a dedicated position?

MR. DOUGHERTY: In some offices. Well, it's a dedicated position, yes, but in some offices it's more than a full-time job and in some offices less, just depending on the size of the contracts that they administer, the number of FEPA agencies in their respective jurisdictions.

COMMISSIONER GRIFFIN: Let me ask you something about the annual meeting that they have. I think in some of these agencies and I don't know them all, but I know a lot of the bigger state agencies, the Commissions against discrimination, stuff like that, the employment pieces is a piece of what they do. They do lots of other stuff. And they have other funding.

Do they have like an annual meeting that's related to their other work that they do? Do all the FEPAs get together with their housing issues or their other -- whether it's public accommodations or things like that. Do they have other annual meetings or is this the only one?

MR. DOUGHERTY: The one that I'm most familiar with, again and I hate to keep bashing them, but it's HUD -- HUD has a meeting every year and we, of course, can't be as lavish as HUD, but they have their meeting this year I think is in California, Nick? I think they told us it's in California. But that's the only one that I'm familiar with.

The IAOHRA meeting, the International Association of Official Human Rights Agencies, of which most of my FEPA partners are members, they have their own meeting, Commissioner.

COMMISSIONER GRIFFIN: Yes.

MR. DOUGHERTY: But other than us and HUD and IAOHRA which is their own thing, I'm not sure of any others there may be.

COMMISSIONER GRIFFIN: I was actually looking at the $300,000 for that and thinking maybe that could be better spent doing cases, doing more cases. We could piggy back on one of these other annual meetings.

MR. DOUGHERTY: What my FEPA partners have told me on more than one occasion is they really appreciate the opportunity to get together among themselves and with us and to network and to be able to meet and greet and --

MR. INZEO: And to discuss issues of common concern. At our conference, Commissioner, we always have time for the District Director to meet with all of the FEPA Directors within his or her jurisdiction. And a number of joint activities are discussed and sometimes planned at those meetings.

COMMISSIONER GRIFFIN: Well, I hope they see each other more regularly than that annual meeting.

(Laughter.)

Seeing as they're all in each other's neighborhood.

MR. INZEO: Most of them do.

COMMISSIONER GRIFFIN: All right. That's it for my questions.

CHAIR DOMINGUEZ: Yes, just a comment. I remember a good 10 years ago it used to be joint – HUD and...

COMMISSIONER GRIFFIN: Oh it did?

CHAIR DOMINGUEZ: Yes, many years ago. In fact, I spoke - at the Department of Labor; I spoke at one or two of their conferences. Isn't that right?

MR. DOUGHERTY: I recall one right before I came to state and local.

CHAIR DOMINGUEZ: They have had them in the past. They(re nothing new.

COMMISSIONER GRIFFIN: When times - when budgets are tight and you're looking at maybe getting more resolution that sounds like something, a place you could consolidate.

CHAIR DOMINGUEZ: Thank you, Commissioner. And Commissioner Ishimaru, my apologies. Since you jumped right in when the Vice Chair was speaking, I just assumed that you had made your points, but at this time I'll ask you to make further comments.

COMMISSIONER ISHIMARU: I thank you, Madam Chair, and I knew that I wasn't being purposely cut out and I appreciate all the courtesies.

I wanted to follow up on Commissioner Silverman's point about the HUD budget. It's my understanding though that the HUD budget that's devoted to fair housing enforcement is certainly a smaller dollar amount than the budget of this agency and probably should be. And the amount that goes to state and local programs through the FHIP program, I believe at HUD -- is it FHIP or FHAP?

MR. DOUGHERTY: FHAP.

COMMISSIONER ISHIMARU: FHIP, FHAP. Is less than the allocation we're talking about here, so when we talk about the overall aggregate number, it isn't any larger?

MR. DOUGHERTY: That's right.

COMMISSIONER ISHIMARU: Okay. I just wanted to be clear on that.

I wanted to go back to the Chair's earlier question about reading the language and I just wanted to make sure what our historic practice has been. And I believe I've been told that historically we have followed, or we have funded the state and local programs, the FEPAs, at the not to exceed amount, less a rescission if it was required. Is that correct?

MR. INZEO: Yes.

COMMISSIONER ISHIMARU: Have there been any years when we've gone below the not to exceed level?

MR. INZEO: I'm not aware of any.

COMMISSIONER ISHIMARU: Any years that we've gone over it?

MR. INZEO: No.

COMMISSIONER ISHIMARU: No.

(Laughter.)

COMMISSIONER ISHIMARU: And I don't know if either of you would know this, but maybe one of my colleagues or someone else here would. I would guess that any different use of this money would be subject to a reprogramming and notification to the appropriators as required for any time we do a reprogramming of a certain dollar amount?

CHAIR DOMINGUEZ: I would have to get a legal opinion on that, but again, we have carefully studied the language, is not to exceed . . . so . . .

COMMISSIONER ISHIMARU: Right, but any time we do a reprogramming, generally, there are requirements with the appropriations committees of what we have to do? That was my understanding and --

CHAIR DOMINGUEZ: Nick?

MR. INZEO: I don't think that that would be a reprogramming.

CHAIR DOMINGUEZ: Right.

COMMISSIONER ISHIMARU: If we spent it in some other area other than state and local programs, your view is that it's not a reprogramming?

MR. INZEO: Yes.

COMMISSIONER ISHIMARU: One of the -- again, going back to my concern about budget and the inadequate information that I believe I have, to make a reasoned determination here is that I noted that in the contract proposal is for $32.5 million, in the President's budget proposal that we submitted to the Congress and in the other briefing materials that I have seen, the figure was $30.5 million, a difference of $2 million. It was explained to me that the Chair decided to fund it at the full level which I would support, but, my question when I sat down with Mr. Smith the other day is, where is this other $2 million coming from and this is probably not a question you can answer, because the budget is so tight and Mr. Smith, ably explained to me the various -- I don't want to call them tricks, because it's not magic, but as the chief operating officer told us earlier when we talked about how you stretch a tight budget to make it fit, that you hire at different times and you shave off a little bit from here, shave off a little bit from there and sooner or later you can come up with this extra money from other

programs without harming the substantive programs.

But again, I go to my concern that because so many of our programs are under severe fiscal restraints, that I wonder where this extra $2 million came from and I wonder how much other flexibility there is in the budget. I wonder because when -- we have a whole variety of programs that we have here at the Agency, some have been voted on by the Commission, others are within discretion of the Chair to carry out.

The question for me is how are we spending our money on an overall basis and from the materials that I've been given and have been told that are all that I'm going to get, how do we spend our money, how do we do it in a most effective way?

Saying that, let me ask you, Mike, this question. I know that we talked about how the formula works now in the proposal, and how it's worked historically. Have you ever considered paying more money per charge and just paying people up to whatever our pot is and not fully funding, fully paying out all the charges that come to us? Has that ever been explored as an option, so, instead of say, paying 100 charges at $500 a charge, we would pay I don't know what the amount is, but we would pay $2500 per charge for a smaller number of charges. Has that ever been explored? We would obviously pay less charges, but we would be paying more per charge.

MR. DOUGHERTY: The reality is that's -- that was the situation even at the $500 level years ago when there was a lesser amount in the state and local budget, meaning we couldn't pay even at the $500 level for all the charges that we did. So what we do, Commissioner, at the beginning of some years, we would propose that we contract for 85 percent, 87 percent, 83 percent of what they could do. Clearly, if you raised the rate, if you raised the per charge rate to $1,000, for example, you would only contract for half of the cases that they would be able to process.

What we have heard from various people in the FEPA community, that it is -- for some of them, this is not across the board -- it is better for them in their own jurisdictions, to be able to tell the people that they work for and around that they are being funded at 100 percent, so that they then don't have to explain why they're doing cases "for free", which is a misnomer and is not accurate, but for purposes of their interactions with their funding authorities, if you will. In their state or local agencies, it's better for them to be at 100 percent.

COMMISSIONER ISHIMARU: I see. The reason why I raise this - we, as a body have talked about how do we focus our work, how do we try to focus on the cases of import to move them forward and historically through the years we've struggled on how to do that best.

I would assume here that the charges that they are investigating, the state and locals are investigating, run the whole gamut of quality. Some are good charges. They would run our A, B and C gamut that we use in our offices as well.

So they are paid per charge that they are in process?

MR. DOUGHERTY: Yes, sir.

COMMISSIONER ISHIMARU: A couple of other issues that came up in the briefing that Mike and Nick graciously gave to my office, one is a question of repositioning and a number of FEPAs having new relationships that need to be developed. Mike told us that for administrative purposes and for case processing purposes, the same district office relationship would remain in effect with that FEPA.

So in the State of New Jersey, the FEPA in New Jersey would still report to Philadelphia, our District Office, for administrative purposes for paying the claims, but the State of New Jersey itself for program purposes is now split between the Philadelphia District Office and the New York District Office.

And my question came to how do we encourage outreach, especially for the new offices, for offices like New York that now picks up part of New Jersey that it did not have before and I asked whether there was specific money in the budgets for this type of outreach and I was told no, there wasn't. I was told that there was general money in the district office budgets for outreach.

I would suggest, and ask you, Madam Chair, that some money be allocated specifically for this outreach to make sure that if the district directors believe this is appropriate, that they have outreach funds available to build new relationships with it, with the new FEPAs.

I just ask that you keep that under consideration as we move forward.

CHAIR DOMINGUEZ: Let me -- I think a point of clarification. In terms of our relationship with the FEPA, the point of administration is very clear as to how the funds are going to be transferred. It's going to be an office, one of our offices with their office.

COMMISSIONER ISHIMARU: And it's the same office, as I understand.

CHAIR DOMINGUEZ: Yes, yes.

COMMISSIONER ISHIMARU: That had the whole state before? But for offices that pick up new geographic areas, say Ohio – that's now...

CHAIR DOMINGUEZ: You mean one of our offices, Commissioner; you're talking about our offices?

COMMISSIONER ISHIMARU: Right, right. So for our offices that have now split states and offices cover different parts of the states that the new offices be specifically allocated outreach money so they can do the outreach that they need to build up a relationship with the FEPAs that I know the existing offices have built up over time. I just ask that you consider that as a use of the monies that are available.

CHAIR DOMINGUEZ: Yes.

COMMISSIONER ISHIMARU: The other issue that I have, the Vice Chair and I have spoken on many occasions about our interest in the Race and Color Manual, and about the training that will be coming forward with that and I know that training is being planned for our staff on the Race and Color Manual recommendations. I believe that we should open up the training to our FEPA partners so they can get the benefit of this work as well.

Again, I would ask that that be considered at the appropriate point in the appropriate forum as a possibility, because I think, hopefully, once this is approved, it will be a good piece of work that I think we should try to share as broadly as possible.

CHAIR DOMINGUEZ: Thank you, Commissioner. Nick or Mike, would you like to make some comments?

MR. INZEO: Just one point of clarification. In terms of the repositioning, there are some states that have moved because, for instance, North Dakota and South Dakota, which had been under the jurisdiction of the Denver office, is now under the jurisdiction of the Chicago office. And so the administration of those contracts will be done by our Chicago office, which is a new office for them.

COMMISSIONER ISHIMARU: I see.

MR. DOUGHERTY: It will be one office. It's not going to be the identical office, although most of the times it is. Your example of New Jersey being one, but Nick's example of NoDak and SoDak being another, going to Chicago.

COMMISSIONER ISHIMARU: And previously, they were in Denver?

MR. DOUGHERTY: Correct.

COMMISSIONER ISHIMARU: So now the Chicago office will be responsible for administering the contracts for those agencies in those states.

MR. DOUGHERTY: Right.

COMMISSIONER ISHIMARU: As well as having new outreach responsibilities since it's new territory.

MR. DOUGHERTY: That's right.

COMMISSIONER ISHIMARU: Thank you.

CHAIR DOMINGUEZ: Thank you, Commissioner. Any other comments, questions?

VICE CHAIR EARP: May I make one?

CHAIR DOMINGUEZ: Yes, please.

VICE CHAIR EARP: I'd like to follow up to Commissioner Griffin's comments about the annual training for FEPAs. Notwithstanding 2006, where there may be additional need for relationship building and some of the things that Commissioner Ishimaru has mentioned. for 2007, is it totally inappropriate to consider that perhaps the issues and the joint concerns that we have with FEPAs don't change every year, that there is some sense of steady state, that given, on balance, a very tight budget, that we could begin to think in 2007 about not having an annual meeting, but perhaps regional meetings or every two years or some other configuration with the purpose of saving money, maybe even electronically getting information out to the FEPAs.

MR. DOUGHERTY: That wouldn't make me sad.

(Laughter.)

MR. INZEO: I think the answer is yes, Vice Chair, we could consider that.

VICE CHAIR EARP: Good, thank you.

CHAIR DOMINGUEZ: Right, okay, thank you all. Is there now a motion to approve the FY 2006 Proposed Budget Allocation for the State and Local Program?

COMMISSIONER SILVERMAN: So moved.

CHAIR DOMINGUEZ: Is there a second?

VICE CHAIR EARP: Second.

CHAIR DOMINGUEZ: Is there any further discussion? Hearing none, all those in favor, please say yes or aye.

(Ayes.)

Opposed?

(No response.)

Abstentions?

COMMISSIONER ISHIMARU: I abstain, Madam Chair. Thank you for the courtesy.

CHAIR DOMINGUEZ: All right, the vote is four (4) in favor and one (1) abstention and therefore the motion carries. Thank you very much.

The last item on the open agenda is the Spring 2006 Regulatory Agenda and that's going to be presented this morning by Carol Miaskoff.

Carol, please come forward and welcome, make your presentation.

MS. MIASKOFF: Thank you, good morning, Madam Chair, Madam Vice Chair and Commissioners. My name is Carol Miaskoff. I'm Assistant Legal Counsel for Coordination. The Coordination Division in the Office of Legal Counsel performs the administrative tasks necessary to prepare the EEOC's regulatory agenda.

Pursuant to Executive Order 12866, OMB publishes a government-wide regulatory agenda every six months, in the spring and the fall. Each time agencies must describe their current regulatory actions, new regulations under development and existing regulations under review for the next 12 months. OMB directs agencies to provide a time table for each rulemaking.

The Regulatory Agenda for Spring 2006 is due to be submitted to OMB by Friday, February 24th and it would be published in the Federal Register in April or May of this year. This vote is descended to OMB.

The proposed Spring 2006 Regulatory Agenda includes seven items. The first five are carried over from the last agenda that was published on October 31, 2005. The descriptions of these items in the text of the draft of the spring agenda are identical to the descriptions used in the fall agenda.

The five repeated items are: first, the retiree health final rule. This continues to be on hold pending the outcome of AARP's judicial challenge which is now before the Third Circuit. For Spring 2006, the proposed agenda entry states simply that "the next action is undetermined."

Second, an item titled "Federal Sector Complaint Processing". This item states that the Commission is reviewing the federal sector process, consulting with stakeholders and considering alternatives. The vehicle for any proposed changes would be a notice of proposed rulemaking. No date for an NPRM has been set.

Third, an interim final rule titled "Posting Requirements under the No Fear Act." This rule is now being finalized after the receipt and review of public comments in 2004. The goal is to have a final rule by September 2006.

Fourth, a Notice of Proposed Rulemaking to conform the EEOC's ADEA regulation on disparate impact to the Supreme Court's 2005 decision in Smith v. City of Jackson. The regulatory agenda states that the goal is to publish an NPRM in September 2006.

And fifth, a Notice of Proposed Rulemaking to again conform relevant portions of the EEOC's ADEA regulations to the Supreme Court's holding, this time in General Dynamic Land Systems v. Klein. The goal here is to publish an NPRM by July of 2006.

There are also two items that are new, being listed for the Spring 2006 agenda. The two new items are first, updating the EEOC's Privacy Act regulation at 29 CFR 1611.11 to revise fees to reflect increased

costs consistent with the fees charged for services under the Freedom of Information Act. This was issued as an NPRM on December 12, 2005 with a statutorily required comment period that ended on January 11, 2006. No comments were received. The goal is to issue a final rule by May 2006.

And second, a rule is under development to update EEOC's regulations to reflect new organizational names, consistent with the field repositioning approved in 2005. This rule would change nomenclature only. For example, it would add references to "field offices" when one of our rules references or lists district, local and area offices. This rule would not change any procedures for filing charges. And it would not be substantive in any way. On the regulatory agenda, the rule is slated for May 2006.

This concludes my statement. Thank you.

CHAIR DOMINGUEZ: Thank you very much, Carol. We'll now have statements or questions from my fellow Commissioners, beginning with Madam Vice Chair?

VICE CHAIR EARP: Nothing, Madam Chair.

CHAIR DOMINGUEZ: Commissioner Silverman?

COMMISSIONER SILVERMAN: No questions.

CHAIR DOMINGUEZ: Commissioner Ishimaru?

COMMISSIONER ISHIMARU: Thank you, Madam Chair. I note that the regulatory agenda came around for review and not for vote. I certainly appreciate having the opportunity to discuss this publicly at the meeting, Madam Chair. Thank you for doing that.

It's always quite an accomplishment if we get all this work done during the year and I know that it's not a binding contract on us, but it's a plan of what we hope to do during the year. I'm looking forward to consideration of all these documents.

I have a couple of brief questions though. We still have, it's my understanding, the definition of applicant rule that is still in our process. I know the Department of Labor has issued a final rule on this. Is there a reason that it's not on our regulatory agenda, since it's still an on-going piece?

MS. MIASKOFF: Certainly. The regulatory agenda only lists items that are regulations, or rules or NPRMs leading up to rules. It does not list items that are going forward under the Paperwork Reduction Act which is the case for the definition of applicant. It's been moving through that process because it essentially is an issue about what data to collect.

COMMISSIONER ISHIMARU: I see. So it's like our EEO-1 work that was considered under the Paperwork Reduction Act.

MS. MIASKOFF: Exactly.

COMMISSIONER ISHIMARU: And also did not show up in earlier regulatory agendas.

MS. MIASKOFF: That's right.

COMMISSIONER ISHIMARU: I would assume, given the new piece on making changes due to repositioning, I know there's been some talk of doing a Headquarters repositioning. This doesn't preclude, I would assume if we needed to make changes, if Headquarters repositioning is finished before we get to that point. I assume we could add that without penalty?

MS. MIASKOFF: Certainly.

COMMISSIONER ISHIMARU: And just from an earlier conversation I had over the last week with Lea Guarraia, that's still in the near term horizon, hopefully. Is that --

CHAIR DOMINGUEZ: It's not on the regulatory agenda, but it's on the operational agenda.

(Laughter.)

COMMISSIONER ISHIMARU: But hopefully soon, that was my question to Lea, and I never got quite an answer back and I may not now.

CHAIR DOMINGUEZ: Yes. No, no, it is, in fact, just as an aside, our District Directors are in town and we've talked about regulatory agenda, operational agendas, and...

COMMISSIONER ISHIMARU: I thank you, Carol. I thank you, Madam Chair.

CHAIR DOMINGUEZ: Thank you, Commissioner. Commissioner Griffin?

COMMISSIONER GRIFFIN: No, I don't have any questions.

CHAIR DOMINGUEZ: All right. Is there a motion then to approve the Spring 2006 Regulatory Agenda?

COMMISSIONER ISHIMARU: So moved.

CHAIR DOMINGUEZ: Is there a second?

VICE CHAIR EARP: Second.

CHAIR DOMINGUEZ: Any further discussion? Hearing none, all those in favor, please say aye.

(Ayes.)

Opposed?

(No response.)

Abstentions?

(No response.)

The vote carries, five (5) to nothing, all in favor. Motion carries. Well, I want to thank everyone for joining us. I think we've had a very good, healthy discussion on a variety of issues and obviously the budget is of forefront and center of all the decisions that we make and I want to thank my fellow Commissioners for their input and contributions to really making the Commission operate and move forward as effectively as it can.

Having said that, do I hear a motion to adjourn the meeting?

VICE CHAIR EARP: So moved.

CHAIR DOMINGUEZ: Is there a second?

COMMISSIONER ISHIMARU: Second.

CHAIR DOMINGUEZ: All in favor, please say aye.

(Ayes.)

Opposed?

(No response.)

Abstentions?

(No response.)

The ayes have it and the meeting is adjourned. Thank you.

(Whereupon, at 10:10 a.m., the meeting was concluded.)

*This page was last modified on February 28, 2006.*

 Return to Home Page