UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
WESTERN DIVISION

SPRINGFIELD, MASSACHUSETTS        CIVIL ACTION NO. 3/05-CV-30160-KPN

| | |
|---|---|
| SCOTT STERN, | ) |
|     Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| HADDAD DEALERSHIPS OF THE | ) |
| BERKSHIRES, INC.; JAMES SALVIE, | ) |
| GENERAL SALES MANAGER; | ) |
| TIMOTHY CARDILLO, SALES | ) |
| MANAGER; MICHAEL COGGINS, | ) |
| GENERAL MANAGER, IN THEIR | ) |
| PERSONAL AND OFFICIAL | ) |
| CAPACITIES OF HADDAD | ) |
| DEALERSHIPS OF THE BERKSHIRES, | ) |
|     Defendants | ) |

**AFFIDAVIT OF JOHN C. BARKER IN OPPOSITION TO PLAINTIFF'S
MOTION TO QUASH THE SUBPOENA ON PLAINTIFF'S PSYCHIATRIST**

I, John C. Barker, hereby do declare under oath as follows:

1.       I am currently a partner at the law firm of Michienzie & Sawin LLC, 745

Boylston Street, Boston, MA 02116, which law firm represents named defendants

Haddad Dealerships of the Berkshires, Inc., James Salvie, Michael Coggins, and Timothy

Cardillo (collectively, the "Haddad Defendants"), against actions by plaintiff Scott Stern

("plaintiff" or "Stern").  The correct name of the defendant named as Haddad Dealerships

of the Berkshires, Inc. is Haddad Motor Group, Inc. ("Haddad").

2.       Except where stated otherwise, I have personal knowledge of the facts set

forth herein, and if called and sworn to testify, could competently testify thereto.

3.       Before I or my firm were involved with this case, the Haddad Defendants

responded to Stern's MCAD charge with two separate letter-affidavits, one by Timothy

Cardillo dated 8/13/03, and the other by Michael Coggins dated 8/14/03. A true and accurate copy of the 8/13/03 Affidavit by Timothy Cardillo is at Exhibit A hereto. A true and accurate copy of the 8/14/03 Affidavit by Michael Coggins is attached hereto at Exhibit B. The Cardillo Affidavit is also Exhibit A to Stern's Amended Complaint, and the Coggins Affidavit is also Exhibit B to Stern's Amended Complaint.

4.      Consistent with these two Affidavits (from Cardillo and Coggins) and consistent with the Affidavit of James Salvie at Exhibit F, it has been my understanding from the beginning of my involvement with this case, that a meeting occurred between Stern and Haddad Managers in November 2002, concerning Stern's tardiness and other performance issues, while Stern still worked at Haddad Motors. At that November 2002 meeting, Stern first informed Haddad that he claimed a disability -- a bi-polar condition -- and requested that he be allowed to arrive late to work every day because of this alleged disability. Haddad requested that he show some documentation, both of the disability, and of his need to arrive late to work every day, and of the connection between the two. At that meeting, Stern briefly presented a crumpled piece of paper that he claimed was a note from a doctor and that contained the phrase "work with Scott." However, it is also my understanding that Stern refused to leave the note with Haddad Management and refused to permit them to make a photocopy of the note. Haddad Management asked Stern to provide written documentation, both of his disability, and of the need for the accommodation that he requested. Stern never provided this written documentation. Further, it is my understanding that Stern displayed the note to them so quickly that they were unable to obtain any information from it as to the identity or contact information concerning the doctor who purportedly had authored the note. Haddad Management who

saw this "work with Scott" note at this meeting did not know whether Stern had written it himself, or whether it was actually from a doctor.  The factual statements concerning the November 2002 meeting contained in this paragraph are made on information and belief: I do not have personal knowledge of these facts, because I was not present (and knew nothing of either Stern or Haddad) at the time.  A true and accurate copy of Respondent Haddad's Answer filed with the MCAD in response to Complainant Stern's initial charge is attached hereto at Exhibit I, and a true and accurate copy of the Salvie Affidavit is attached hereto at Exhibit F.

5.      At Appendix S, Stern copied to the parties in this case, a 4/8/05 letter he had written to former defendant Robert Sanders, the area office director the federal EEOC.  A true and accurate copy of this 4/8/05 letter by Stern to Mr. Sanders, is attached hereto at Exhibit C.

6.      On or about 6/27/07, I caused to be served on Dr. Michael Perlman the subpoena and supporting papers that are copied at Exhibit D hereto.  At this Exhibit are true and accurate copies of the papers served on Dr. Perlman, including the Schedule A setting forth categories for Dr. Perlman's testimony and/or production of psychiatric records concerning plaintiff.  Before I had this subpoena and papers served on Dr. Perlman, I wrote a letter date 6/5/07 to plaintiff explaining that I intended to seek discovery of his psychiatric records and information.  A true and accurate copy of my 6/5/07 letter is attached hereto at Exhibit E.  Stern called back in response to my 6/5/07 letter, and left a phone message that he objected to discovery from his psychiatrist.

7.      On or about 7/19/07, I received the 7/17/07 letter from Dr. Perlman.  I responded with a letter to Dr. Perlman of 7/20/07, at true and accurate copy of which is

attached hereto at Exhibit G.  I acknowledged what Dr. Perlman said in his letter, that he

declined to produce any records or appear for his deposition because of the

psychotherapist-patient privilege that Stern is asserting in this case.  In my 7/20/07 letter,

I also inquired of Dr. Perlman as to whether he was represented by counsel in this matter,

asking that his counsel contact me if he was so represented.  On 8/8/07, I received a call

from Michael Porter of Connor & Hilliard, indicating that that firm represented Dr.

Perlman in this matter.  I therefore included Connor & Hilliard on the certificate of

service as to all papers concerning this particular matter.  Mr. Porter indicated to me over

the phone that Dr. Perlman did not plan to submit his own separate briefing on these

issues, in addition to plaintiff's briefings.

      8.     On or about 7/27/07, I sent a letter to plaintiff Stern that I intended to

pursue discovery from his psychiatrist, that I would move to compel such documents and

the deposition, and that I was requesting a discovery conference pursuant U.S. District

Court Local Rule 37.1(B).  A true and accurate copy of my 7/27/07 letter to plaintiff is

attached hereto at Exhibit H.  Shortly, thereafter, Stern filed the instant Motion to Quash

in response, without engaging in the requested discovery conference.

      SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 8th DAY

OF AUGUST 2007.

_____
John C. Barker



Exhibit A

To whom it may concern.

This letter is in response to allegations of discrimination against a former employee of Haddad Motors Scott Stern.  I have been employed at Haddad Motors since October 1, 2002 as a sales manager.  During this time I had the opportunity to work directly with Scott.  Scott had several issues that brought his employment to an end with Haddad Motors.  The number one reason was his inability to be on time.  Scott was consoled many times about his tardiness.  I have attended many meetings addressing his tardiness. Scott was given time off on several occasions after being counseled and then continued to be late.  Jim Salvie the general sales manger gave Scott more than enough chances to address the issue.  Only after Scott was about to be terminated did he bring up the fact that he had a disease which he called Bi- Polar. The manner in which he brought it up was taken as a direct threat of a law suit if we didn't back off the issue of his tardiness. We requested Scott have his Doctor write a signed letter so as to communicate to us that his tardiness was associated with his disease.  Scott never produced a signed documentation or any real proof of his disease.  Scott did take out of his wallet a crumpled piece of note paper that said please work with Scott.  Jim Salvie gave Scott a final chance of a 15 minute grace period. The deal was if Scott was late again by more than his 15 minute grace period he would be terminated.   Scott was late and he was terminated.   No other employee has  ever been given a grace period especially after Scott Stern was asked to provide documentation about his Bi-Polar and never did.  Scott never advised Haddad of his disease prior to his employment. Scott had other issues concerning comments and inappropriate behavior with staff and customers.

Sincerely

Timothy Cardillo
Sales Manager
Haddad Motors
tcardillo@haddaddealerships.com

Subscribed to and sworn before me
this 13 day of Aug. 03
Constance J. Welland, Notary Public
My commission expires July 28, 2007

Exhibit B

To whom it may concern.

This letter is in response to the complaint from Scott Stern. I am a direct supervisor of Mr. Stern. It is a practice at Haddads that if a salesperson is continually late with no good reason and we can't seem to get his attention and want to retain the person because they are an asset, we will send them home for a period of time to see if we can get their attention. Mr. Stern is not the only one this has occurred with.

If a salesperson is not here to take care of their customer at the time of delivery, we do split the deal. It is our opinion that the customer must be treated in a certain way and we do try to be very consistant on the delivery. Mr. Stern is not the only salesperson who has had to split a deal for not being available at the time of delivery.

We had a meeting with Mr. Stern due his frequently arriving late for work. It was at this meeting Mr. Stern informed us that he had a bi-polar disability that was causing him to frequently be late. Not knowing a lot about this disability, we did ask Mr. Stern to bring a doctors note stating that one of the effects of this disability was being late for work on a consistant basis. A note was presented that said "work with Scott". I couldn't get anything that states due to his disability he would frequently be 15 minutes late. In spite of this and the disruption it would cause with all the other employees that were required to be here on time, we did give Scott a new schedule that allowed him to be 15 minutes late.

Everything did finally come to a head when Mr. Stern could not arrive within the 15 minute window everybody had agreed on. In spite of the frequent disruptions, we liked Mr. Stern but counld not justify his behavior any longer.

Jim Salvie
General Sales Manager
Haddad Motors

RECEIVED

AUG

COMMISSION AGAINST
DISCRIMINATION/SPRINGFIELD

Subscribed to and sworn before me
this ___ day of _____ 03

Constance J. Welland, Notary Public
My commission expires July __, 2007

April 8, 2005

Mr. Robert Sanders
Area Office Director
Boston Area Office, Equal Employment Opportunity Commission
John F. Kennedy Federal Building
Government Center, Room 475
Boston, Massachusetts 02203

Dear Mr. Sanders,

I am in receipt of the United States Equal Employment Opportunity
Commission's Notice of Rights and Dismissal of the action of Stern
v. Haddad Toyota Pontiac Buick.

I adamantly and wholeheartedly disagree with the decision to dismiss
this action.

For several reasons I implore you to review this case further and
examine the evidence, and the statements of Phyllis Mitchell, my
advocate at the Massachusetts Office on Disability.

I believe that this case should not be dismissed, and I am hereby
notifying the Equal Employment Opportunity Commission that I am
appealing this egregious decision.

Let me point out some facts:

Fact #1:

On November 27, 2002, I met with management and presented a note from
Dr Michael Perlman, received from Dr. Perlman the same day, of which
management was aware that I had this appointment, in Northampton.
This doctor's note clearly lists what my diagnosis is and who my doctor
is.


David Michael Coggins, James Salvie and Timothy Cardillo each refer to
a note that was "crumpled" and their statements that no proof or
documentation being presented to corroborate my bipolar disorder is
inconsistent with their admission that a note, which was "crumpled" and
stated "work with Scott" existed.  There was only one note that
incorporated the words "work with Scott".

Please find enclosed a copy of this note that was received from my
doctor, on November 27, 2002, and presented to Haddad Toyota Pontiac
Buick, Inc.  Respondent David Michael Goggins, in his response by
counsel states: "allegedly bi-polar, and that he showed Respondent the
referenced note, allegedly from a doctor".  This is that note.  There
is no question that note is from a doctor.  It also corroborates the
fact that Complainant-Scott Stern does have a disability.  Please note
the date on this doctor's order/note:  Even though I prove that I have
a disability, management requests that I get further documentation from
my doctor regarding my condition and verifying that it does affect my
ability to arrive to work on time.
Dr Michael Perlman, M.D. and discussed the issue of my bipolar disorder
and what my employer had requested, and how my bipolar affected my

*work.* Dr. Perlman provided the note, which I have enclosed for your convenience a copy of the same. This note clearly lists that:
  a) Dr. Perlman is a Psychiatrist
  b) Scott Stern has "bipolar disorder"
  c) Dr. Perlman encourages my employer to "work with him as he continues to improve"
  d) The note is dated, for November 27, 2002.
  e) On November 26, 2002 I was instructed to get a note and, did as I was instructed by my employer.

Prior to the meeting with Management on November 27, 2002, I removed, from my wallet, an order from my Doctor stating that I had a disorder called "bipolar disorder". This meeting took place Timothy Cardillo merges two separate incidents into one event.

The first note, which was referred to as "crumpled" and illegible, I have also enclosed for your perusal. This Doctor's note happens to be from the same doctor and it clearly states what my diagnosis is. Timothy Cardillo and Michael Coggins mis-state facts and events. This note was viewed on November 26, 2002 and it did involve a note that was tattered, but it was, and is, quite legible. This note also corroborates who my doctor is (I still have Dr. Perlman as my doctor) and what my condition is. Whether it is this note dated, or the second note of November 27, 2002 both clearly state and show who my doctor is and what my diagnosis is. The doctor's note discussed on November 27, 2002 is that which you have before you. One event occurred prior to November 27, 2002; the next event occurred on November 27, 2002. Two separate doctor notes. The first meeting I provided a doctor's order for bloodwork, similar to the one enclosed dated December 18, 2000. All of Dr Perlman's bloodwork orders state the procedure to be performed, the diagnosis, and the doctor's name, address and telephone number that can be contacted. This note describes in clear terms the diagnosis as bipolar disorder and it also describes the doctor's name, address and telephone number like the note that was presented on November 27, 2002. It was the meeting with a note similar to this the one dated December 18, 2000.

Fact #2:

Timothy Cardillo, Sales Manager for Haddad Dealerships, on August 13, 2003, stated that:
  a) "We requested Scott have his Doctor write a signed letter as to communicate to us that his tardiness was associated with his disease"
  b) "Scott never produced a signed documentation or any real proof of his disease"
  c) "Scott did take out of his wallet a crumpled piece of paper that said "please work with Scott"

A doctor's note was presented, it states my diagnosis, certainly the fact that he acknowledges this "please work with Scott" corroborates this note you have before you. I am sure you can clearly read who my doctor is and what my diagnosis is. Obviously, if Timothy Cardillo can read and paraphrase the actual statement to "please work with Scott", it should be fairly obvious to a reasonable person that he could read who my doctor is and what the diagnosis is. These two facts are as plain as day, and are enclosed for your review and analysis.

- 2 -

Fact #3:

James Salvie, General Sales Manager for Haddad Dealerships, on August 14, 2003 stated that:

　　　　a) "A note was presented that said "work with Scott"

James Salvie statements corroborates both my statement and Timothy Cardillo that a note was presented to them that stated "please work with Scott" Likewise, if James Salvie could read the "work with Scott" statement, it should be fairly obvious to a reasonable person that he could read who my doctor is and what the diagnosis is.

Fact #4

On September 15, 2003, David Michael Coggins swore, under the penalties of perjury, that on page 2 of Respondent's defense dated September 13, 2003,

　　　Respondent stated several false and inconsistent statements if one compared his statements to the original note from Mr. Stern's Doctor or simply compared the statements one after another.

　　　1) "Complainant has never shown any proof that he is in fact "bi-polar""
　　　2) "During a meeting in November or December of last year, Complainant flashed and read a crumpled-up, hand-written note that he claimed was from a doctor, which note allegedly asked Complainant's employer (Respondent) to "work with" Complainant."
　　　3) "The note did not indicate any diagnosis or identify any disability."
　　　4) "Complainant would not give the note, or a copy there-of to Respondent, and Respondent could not see the name of the doctor on that note to enable Respondent to verify Complainant's claim concerning his disability"
　　　5) "To this date, Respondent has received no proof that Complainant was (1) bipolar"

　　　Obviously if David Michael Coggins, had ample time to read the "work with" statement on this doctor's note, certainly he should have been fairly competent to read who my doctor is, and what my diagnosis is.

　　　Each of these three defendants corroborate the facts that:

1) A meeting took place
2) A Doctor's note was passed around, and each corroborate a singular point of this doctor's note.
3) Each of the three Respondents had ample opportunity to view said note, and it was not "flashed" as David Michael Coggins asserts in his response.

Fact #5:

　　　Dr Michael Perlman's note fully:

-3-

1) Discloses that it originates from a Doctor, and it is quite legible
2) What Doctor Perlman's relationship is to the patient (complainant-Scott Stern),
3) What disorder the Complainant(Scott Stern) has (bipolar disorder).
4) This same doctor's note encompasses each of the three points above and, in addition, clearly states: "I encourage his employer to work with him as he continues to improve."

Fact #6:

Respondent admits that Complainant did invoke his rights asserted under the ADA, which corroborate the statement of complainant. When Complainant asserted his rights, accordingly, he was denied the right to submit a request for reasonable accommodation. In addition, at this meeting, my schedule became more stringent in that they changed my day time shifts to earlier and more frequent early morning shifts, thus setting me up for a fall, knowing that I had issues, they exacerbated it by changing my schedule and did not accommodate my disability. They placed me on probation at the same time that they allowed me to be "up to 15 minutes late", but no later than 15 minutes. That is not flex time. It was incredibly unfair and unconscionable that management had expected complainant to work seven days a week, deny me the right to visit my three minor children, threaten termination if quota's were not met, threaten termination if we did not work on Sunday (Contrary to my court ordered Visitation), denied me the right to modify my schedule to visit my children, steal my sales leads to allow other employees the necessary quota to have Sunday off so they could golf at 7:00 a.m. on Sunday mornings (Pat Cody) and would not be flexible to accommodate my disability should I run 16 minutes late, or 21 minutes late.

Fact #7

Complainant was an excellent salesperson contrary to what David Michael Coggins asserts in his response. If I were not, why would they allow me to deliver a vehicle to New Jersey, by personally driving the vehicle to the intended customer? I also had to drive the customer's other vehicle back to Massachusetts. In addition on this and several other occasions, I was granted the authority to execute the documents for the dealership when delivering the customer's vehicles. This salesperson sold, on two occasions, two vehicles to two separate families within a six month period. I am the only salesperson to have sold two of the most expensive vehicles in the Toyota family of vehicles (Land Cruisers) which the dealership usually traded to alleviate its burden of carrying this stock on its inventory, within a six month period. In July of 2002, I sold 17 vehicles, delivered three in one day, six or seven in one week!

Fact #8

David Michael Coggins denied this individual the opportunity to formally submit in writing a request for a "reasonable accommodation". He further asserted that he never received anything, yet the doctor's note, which each of these defendants corroborate in their own sworn

affidavits, contradicts each of their own statements and further prove that they did receive and handle a doctor's note, more specifically, the note that you have before you. David Michael Coggins, was directly handed the note by me, a note I requested of my doctor earlier that same day. I also had to point out who he is and my diagnosis to him directly. David Michael Coggins personally made a copy of the Doctor's note, and returned the original to me. David Micheal Coggins conspired with the defendant James Salvie and Timothy Cardillo to deprive me of earned commissions, earned special incentives, and add-on commissions. David Michael Coggins contributed to harassing me by sending me home on numerous occasions, underwriting and allowing James Salvie to delete customers and a customer base I was developing. He sought to impair my ability to work by creating an inhospitable, unfriendly and negative atmosphere.

Fact #9

James Salvie created an incredibly hostile work atmosphere and sought, at every possible instance, to deprive me of commissions, of potential customers and literally stole leads to give them to his wife's sisters husband, Pat Cody. He continually harassed me, my work style, criticized me in front of other employees, and forcibly removed me from meetings in front of other employees.

Fact #10

Timothy Cardillo, a part-time police officer for Great Barrington, Massachusetts, allowed another individual (Peter Haven) to threaten me verbally, directly before his person, and did nothing about it, as it occurred. Only afterward, when Tim knew that he was wrong for not stopping the actions of this other employee (Peter Haven) as it occurred. Timothy Cardillo came over only after the incident had transpired and I was humiliated in the showroom, and apologized for this other employee's behavior and his own lack of response to this employee's behavior. He informed me that he had admonished that employee for his actions towards me. This same employee was fired for not showing up to work, and then rehired several weeks later.

Each of these individuals attempt to confuse my doctor's order, retrieved from my wallet, at a separate meeting, prior to November 27, 2002, which was an order for me to obtain bloodwork to monitor medication, and to assert that this note was the note of November 27, 2002. Either note, the note ordering bloodwork or the note of November 27, 2002 establish what I have set forth under Fact #5 above. The diagnosis is also corroborated on the doctor's note requested on November 27, 2002 and presented to management on this same day! It was from the meeting before the meeting of November 27, 2002 that I was requested to get another note from my Doctor, of which I did, on November 27, 2002 and likewise presented this same note on November 27, 2002 to the management of Haddad Dealerships which included David Michael Coggins, James Salvie, and Timothy Cardillo and a fourth individual, named Joseph Scibelli who was not named in the complaint.

Clearly, a reasonable individual would see that they are each providing partially factual, yet partially false testimony.

Fact: Doctor's note that stated "work with Scott"

Falsehood: This Doctor's note did not provide diagnosis or the name of the Doctor.

Falsehood: No Documentation in general was ever presented to the management;   Compare that with each of their statements which identify the "work with Scott" doctor's note.

Falsehood: Scott never provided documentation of his disorder.  Compare that with each of their statements which identify the "work with Scott" doctor's note.

They unknowingly and inadvertently corroborating the fact that a doctor's note was presented.  Specifically, James Salvie and Timothy Cardillo both swear that I never provided "documentation about his bi-polar disorder", yet both describe the note of November 27, 2002 in separately dated affidavits.

Dr. Perlman's note of November 27, 2002 does provide documentation.  Each of the respondents corroborate that there was a note which stated "work with Scott".  There is only one note that had this statement on it.  I am providing this doctor's note for your direct review and analysis.  Compare this with their statements and you will clearly see that, not only am I right, but that the Massachusetts Commission Against Discrimination failed to enforce my Equal Employment Opportunity rights and my claim against Haddad Dealerships.

There is only one note for November 27, 2002 that was copied, and passed around at the meeting.  David Michael Coggins, James Salvie, and Timothy Cardillo mis-state facts and further provide false affidavits to the Massachusetts Commission Against Discrimination.

I have issue with the fact that the Equal Employment Opportunity Commission did not clearly see that these three individuals did not provide honest and truthful statements to the Massachusetts Commission Against Discrimination and there are inconsistencies within their own statements.  A reasonable person can read this and recognize their inconsistencies and mis-statements.

I have no qualms about filing a lawsuit against Haddad Dealerships in either Federal or State Court.  In that lawsuit, I will also be naming the Massachusetts Commission Against Discrimination for its failure to uphold my rights and claims against Haddad Dealerships. The MCAD clearly denied this individual justice when the evidence against the dealership was conclusive, factual and corroborated by Respondents themselves.

I prefer not to file a lawsuit against the United States Equal Employment Opportunity Commission to secure my rights accorded by both the United States Constitution, Bill of Rights, and the Acts of Congress, including, but not limited to the Civil Rights Acts of 1866, Civil Rights Act of 1871, Civil Rights Act of 1964, and the Americans with Disabilities Act of 1971, and its related amendments citing recent Federal and State law.  The EEOC has failed to uphold the laws it is entrusted to enforce for this citizen of the United States.  I have no reservations about filing a lawsuit against the United States Equal Employment Opportunity Commission.

I am mailing a copy of this letter to my Congressman, my Senator, and expect that I shall receive a response, appropriate to the matter, regarding this issue, within the next several days.

The Courthouse in Springfield, Massachusetts has an inscription on its building, it reads: "Obedience to law is Justice".  What is the point of law, if the laws are not going to be enforced by the agencies that are entrusted to enforce them?

I leave that thought with you and hope that you shall take action accordingly to review this egregious decision, and to further reopen this case promptly and expeditiously.

Most Sincerely,

Scott Stern
400 West Main Street
North Adams, Massachusetts 01247

Cc: Senator John Kerry
    Congressman John Olver
    Phyllis Mitchell, Massachusetts Office on Disabilities

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
WESTERN DIVISION

SPRINGFIELD, MASSACHUSETTS

CIVIL ACTION NO. 3/05-CV-30160-KPN

SCOTT STERN,
    Plaintiff               )
                            )
      v.                   )
                            )
HADDAD DEALERSHIPS OF THE  )
BERKSHIRES, INC.; JAMES SALVIE, )
GENERAL SALES MANAGER;      )
TIMOTHY CARDILLO, SALES      )
MANAGER; MICHAEL COGGINS,   )
GENERAL MANAGER, IN THEIR   )
PERSONAL AND OFFICIAL       )
CAPACITIES OF HADDAD         )
DEALERSHIPS OF THE BERKSHIRES, )
    Defendants             )

## THIRD-PARTY KEEPER OF RECORD SUBPOENA
## OF DR. MICHAEL PERLMAN

TO:   Dr. Michael Perlman
       Keeper-of-Records
       57 Gothic Street
       North Hampton, MA 01060

     YOU ARE HEREBY COMMANDED in the name of the Commonwealth of Massachusetts in accordance with the provisions of Rule 45 of the Massachusetts Rules of Civil Procedure to appear and testify on behalf of the defendants, before a Notary Public of the Commonwealth, at the office of **Bacon and Wilson, located at 33 State Street, in the City of Springfield, MA 01103**, on the 3rd **day of August 2007, at 11:00 A.M.**, and to testify as to your knowledge, at the taking of the deposition in the above-entitled action. All parties are invited to attend.

     The deponent and/or his counsel shall provide the undersigned counsel, at least three business days before the 8/3/07 deposition, any relevant non-privileged documents relating to this lawsuit or to the treatment of plaintiff Scott Stern [SSN 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, DOB 3/12/62] from 2000 until the present. Documents produced to the undersigned counsel should include the documents requested at Schedule A, attached hereto. Documents already produced to the undersigned counsel need not be produced again. If your office makes a full production of documents relating to Plaintiff Stern or his

{00120323.DOC}

medical/psychiatric treatment in a timely fashion (three business days before the scheduled deposition), you need not appear at the scheduled deposition in person.

Hereof fail not as you will answer your default under the pains and penalties in the law in that behalf made and provided.

John C. Barker
*Attorney for Defendant*
745 Boylston Street
*Address*
Boston, MA 02116
*City or Town*

Dated: June 27, 2006

*Notary Public*

My Commission Expires

PRISCILLE C. BUCKLEY
Notary Public
Commonwealth of Massachusetts
My Commission Expires
November 16, 2012

{00120323.DOC}

# RETURN OF SERVICE

**Office of the Sheriff**   •   P.O. Box  684   •   Northampton, MA 01061   •   585-0618

*Hampshire, ss.*

July 2, 2007

I hereby certify and return that on 6/28/2007 at 11.45 A.M. I served a true and attested copy of the WITNESS SUBPOENA in this action in the following manner: To wit, by leaving in the last and usual place of abode of DR. MICHAEL PERLMAN to wit: 76 MARIAN STREET, NORTHAMPTON, Ma 01060. Served along with $49.5 witness fee. In the service of this precept it was necessary and I actually used an automobile 10 miles. Copy Subpoena ($1.00), Basic Service Subpoena. ($20.00) Conveyance ($1.50), Travel ($5.12), Attest ($5.00), Witness Fee ($49.50) Total Charges $82.12

Deputy Sheriff GEORGE SZMBORSKI

_____

**Deputy Sheriff**

{00120323.DOC}

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
WESTERN DIVISION

SPRINGFIELD, MASSACHUSETTS        CIVIL ACTION NO. 3/05-CV-30160-KPN

| | |
|---|---|
| SCOTT STERN,<br>    Plaintiff | )<br>)<br>) |
| v. | )<br>) |
| HADDAD DEALERSHIPS OF THE<br>BERKSHIRES, INC.; JAMES SALVIE,<br>GENERAL SALES MANAGER;<br>TIMOTHY CARDILLO, SALES<br>MANAGER; MICHAEL COGGINS,<br>GENERAL MANAGER, IN THEIR<br>PERSONAL AND OFFICIAL<br>CAPACITIES OF HADDAD<br>DEALERSHIPS OF THE BERKSHIRES,<br>                    Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## NOTICE OF DEPOSITION OF DR. PERLMAN

**TO:**   Mr. Scott Stern
400 West Main Street
North Adams, MA 01427

Please take notice that at **11:00 a.m. on Friday, August 3, 2007,** Michienzie & Sawin LLC, counsel for the Haddad Defendants will take the deposition upon oral examination of **the Keeper of Records for Dr. Marc Perlman,** at the offices of **Bacon and Wilson, located at 33 State Street, in the City of Springfield, MA 01103,** pursuant to the applicable provisions of the Massachusetts Rules of Civil Procedure, before a Notary Public of the Commonwealth, or before some other officer authorized by law to administer oaths. The oral examination will continue from day-to-day until completed.

You are invited to attend and cross-examine.

The deponent is not required to appear on August 3, 2007, if certified copies of the records requested in the attached Schedule A are received by this office on or before July 30, 2007.

{00120323.DOC}

THE HADDAD DEFENDANTS,
By Their Attorneys
MICHIENZIE & SAWIN LLC

Dated: 6/27/07          BY: *John Barker*

Richard A. Sawin, Jr. – BBO NO: 546786
John C. Barker – BBO NO: 637406
745 Boylston Street, 5th Floor
Boston, MA 02116
Tel: (617) 227-5660

## CERTIFICATE OF SERVICE

I, John C. Barker, attorney for defendant, hereby certify that I have on this 27th day of ~~August~~ June 2007, served a copy of the foregoing Deposition Notice, by mailing a copy of same, postage prepaid, to the following:

Mr. Scott Stern
400 West Main Street
North Adams, MA 01427

*John Barker*

John C. Barker

{00120323.DOC}

## SCHEDULE A

1.      A copy of the complete medical records of plaintiff Scott Stern.

2.      Any treatment records or reports, copies of medical documents (including but not limited to bills, prescriptions, treatment plans) for Scott Stern, during the period from 2000 to the present.

3.      Any initial treatment write-up, evaluation, or assessment for Scott Stern.

4.      Any notes, correspondence, messages, or other communications from Dr. Perlman's office to Scott Stern's former employer Haddad Motors (or to any representative, agent, or employee of Haddad Motors) concerning Scott Stern.

{00120323.DOC}

*Michienzie & Sawin LLC*

1 ... nston Street
Boston, Massachusetts
02116-2636

Telephone
617 227-5660

Facsimile
617 227-5882

Email
jb@masatlaw.com

E

June 5, 2007

Mr. Scott Stern
400 West Main Street
North Adams, MA 01427

     <u>Re:</u>   Stern v. Haddad Dealerships et al., U.S. District Court, Western Division
          3/05-CV-30160

Dear Mr. Stern:

    We intend to seek discovery of your psychiatrist's records that are relevant to this lawsuit, based on the notes Doctor Pearlman allegedly provided to the Haddad defendants during your employment at Haddad and also based on your assertion of mental disability. When we raised this issue previously, you objected to producing these records or to permitting the deposition of Dr. Pearlman. Please advise if you still so object, so that we may go forward with the necessary motion practice if you so object. If we do not hear from you by 6/12/07 on this issue, we will assume that you still object to discovery concerning Dr. Pearlman. We will then move to compel and seek sanctions, as we believe this information and such documents are clearly discoverable because you have put your mental state at issue.

                     Sincerely yours,

                     John C. Barker
                     Richard A. Sawin, Jr.

JCB/tmm
Enclosure

cc:   Richard A. Sawin, Jr., Esq.

*F*

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
WESTERN DIVISION

SPRINGFIELD, MASSACHUSETTS          CIVIL ACTION NO. 3/05-CV-30160-KPN

SCOTT STERN,                                          )
    Plaintiff                                        )
                               )
    v.                                               )
                               )
HADDAD DEALERSHIPS OF THE          )
BERKSHIRES, INC.; JAMES SALVIE,     )
GENERAL SALES MANAGER;               )
TIMOTHY CARDILLO, SALES              )
MANAGER; MICHAEL COGGINS,         )
GENERAL MANAGER, IN THEIR         )
PERSONAL AND OFFICIAL                   )
CAPACITIES OF HADDAD                      )
DEALERSHIPS OF THE BERKSHIRES,  )
                               )
And                                                     )
                               )
CYNTHIA TUCKER, INVESTIGATING   )
COMMISSIONER; JAMES LEVINSKY,   )
DEPUTY GENERAL COUNSEL;             )
MIGDALIA RIVERA, COMPLIANCE       )
OFFICER II; CRYSTAL BORGES,          )
INVESTIGATOR, IN THEIR PERSONAL )
AND OFFICIAL CAPACITIES OF THE    )
MASSACHUSETTS COMMISSION          )
AGAINST DISCRIMINATION,               )          **AFFIDAVIT OF DEFENDANT**
                               )          **JAMES SALVIE**
And                                                     )
ROBERT SANDERS, BOSTON AREA     )
OFFICE DIRECTOR, IN HIS PERSONAL )
AND OFFICIAL CAPACITY AS             )
DIRECTOR OF EQUAL EMPLOYMENT  )
OPPORTUNITY COMMISSION,            )
    Defendants                                   )

{00087018.DOC}

1

## AFFIDAVIT OF JAMES SALIVE

I, James Salvie, hereby do depose under oath as follows:

1.      I am a defendant in the instant case brought by plaintiff Scott Stern ("plaintiff" or "Stern"). At the time of Stern's employment at Haddad Motor Group, Inc. (incorrectly sued herein as Haddad Dealerships of the Berkshires, Inc.; hereinafter, "Haddad"), and at the time of Stern's termination from Haddad, I was the General Sales Manager at Haddad. I was Stern's immediate supervisor at Haddad.

2.      I have personal knowledge of the facts set forth herein, and if called to testify, could competently testify thereto.

3.      At Exhibit B to plaintiff Stern's Amended Complaint and at Exhibit B to Haddad's papers filed herewith, is a true and accurate copy of a letter/response that I wrote on 8/14/03, and subsequently filed with the MCAD, in response to Stern's charge.

4.      In that 8/14/03 letter-response, I indicated that Stern "informed us that he had a bi-polar disability that was causing him to frequently be late. Not knowing a lot about this disability, we did ask Mr. Stern to bring a doctor's note stating that one of the effects of this disability was being late for work on a consistent basis. A note was presented that said 'work with Scott.' I couldn't get anything that state[d] that due to his disability he would frequently be 15 minutes late." My 8/14/03 letter went on to state that, despite Stern's failure to provide us with a doctor's note explaining his condition and its connection to his purported need to be late everyday, Haddad granted Stern the reasonable accommodation that Stern asked for anyway - - namely that he could be 15 minutes late everyday. This is consistent with my memory of the November 2002 meeting, in which we asked Stern for some documentation, both of his bi-polar condition and also of its connection to his need to be late to work everyday. He never provided

{00087018.DOC}

2

such documentation. The only note he provided was the note that he briefly presented to us at a meeting that said "work with Scott"; but he would not let us have this note or copy it or take down the name and/or contact information for the person on the note that Stern said was a doctor.

5.      I did not see any note that was a doctor's note until the 5/19/04 MCAD hearing on Stern's case. At that hearing, Stern showed to the MCAD and to counsel, a note apparently from a doctor that contained the phrase "work with Scott." It is my understanding that this was the first time that my counsel had ever seen this note.

6.      At that 5/19/04 MCAD hearing, Stern (acting pro se), myself, my lawyer John Barker, MCAD investigators, and MCAD hearing officer Jerrold Levinksy were present.

7.      At that 5/19/04 MCAD hearing, my lawyer John Barker did not say "there was no note" or anything to this effect. If fact, this would have been inconsistent with Haddad's position at the time and would have been inconsistent with the written responses from Haddad to the MCAD and with the factual accounts given by me on 8/14/03 (at Exhibit B) and by co-Haddad manager, Timothy Cardillo, on 8/13/03 (at Exhibit A to Stern's Amended Complaint). All of these statements and accounts consistently stated that Stern had shown or presented or flashed a unidentified note at us, claiming that it was from a doctor, but that he had not allowed us to keep the note or keep a copy of it, and that he had never presented any other note from a doctor even though we asked him repeatedly to do so. This is what John Barker stated at that hearing on

behalf of (Respondent) Haddad.

Signed under the pains and penalties of perjury this _____ day of June 2006.

Mr. James Salvie

John C. Barker

745 Boylston Street
Boston, Massachusetts
02116-2636

Telephone
617 227-5660

Facsimile
617 227-5882

Email
jb@masatlaw.com

*Michienzie & Sawin LLC*

July 20, 2007

Michael S. Perlman, M.D.
57 Gothic Street
Northampton, MA 01060

     Re:   Stern v. Haddad Dealerships et al., U.S. District Court, Western Division
             3/05-CV-30160

Dear Dr. Perlman:

We are in receipt of your letter of 7/17/07, responding to our subpoena of 6/27/07, requesting medical records of Scott Stern and your deposition. We understand that you are not planning to produce any records or to appear for the deposition previously scheduled for 8/3/07 in Springfield.

Previously in this litigation, you were represented by counsel, namely James Hilliard of Connor & Hilliard, P.C. Are you still represented by Mr. Hilliard or by that firm? If so, would you be kind enough to forward this (and previous communications from us) to your lawyer, and also ask him or her to contact us about this matter. If I do not hear back from you on this, I will assume that you are not currently represented by counsel in this matter. Thank you.

Sincerely yours,

John C. Barker

JCB/tmm

cc:    Richard A. Sawin, Jr.

       Mr. Scott Stern
       400 West Main Street
       North Adams, MA 01427

{00122619.DOC}

John C. Barker

745 Boylston Street
Boston, Massachusetts
02116-2636

Telephone
617 227-5660

Facsimile
617 227-5882

Email
jb@masatlaw.com

*Michienzie & Sawin LLC*

H

July 27, 2007

Mr. Scott Stern
400 West Main Street
North Adams, MA 01427

<u>Re:</u>     Stern v. Haddad Dealerships et al., U.S. District Court, Western Division
3/05-CV-30160

Dear Mr. Stern:

We have sent a keeper-of-records document subpoena to your psychiatrist, Dr. Michael Perlman, and we have requested his deposition, in the above-referenced case.  I received your phone message that you object to producing documents from Dr. Perlman's office and that you object to his deposition being taken, on grounds of the patient-psychotherapist privilege.  Dr. Perlman has also written to me to indicate that he declines to produce documents or attend his deposition, on the same grounds.  We intend to move to compel these documents and/or Dr. Perlman's deposition.  We hereby request a discovery conference pursuant to Local Rule 37.1(B).  As with the previous request for a discovery conference (concerning your failure to respond to the Haddad Defendants' Interrogatories and Document Requests), we will assume that you do not wish to confer on these matters if we have not heard from you by the end of next week (by 8/3/07).

Sincerely yours,

John C. Barker

JCB/tmm

cc:     Richard A. Sawin, Jr., Esq.

{00123450.DOC}

Exhibit G

COMMONWEALTH OF MASSACHUSETTS
MASSACHUSETTS COMMISSION AGAINST DISCRIMINATION

SPRINGFIELD, ss

MCAD DOCKET NO. 03SEM0146B
EEOC DOCKET NO.  16CA301828

|  |  |
|---|---|
| SCOTT STERN, | ) |
| Complainant | ) |
| | ) |
| v. | ) |
| | ) |
| HADDAD TOYOTA PONTIAC BUICK, | ) |
| Respondents | ) |
| | ) |

## RESPONDENT'S ANSWER TO CHARGE OF DISCRIMINATION

Now come Respondent Haddad Toyota Pontiac Buick ("Haddad" or "Respondent"),

through its counsel of record, and responds to the Charge of Discrimination by Complainant

Scott Stern ("Complainant"), in the above-captioned case.

## Narrative Answer

Respondent Haddad denies that it discriminated against Complainant in any way or made

an adverse employment decision concerning Complainant based on any improper motive.

Complainant was a reasonably competent car salesperson at Respondent's dealership, but his

performance suffered from chronic tardiness until he was terminated for this same problem.  His

tardiness was chronic and repeated (approximately three times per week and sometimes more),

affected his job performance, and threatened to decrease morale among other salespeople who

were not afforded the same leniency as to required hours and arrival times.  Respondent

reprimanded Complainant for his repeated tardiness long before Complainant claimed to

{00043654.DOC}

1

Respondent's management that he was bi-polar. Complainant's termination on or about 2/3/03 was because of his tardiness problem, not because of his alleged disability.

Complainant has never shown any proof that he is in fact bi-polar. During a meeting in November or December of last year, Complainant flashed and read a crumpled-up, handwritten note that he claimed was from a doctor, which note allegedly asked Complainant's employer (Respondent) to "work with" Complainant. The note did not indicate any diagnosis or identify any disability. Complainant would not give the note, or a copy thereof, to Respondent, and Respondent could not see the name of any doctor on that note to enable Respondent to verify Complainant's claim concerning his disability. Respondent's General Manager, Mike Coggins, specifically asked Complainant to provide a letter from his doctor indicating the nature of his disability and stating the need for the accommodation that Complainant requested. Complainant never provided such a letter, nor did any medical provider ever contact Respondent with regard to plaintiff's alleged disability. To this date, Respondent has received no proof that Complainant was (1) bi-polar, (2) disabled (partially or totally), or (3) entitled to any accommodation such as being able to arrive 15 minutes late every day because of his alleged disability.

As Complainant indicates in ¶6 of his Charge, Respondent granted him the accommodation that he requested, even without the above-referenced documentation of his medical condition and its connection to his tardiness. He was permitted to arrive 15 minutes late, with the understanding that he was in effect on "probation," such that if he ever arrived *more* than 15 minutes late, he would be terminated. As Complainant concedes in ¶7, he *did* in fact arrive 6 minutes too late (that is, a total of 21 minutes late: the permitted 15 minutes, plus 6 minutes). After months of putting up with his repeated tardiness (on average, 3 times per week),

Respondent terminated Complainant, as Respondent had repeatedly warned Complainant that it would.

Respondent does not accept, and holds Complainant to its proof, (1) that Complainant is bi-polar in the first place, and if so, (2) that that condition constitutes a legal disability. The only accommodation that Complainant requested because of his alleged disability, was permission to arrive late every day. There does not seem to be any clinical reason that the ability to always be late to work would in some way alleviate bi-polar disorder. In fact, it was not until months of warnings, days of being sent home, and intimations by Respondent that it was about to fire Complainant, that Complainant conveniently mentioned his alleged bi-polar disorder and made his request for an accommodation to be permitted to arrive late because of this disorder. Respondent submits that Complainant may have used an imagined (or concocted) disorder to buy himself time when it became apparent that he was about to be terminated for his chronic tardiness. And Complainant has still not shown any medical evidence of his alleged condition, and did not provide any to Respondent during the final three months of his employment (between the first time he informed Respondent that he suffered from this disorder, and his termination in February of 2003).

### Respondent's Answers to Complainant's Specific Numbered Paragraphs

1.    Respondent admits that it hired Complainant in April 2002 as a salesperson. Haddad also admits that, other than the chronic and repeated tardiness for which Complainant was terminated, Complainant's performance as a salesperson was usually satisfactory; although Respondent did receive several complaints about Complainant's behavior from customers and from other employees.

2.      Respondent denies that Complainant was subjected to any unfair or unequal treatment by Respondent.  Respondent admits that its management asked Complainant to go home on certain days, after he had repeatedly called in late, but denies that other salespersons were treated any differently.  Respondent admits that it followed standard practice with splitting commissions between the salesperson who actually made the sale and the salesperson who serviced the client at the time of delivery (if different people).  Respondent denies that Complainant was treated any differently from any other salespersons in this standard practice at the dealership, and points out that Complainant sometimes *benefited* from this practice, as he would receive a portion of the commission on a sale that he had not originally made if he was the salesperson present at the time of delivery.

3.      Coggins remembers referring to Stern as "crazy" in a joking manner, but never *after* Stern informed Respondent that he was allegedly bi-polar.  All employees were treated in a similar joking manner, and Stern was not singled out.  Moreover, the joking title of "crazy" was not entirely unearned:  Complainant had a practice of staring at other employees and customers, and the dealership received complaints about his behavior.  On one occasion he followed a female customer home, and the dealership received a complaint about his surveillance of her house on different occasions.  At another time, he went to the house of two other employees early in the morning (12:30 a.m.), opened their door, and watched them from the doorway (while they were unaware of his presence).  He would frequently complain about other employees and then, after discussing equal treatment with management, he would inexplicably weep and confess that he was sorry, "it's all in my head."  Respondent could have terminated him much earlier for his aberrant behavior, but tried to work with him on this as well as his chronic tardiness.

4.      Respondent agrees that Complainant "frequently had difficulties arriving to work on time" and that many meetings were held to discuss his tardiness. Respondent does not recall the date of the meeting discussed in this paragraph, and had remembered that it was in December, not November of 2002. Respondent admits that Complainant informed Respondent that he was allegedly bi-polar and that he showed Respondent the referenced note, allegedly from a doctor, suggesting that Respondent "work with" Complainant (see discussion above). Respondent denies that Complainant ever gave this note, or a copy of it, to Respondent, or provided any other documentation (such as a doctor's letter) attesting to his bi-polar disorder, even though Respondent asked Complainant to provide same.

5.      Respondent admits that Complainant invoked the ADA, at the previously referenced meeting at which he claimed that he had bi-polar disorder. Respondent also admits that Complainant sought an accommodation of being permitted to be late every day, unlike other employees. Respondent denies that it "refused to make any accommodations whatsoever," and asserts that it did in fact grant Complainant permission to be 15 minutes late each day. This accommodation was made despite Complainant's failure to provide any type of medical documentation to support his alleged bi-polar disorder.

6.      Respondent agrees that it allowed Complainant to be as much as 15 minutes late. Respondent denies that this accommodation was provided "on or about the last week of February 2003," and points out that Complainant had already been fired by that time.

7.      Respondent agrees with Complainant that he was late again on or about the date of his termination. Respondent also states that Complainant was fired for violating the terms of his reasonable accommodation or "probationary" period, because he was *more than* 15 minutes

late that day. Respondent denies that his supervisor's annoyance (if any) over allegedly not receiving some fee of $160 had anything to do with Complainant's termination.

8.    Respondent denies the allegations in ¶8. Further, Respondent asserts that, in fact, it bent over backwards to treat Complainant specially, and permitted Complainant to be late for work every day (which Respondent did not permit any other employee to do).

### Respondent's Additional Defenses

1.    Complainant cannot show his prima facie case for disability discrimination because Complainant cannot show that he was a "qualified handicapped person."

2.    Complainant cannot show his prima facie case for disability discrimination because he cannot show that he was fired based on his alleged disability.

3.    Complainant cannot show his prima facie case for disability discrimination because he cannot show that Respondent was unwilling to make any requested "reasonable accommodation" for his disability.

4.    To the extent that there has been no attempt to mitigate, minimize, or avoid any damage alleged in Complainant's claims, any recovery against Respondents must be reduced or eliminated.

5.    Complainant's claims are barred by the exclusivity and/or preclusion provisions of the Worker's Compensation Act (M.G.L. ch. 152), which bar her recovery against Respondents.

6.    The MCAD Complaint does not describe the subject claims with sufficient particularity to enable Respondent to determine all of the grounds for its defense. Respondent therefore reserves its right to assert any additional grounds for its defense that may have become available once the precise nature of Complainant's claims is ascertained.

09/15/2003 MON 11:41 FAX                                                    @002/002

Signed under the pains and penalties of perjury, by Respondent, as required by 804

C.M.R. § 1.10(8)(e), on September *15*, 2003.

David Michael Coggins

RESPONDENT,
By Its Attorneys
MICHIENZIE & SAWIN LLC

Dated:   *9/13/03*                  BY:

Richard A. Sawin, Jr. – BBO NO: 546786
John C. Barker – BBO NO: 637406
101 Merrimac Street, 6th Floor
Boston, MA 02114
Tel: (617) 227-5660

{00043654.DOC}                                          7

TOTAL P.09