UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
WESTERN DIVISION

SPRINGFIELD, MASSACHUSETTS    CIVIL ACTION NO. 3/05-CV-30160-KPN

| | |
|---|---|
| SCOTT STERN, | ) |
| Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| HADDAD DEALERSHIPS OF THE | ) |
| BERKSHIRES, INC.; JAMES SALVIE, | ) |
| GENERAL SALES MANAGER; | ) |
| TIMOTHY CARDILLO, SALES | ) |
| MANAGER; MICHAEL COGGINS, | ) |
| GENERAL MANAGER, IN THEIR | ) |
| PERSONAL AND OFFICIAL | ) |
| CAPACITIES OF HADDAD | ) |
| DEALERSHIPS OF THE BERKSHIRES, | ) |
| Defendants | ) |

**THE HADDAD DEFENDANTS' CONCISE STATEMENT OF UNDISPUTED
FACTS, IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDMGENT**

Now come defendants Haddad Dealerships of the Berkshires, Inc.,[1] James Salvie,

Michael Coggins, and Timothy Cardillo (collectively the "Haddad Defendants"), through

their counsel of record, and hereby serve the following Concise Statement of Undisputed

Facts, in support of their Motion for Summary Judgment, pursuant to F.R.C.P. 56(c) and

U.S. District Court Local Rule 56.1. In support of their Motion for Summary Judgment,

the Haddad Defendants state that the following facts are undisputed in this case:

    1.    Defense counsel for the Haddad Defendants served the Haddad

Defendants' Requests for Admissions on plaintiff on 8/3/07, and again on 8/8/07, both

---

[1]  The correct name for this party is Haddad Motor Group, Inc.

times via certified mail, return receipt requested. Affidavit of John Barker[2] in support of the Haddad Defendants' Motion for Summary Judgment ("Barker Affidavit") ¶3 and Exhibit 3 hereto.

2.    Plaintiff actually received the Haddad Defendants' Requests for Admissions, at the latest, on 8/10/07, via certified mail, with return receipt requested. Barker Affidavit ¶4 and Exhibit 3 hereto.

3.    Giving plaintiff the benefit of the doubt, the latest date on which he received the Haddad Defendants' Requests for Admission was 8/10/07. Thirty days after this date of receipt was 9/10/07. As of the date of this Motion for Summary Judgment (12/20/07), plaintiff has not responded at all to this set of Requests for Admissions. Barker Affidavit ¶4. Plaintiff has not sought any extensions for responding to defendants' Requests for Admissions, despite his repeated requests for extensions on other pleadings and discovery matters in this case. Id. Because these Requests for Admissions are now deemed admitted under F.R.C.P. 36 (see the Haddad Defendants' Memorandum of Law filed herewith), some of these admissions are referred to below as "Plaintiff's Admissions." A copy of this set of Requests for Admissions is at Exhibit 2.

4.    Plaintiff was a full-time employee of Haddad Motor Group, Inc. ("Haddad") from April 2002 until February 2003. Plaintiff's Admission No. 1; plaintiff's deposition, day 1, p.7. A copy of cited excerpts from the first day of plaintiff's deposition is at Exhibit 4, and a copy of cited excerpts from the second day of plaintiff's deposition is at Exhibit 5.

---

[2]    The Barker Affidavit is being filed and served herewith. The other documents referenced herein, such as Plaintiff's Admissions and cited excerpts from plaintiff's deposition or from the deposition of plaintiff's psychiatrist, Dr. Michael Perlman, are also attached as exhibits hereto.

5.      Plaintiff was an at-will employee when he worked at Haddad from April 2002 until February 2003.  Affidavit of George Haddad ("Haddad Affidavit") ¶3; *see also* Plaintiff's deposition, day 1, p.8 (Plaintiff concedes that he was at-will when he was hired at Haddad).

6.      Plaintiff claims to have suffered from a mental disability during his employment at Haddad in 2002 and 2003, and specifically plaintiff claims to have suffered from a bi-polar condition during this time.  Plaintiff's Admissions Nos. 2 & 3; *see* plaintiff's deposition, day 1, pp. 152-153 (he was diagnosed in 1998 or 1999 with bi-polar condition); deposition of Dr. Michael Perlman, plaintiff's psychiatrist, pp. 7-9 (Dr. Perlman's diagnoses of plaintiff).  A copy of cited excerpts from Dr. Perlman's deposition is at Exhibit 6.

7.      Plaintiff did not inform the Haddad Defendants about plaintiff's alleged disability until a meeting toward the end of November 2002, such that the Haddad Defendants did not know that plaintiff suffered from his claimed mental disability or bi-polar condition until that time.  Plaintiff's Admissions Nos. 4 & 5; plaintiff's deposition, day 1, pp. 57-59, 127.

8.      Plaintiff was not capable of performing the essential functions of his sales job at Haddad Motor Group, at the time he was terminated from Haddad in February 2003.  Plaintiff's Admission No. 6; *see* Pearlman deposition, pp. 13-23 (plaintiff not capable of holding a steady job at this time).

9      Stern describes his own work history as "very erratic."  Stern deposition, day 1, p.25.  He remembered 27 different jobs over the past 20-year period.  Of these, he has been outright fired from eight (including Haddad):  Stern deposition, day 2, p.111

(Electrolux in Pittsfield); day 1, pp. 67-68 (D'Angelo's Restaurant in Amherst); day 1, p.65 (Electronics Boutique in Berkshire Mall); day 2, p.152 (Unistress in Lanesboro); day 1, p.88 (Johnson Ford Nissan in Pittsfield); day 1, pp. 61-62 (Bogie's Restaurant in Great Barrington); day 1, p. 55-56 (Haddad Motors); day 1, p.49, and day 2, p.102 (Williams College in Williamstown). In addition to these, there are various jobs that Stern admits he has left by mutual agreement: Stern deposition, day 2, pp. 110-111 (DuBois Chemicals); day 2, pp. 137-138 ("abandoned" his job at Taco Bell in Northhampton); day 1, p.89 (Bennington Motor Car in Bennington, VT). During the time of Dr. Michael Perlman's treatment of plaintiff Stern, Perlman confirms that Stern had chronic difficulty obtaining and retaining steady employment, because of the symptoms of his disabilities. Perlman deposition, pp. 12-23.

10.    The only accommodation for his alleged mental disability that plaintiff sought from Haddad, was his request in November 2002 that he be permitted to arrive late to work each day, as a purported accommodation for his bi-polar disability; plaintiff states that this accommodation -- being permitted to arrive late to work each day -- did constitute a *reasonable* accommodation for his disability. Plaintiff's Admissions Nos. 7 & 8; *see* plaintiff's deposition, day 1, p.108 (the accommodation of being allowed to arrive late to work would have been a reasonable accommodation), p.151 (it would have been reasonable to allow him to arrive late to work each day up to one half hour).

11.    The Haddad Defendants gave this accommodation to plaintiff and allowed him to be late to work each day. Plaintiff's Admission No. 9; plaintiff's deposition, day 1, p.56; Haddad Affidavit ¶5.

12.     The Haddad Defendants requested in November 2002, that plaintiff provide them with a doctor's note or letter showing (a) that he was mentally disabled and/or suffered from bi-polar condition, and (b) that an accommodation permitting plaintiff to arrive late to work each day, was connected to plaintiff's alleged disability and therefore would assist plaintiff's alleged disability.  Plaintiff's Admissions Nos. 11-13; *see* plaintiff's deposition, day 1, pp. 121-122.

13.     While plaintiff provided the Haddad Defendants with a handwritten note, purportedly from plaintiff's doctor, stating that plaintiff suffered from a bi-polar condition and asking the Haddad Defendants to "work with him,"[3] plaintiff did not permit the Haddad Defendants to keep this note or keep a copy of it or to contact the doctor who wrote the note (Dr. Perlman).  Plaintiff's Admissions Nos. 14-18.

14.     The Haddad Defendants in November 2002 also asked plaintiff to provide them with a doctor's note showing the connection between plaintiff's alleged bi-polar condition and plaintiff's request to be permitted to arrive late to work each day. Plaintiff's Admission No. 13; plaintiff's deposition, day 1, p. 122.

15.     Plaintiff did not provide the Haddad Defendants with any such doctor's note, that showed that an accommodation permitting plaintiff to arrive to work each day was connected to, and thus would assist, plaintiff's alleged disability.  Plaintiff's Admissions Nos. 10, 13-15; plaintiff's deposition, day 1, pp. 121-125 (plaintiff did not provide any note other than the "work with him" note[4] concerning the alleged connection between plaintiff's being able to arrive late and plaintiff's alleged bi-polar condition).

---

[3] A copy of the note containing the phrase "work with him" is at Exhibit 1 hereto.

16.     The Haddad Defendants granted plaintiff permission to arrive late to work each day (up to 15 minutes) when plaintiff worked at Haddad Defendants, as an accommodation for plaintiff's purported disability, even though plaintiff had never given the Haddad Defendants any proof of the connection between his alleged disability and his being allowed to arrive late to work each day.  Plaintiff's Admissions Nos. 7-10, 13-14, 18, 21; Haddad Affidavit ¶5; *see also* plaintiff's deposition, day 1, pp.121-125 (plaintiff did not provide any note other than the "work with him" note[5] concerning the connection between his alleged bi-polar condition and his being allowed to arrive late to work each day).

17.     Plaintiff had chronic tardiness problems when he worked at Haddad Defendants, and would arrive late to work once or twice per week.  Plaintiff's deposition, day 1, p.86.  Before plaintiff's termination from Haddad on the grounds of tardiness, he had already been suspended for his tardiness on more than one occasion.  Id. p.128; *see* p.91.  Plaintiff came in more than 15 minutes late during 2003 before his termination on 2/3/03.  Plaintiff's Admission No. 22.

18.     Stern admits that defendant James Salvie was the only defendant with whom Stern had any physical contact when Stern worked at Haddad Motors.  Stern deposition, day 2, pp. 29-30, 160.  Stern had no physical contact with defendant Timothy Cardillo or defendant Michael Coggins, or with anyone else from Haddad Motors, when Stern worked at Haddad.  Id.

---

[4] A copy of the note containing the phrase "work with him" is at Exhibit 1 hereto.  This is the only one of the four notes, purportedly from Dr. Perlman, that Stern gave to Haddad while Stern worked at Haddad.  Plaintiff's Admissions Nos. 16 & 20.

[5] A copy of the note containing the phrase "work with him" is at Exhibit 1 hereto.  This is the only one of the four notes, purportedly from Dr. Perlman, that Stern gave to Haddad while Stern worked at Haddad.  Plaintiff's Admissions Nos. 16 & 20.

19.    Plaintiff admits to following a customer home in May of 2002, an incident which generated a customer complaint to Haddad.  Plaintiff's deposition, day 1, pp. 136-137.  (Plaintiff denies other stalking incidents, such that these other incidents present questions of fact, and the Haddad Defendants are not putting these at issue in this Motion for Summary Judgment.)

For the forgoing reasons and for these undisputed facts set forth above, and for the reasons set forth in the accompanying Memorandum of Law, the Haddad Defendants submit that they are entitled to summary judgment in this case.

THE HADDAD DEFENDANTS,
By Their Attorneys
MICHIENZIE & SAWIN LLC

Dated: 12/20/07                    BY: _John Barker_

Richard A. Sawin, Jr. – BBO NO: 546786
John C. Barker – BBO NO: 637406
745 Boylston Street, 5th Floor
Boston, MA 02116
Tel: (617) 227-5660

# EXHIBIT 1

Exhibit B

**MICHAEL S. PERLMAN, M.D.**
57 GOTHIC STREET
NORTHAMPTON, MA 01060

(413) 584-6186                                    DEA # AP 4510827

NAME _____                    AGE _____

ADDRESS _____                    DATE 11/27/2001

℞      I'm a psychiatrist
who treats Scott Stern for
bipolar disorder. He is
definitely improving.
        I encourage his
employer to work with him
as he continues to
              improve.

Refill _____ times            _____
                                    (Signature)

Interchange is mandated unless the practitioner writes
the words 'NO SUBSTITUTION' in this space.              0KPS04183

# EXHIBIT 2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
WESTERN DIVISION

SPRINGFIELD, MASSACHUSETTS          CIVIL ACTION NO. 3/05-CV-30160-KPN

| | |
|---|---|
| SCOTT STERN, | ) |
| Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| HADDAD DEALERSHIPS OF THE | ) |
| BERKSHIRES, INC.; JAMES SALVIE, | ) |
| GENERAL SALES MANAGER; | ) |
| TIMOTHY CARDILLO, SALES | ) |
| MANAGER; MICHAEL COGGINS, | ) |
| GENERAL MANAGER, IN THEIR | ) |
| PERSONAL AND OFFICIAL | ) |
| CAPACITIES OF HADDAD | ) |
| DEALERSHIPS OF THE BERKSHIRES, | ) |
| Defendants | ) |

**THE HADDAD DEFENDANTS' REQUESTS FOR
ADMISSIONS TO PLAINTIFF**

Now come defendants Haddad Dealerships of the Berkshires, Inc.,[1] James

Salvie, Michael Coggins, and Timothy Cardillo (collectively the "Haddad Defendants"),

through their counsel of record, and hereby serve the following set of Requests for

Admissions on plaintiff Scott Stern ("plaintiff" or "Stern") pursuant to F.R.C.P. 36.  The

Haddad Defendants hereby request that plaintiff admit the following:

1.      Plaintiff was a full-time employee of Haddad Motor Group, Inc.

("Haddad") from April 2002 until February 2003.

2.      The disability that plaintiff claims to have suffered from, during his

employment at Haddad in 2002 and 2003, was a mental disability.

---

[1]  The correct name for this party is Haddad Motor Group, Inc.

3.       More specifically, plaintiff claims to have suffered from a bi-polar condition during his employment at Haddad in 2002 and 2003.

4.       The first time that plaintiff told the Haddad Defendants about plaintiff's alleged disability was in November 2002.

5.       Before November 2002, the Haddad Defendants did not know that plaintiff suffered from his claimed mental disability or bi-polar condition.

6.       Plaintiff was not capable of performing the essential functions of his sales job at Haddad Motor Group, at the time his employment with Haddad was terminated in February 2003.

7.       Plaintiff sought a reasonable accommodation for his alleged handicap, in November 2002, that he be permitted to arrive up to 15 minutes late to work each day.

8.       The accommodation that plaintiff sought from the Haddad Defendants, that plaintiff be permitted to arrive up to 15 minutes late to work each day, was a reasonable accommodation.

9.       The Haddad Defendants gave this accommodation to plaintiff at plaintiff's request, and allowed plaintiff to be up to 15 minutes late to work each day.

10.      Plaintiff did not demonstrate to the Haddad Defendants any connection between his alleged mental disability and his requested accommodation (of being allowed to arrive up to 15 minutes late to work each day), before his termination from Haddad in February 2003.

11.      The Haddad Defendants requested to plaintiff in November 2002, that plaintiff provide a doctor's note or letter that he was mentally disabled.

12.     The Haddad Defendants requested to plaintiff in November 2002, that plaintiff provide a doctor's note or letter that plaintiff's alleged mental disability was a bi-polar condition.

13.     The Haddad Defendants requested to plaintiff in November 2002, that plaintiff provide them with a doctor's note or letter that an accommodation permitting plaintiff to arrive up to 15 minutes late to work each day, would assist plaintiff's alleged disability.

14.     The Haddad Defendants were never provided with any such note from a doctor, before plaintiff's termination in February 2003.

15.     The only doctor's note that plaintiff allegedly showed to the Haddad Defendants during his employment at Haddad contained the phrase "work with Scott."

16.     The note at Exhibit D hereto, is a true and accurate copy of a note that plaintiff Stern showed to the Haddad Defendants in November 2002.

17.     Plaintiff did not permit the Haddad Defendants to keep the note copied at Exhibit D, or to make a copy of this same note.

18.     Plaintiff did not provide any *other* note or letter from a doctor to the Haddad Defendants concerning plaintiff's alleged disability, before his termination in February 2003.

19.     The notes at Exhibits C, E, and F are true and accurate copies of notes that plaintiff received from his doctor.

20.     Plaintiff never provided the Haddad Defendants with the notes, or copies of the notes, at Exhibits C, E, and F, before his termination in February 2003.

{00124265.DOC}                                                                    3

21.    Plaintiff agreed to arrive at work at Haddad no later than 15 minutes late every day when he worked at Haddad.

22.    Plaintiff came in more than 15 minutes late on at least one occasion before his termination, at Haddad.

THE HADDAD DEFENDANTS,
By Their Attorneys
MICHIENZIE & SAWIN LLC

Dated: _8/3/07_          BY: _John Barker_
                            Richard A. Sawin, Jr. – BBO NO: 546786
                            John C. Barker – BBO NO: 637406
                            745 Boylston Street, 5th Floor
                            Boston, MA 02116
                            Tel: (617) 227-5660

## CERTIFICATE OF SERVICE

I, John C. Barker, attorney for defendant, hereby certify that I have on this 3d day of August 2007, served a copy of the foregoing Requests for Admissions, by mailing a copy of same, postage prepaid, to the following:

Mr. Scott Stern
400 West Main Street
North Adams, MA 01427

_John Barker_
John C. Barker

{00124265.DOC}                                                          4

# EXHIBIT 3

John C. Barker

745 Boylston Street
Boston, Massachusetts
02116-2636

Telephone
617 227-5660

Facsimile
617 227-5882

Email
jb@masatlaw.com

*Michienzie & Sawin LLC*

August 3, 2007

**VIA CERTIFIED MAIL**

Mr. Scott Stern
400 West Main Street
North Adams, MA 01427

> Re:   Stern v. Haddad Dealerships et al., U.S. District Court, Western Division
> 3/05-CV-30160

Dear Mr. Stern:

Enclosed herewith, please find the following documents in the above-referenced

case:

1.   The Haddad Defendants' Motion to Compel Plaintiff's Responses to Interrogatories and Document Requests;

2.   The Haddad Defendants' Memorandum of Law in Support of their Motion to Compel Plaintiff's Answers to Interrogatories and Document Requests; and

3.   The Haddad Defendants' Requests for Admissions to Plaintiff.

Sincerely yours,

John C. Barker

JCB/tmm
Enclosures

{00124550.DOC}

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com®

OFFICIAL USE

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Postmark Here

Sent To Mr. Scott Stern
Street, Apt. No.; or PO Box No. 400 West Main St
City, State, ZIP+4 North Adams - MA 0142

PS Form 3800, June 2002          See Reverse for Instructions

7004 0240 0000 2490 9220

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Mr. Scott Stern
400 West Main Street
North Adams, MA
0142

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X Scott Stern ☐ Agent ☐ Addressee

B. Received by (Printed Name) | C. Date of Delivery
Scott Stern | 2/10/07

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type
☐ Certified Mail ☐ Express Mail
☐ Registered ☐ Return Receipt for Merchandise
☐ Insured Mail ☐ C.O.D.

4. Restricted Delivery? (Extra Fee) ☐ Yes

2. Article Number
(Transfer from service label) 7004 2890 0000 0429 9220

PS Form 3811, February 2004          Domestic Return Receipt          102595-02-M-1540

---

UNITED STATES POSTAL SERVICE

• Sender: Please print your name, address, and ZIP+4 in this box •

MICHIENZIE & SAWIN, LLC
745 BOYLSTON STREET
BOSTON, MA 02116

Attn: Tom Barta-Esq

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

Stern

44 School Street
Boston, Massachusetts
02116-2636

Telephone
617 227-5660

Facsimile
617 227-5882

Email
jb@masatlaw.com

*Michienzie & Sawin LLC*

August 8, 2007

**VIA CERTIFIED MAIL**

Mr. Scott Stern
400 West Main Street
North Adams, MA 01427

> Re:    Stern v. Haddad Dealerships et al., U.S. District Court, Western Division
> 3/05-CV-30160

Dear Mr. Stern:

Enclosed herewith, please find the following documents in the above-referenced

case:

1.    The Haddad Defendants' Opposition to your Motion to Quash the
Subpoena on Dr. Perlman;

2.    The Barker Affidavit, with Exhibits, in Support of Defendants' Opposition
to your Motion to Quash; and

3.    The Haddad Defendants' Requests for Admissions to Plaintiff.

Sincerely yours,

*John Barker*

John C. Barker

JCB/tmm
Enclosures

{00125325.DOC}

UNITED STATES POSTAL SERVICE

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

• Sender: Please print your name, address, and ZIP+4 in this box •

MICHIENZIE & SAWIN, LLC
745 BOYLSTON STREET
BOSTON, MA 02116

Attn: John Baxter, Esq.
#1103-17378

---

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com®

OFFICIAL USE

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Postmark
Here

7007 0220 0004 6327 2208

Sent To: Mr. Scott Stern
Street, Apt. No.; or PO Box No.: 400 West Main Street
City, State, ZIP+4: North Adams, MA 01427

PS Form 3800, August 2006      See Reverse for Instructions

---

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Mr. Scott Stern
400 West Main St.
North Adams, MA
01427

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _Scott Stern_    ☐ Agent  ☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery
8.10.07

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

3. Service Type
☐ Certified Mail  ☐ Express Mail
☐ Registered  ☐ Return Receipt for Merchandise
☐ Insured Mail  ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)  ☐ Yes

2. Article Number (Transfer from service label)
7007 0220 0004 6327 2208

PS Form 3811, February 2004      Domestic Return Receipt      102595-02-M-1540

# EXHIBIT 4

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
WESTERN DIVISION

SPRINGFIELD, MA              CA NO. 3/05-CV-30160-KPN


SCOTT STERN,                        )
                         Plaintiff )
                                    )
v.                                  )
                                    )
HADDAD DEALERSHIPS OF THE           )
BERKSHIRES, INC.; JAMES SALVIE,     )
GENERAL SALES MANAGER;              )
TIMOTHY CARDILLO, SALES             )
MANAGER; MICHAEL COGGINS,           )
GENERAL MANAGER, IN THEIR           )
PERSONAL AND OFFICIAL               )
CAPACITIES OF HADDAD                )
DEALERSHIPS OF THE BERKSHIRES,      )
                        Defendants  )




      VIDEOTAPED DEPOSITION OF:  SCOTT STERN, taken

before Sharon R. Roy, Notary Public, Registered

Professional Reporter, pursuant to the applicable

provisions of the Massachusetts Rules of Civil

Procedure, at the law offices of BACON & WILSON, 33

State Street, Springfield, Massachusetts on August

30, 2007, commencing at 9:45 a.m.




                 Sharon R. Roy
          Registered Professional Reporter

1          A.    Sometimes.

2          Q.    The other thing, too, is if you need a

3     break, you should ask for one.

4          A.    Okay.

5          Q.    And we will accommodate that.

6          A.    Okay.

7          Q.    Did you work at Haddad Motor Group, Inc. in

8     2002 and 2003?

9          A.    I did.  Yes, I did.

10         Q.    Were you hired --

11         A.    I'm sorry.

12         Q.    That's alright.  Do you want to add

13    something to that answer?

14         A.    I was just going to say yes, it's an

15    affirmative; yes, I worked between 2002 and 2003.

16         Q.    Were you hired there in April of 2002, and

17    specifically on April 26th of 2002?

18         A.    Approximately around April 26, 2002.  I

19    don't remember the exact date but I remember I was

20    selling soda at the time and I was invited to join

21    the staff like on the spot.

22         Q.    You were selling soda to Haddad, you mean?

23         A.    Well, I was trying to.

24         Q.    And who was it who invited you to join the

8

```
1    staff?
2         A.    David Michael Coggins.  Well, I didn't know
3    his first name was David at the time.  It was Michael
4    Coggins, general manager.
5         Q.    Did you have something to add to that?
6         A.    Maybe -- I don't know if "invite's" the
7    right word but, you know, asked me to join the
8    employment of Haddad Motors.
9         Q.    Okay.  Were you fired from Haddad on
10   February 3, 2003?
11        A.    I believe that's correct.  Yes, that is the
12   date that I was terminated.
13        Q.    Were you an at-will employee at Haddad?
14        A.    I was under the impression I was under a --
15   there was a contract, to some degree, and there was
16   an employment agreement between Haddad Dealership
17   because we had to sign an agreement, and it was
18   forced upon us to sign the agreement, otherwise we
19   wouldn't be paid and we wouldn't get commissions.  I
20   remember that very clearly back in -- so, at the time
21   I was hired, I would have to say yes I was an at-will
22   employee.
23              Afterwards, after like November of 2003, we
24   were forced -- when I say "forced," we were told that
```

```
 1              '85.  DuBois Chemicals, which is a division

 2   of W.R. Grace.  They sold chemicals.  I don't

 3   remember them in the order.  I'd literally have to

 4   look at my pay stubs and the records to see which is

 5   in what order.

 6         Q.   Okay.

 7         A.   But I had done sales, I think, in --

 8         Q.   Basically what I'm going to be asking you

 9   is for your work history, so I'm trying to go in

10   order --

11         A.   My work --

12         Q.   -- from when you stopped college.

13         A.   My work history has been very erratic.

14         Q.   Can you give me whatever you remember of

15   your work history in as best order as you can?

16         A.   Since 1985?

17         Q.   Yes, as best you can remember.

18         A.   I'm drawing a blank for a second here.  I

19   worked at -- in '85?  DuBois Chemicals.

20         Q.   How long were you at DuBois Chemicals, if

21   you remember?

22         A.   Six, seven; six, seven months, eight

23   months.

24         Q.   Do you remember where you worked after
```

1    how you left these jobs other than Haddad.  Let me

2    just sort of -- I'll go backwards, it might be

3    easiest that way.  How did you end up leaving the job

4    working in the dining room at Williams College?

5         A.   I think my ... how did I leave the job?

6         Q.   If the question isn't clear, what I want to

7    find out is if you quit, if you were laid off, if you

8    are fired, if you just decided you didn't like the

9    job so you left; what the circumstances were that you

10   left the job.

11        A.   I was let go.  I was terminated.

12        Q.   Why were you terminated?

13        A.   The manager and I did not get along.  Among

14   other things.

15        Q.   What were the other things?

16        A.   I was very frustrated with how he was

17   having me work for the value of two people and he

18   wasn't scheduling other people to help on nights when

19   there were 300 people dinners and stuff like that at

20   the faculty house; and that's from my perspective.

21   From his perspective, I think he didn't like the fact

22   that I might have maybe told him how to do his job.

23        Q.   Okay.  Was that the reason that he gave you

24   for your termination from Williams College?

1        Q.   Did you have a sense before the meeting

2    that you were about to lose your job at the meeting?

3        A.   No.

4        Q.   You didn't think that?

5        A.   No, absolutely not.

6        Q.   Let me go to the next one.

7        Now, you didn't work anywhere between

8    Haddad and Williams College, is that right?

9        A.   I may have made a mistake.  I would have to

10   check stubs and reserve to straighten out the times

11   and everything like that because I'm ... between

12   Haddad and Williams?  Attorney Barker, I'm drawing a

13   blank right now.

14       Q.   Okay.  So you don't remember at this time

15   any place that you worked between Haddad and Williams

16   in 2003, is that correct?

17       A.   I was depressed right after I was

18   terminated from Haddad and I slept a lot.  I was on

19   Depakote at the time, too, so ...

20       I think it was several months between

21   Haddad -- no, I don't think I did, but I can be

22   wrong.

23       Q.   Well, let me ask about Haddad and I'll come

24   back to it, obviously, but what was the reason given

1    for your termination from Haddad?

2         A.   From what I remember from the paperwork and

3    everything, it was because I was more than 15 minutes

4    late.

5              After I had been allowed to be.  It was a

6    double -- I was told at a meeting that it's okay, you

7    know, it's okay.  Jim Salvie said "This is against my

8    better judgment" -- I remember him saying those

9    words, "It's against my better judgment, but I'll

10   allow you to be late."  And at that meeting they were

11   writing me up.  That could have been that one with

12   him and Tim Cardillo where he said that, "I'll allow

13   you to be late, it's okay."

14        Q.   And he meant that he was going to allow you

15   to be 15 minutes late each day or -- is that what he

16   meant?

17        A.   I don't think he meant it that Scott should

18   be late every day and everything like that.  I

19   believe that he meant that I had asked for reasonable

20   accommodation and he was trying in some way to

21   recognize that, and by his stating that I think that

22   they understood that I had requested back in November

23   of '02 a reasonable accommodation.  And that's when a

24   whole bunch of parameters changed; the screaming, the

57

1    yelling, the stealing of leads, and everything that

2    transpired.

3        Q.    When was the first time that you informed

4    Haddad of your bipolar condition?

5        A.    I didn't so much tell them directly that I

6    had bipolar disorder, but I would have to say it

7    would be May of 2002.

8        Q.    And in May of 2002 who at Haddad did you

9    inform of your bipolar condition?

10        A.    I said I didn't say "bipolar disorder."

11        Q.    I'm sorry.  Well, what did you tell them,

12    then?

13        A.    I said that I -- I think I mentioned the

14    term "issue," or I had -- I might have referred to it

15    as synapses because I didn't want to just directly

16    come out and say what it was for fear of losing what

17    I was -- what I thought was turning into a wonderful

18    career and a wonderful job.  And all the prior years

19    of selling, I put it all together and I was good at

20    what I did.  I was good at selling cars.

21        Q.    Let me just -- let me ask you about what

22    I'm asking you about and see if I can get you to

23    answer the question I'm asking.

24        A.    Okay, I'll try.

58

```
 1        Q.    Listen carefully.

 2        A.    Okay.

 3        Q.    What was it that you told Haddad in May of

 4   2002 that you're referring to?  You told them that

 5   you had issues and you referred to synapses, is that

 6   correct?

 7        A.    Yes.

 8        Q.    Was there anything else you told them about

 9   your condition?

10        A.    At that time, no.  I had already been

11   hired, no.

12        Q.    When did you tell them that you had a

13   bipolar condition?

14        A.    It was --

15        Q.    Was that at the November 2002 meeting?

16        A.    It was approximately November.

17        Q.    Was that at the meeting that you reference

18   in your Complaint and elsewhere?

19        A.    It was at that meeting, yes.

20        Q.    And that was in November 2002, is that

21   correct?

22        A.    Sorry, say that again.

23        Q.    The meeting that you're referencing was in

24   November of 2002, is that correct?
```

1      A.    It was -- it would have been November --

2    later November of 2002.  The third week of November,

3    the 24; somewhere around there.

4      Q.    Let me go back to the previous jobs.  The

5    sales of soda in 2001 and 2002, why did you leave

6    that job?

7      A.    Why did I leave soda?

8      Q.    Yes.

9      A.    Well, Michael Coggins presented a great

10   possibility of income.  I liked selling soda but I

11   left selling the soda because the possibility of

12   income working for Haddad was -- it was opportunity

13   knocking on the door.  It was like being at the

14   Dakota and the person that owned the soda company

15   saying "Well, come sell.  You could do better than

16   being at the" -- so I jumped at the opportunity.

17     Q.    Did you quit the job selling soda, is that

18   correct?

19     A.    I may have still been a salesperson but I

20   wasn't actively selling because I was arriving at

21   Haddad.  I mean --

22     Q.    Were you fired from the job selling soda?

23     A.    No, I --

24     Q.    Were you laid off?

1    A.    Reaching for a box.  Reaching in the back

2    room for something.

3    Q.    And did you leave after you were injured?

4    A.    I don't remember.

5    Q.    Did you make a workers' compensation claim

6    for that injury?

7    A.    I don't remember that either.

8    Q.    Do you remember how you left the job?

9    A.    I don't remember.

10    Q.    The job at Bogie's restaurant, did you --

11    how did you come to leave that job?

12    A.    Well, I mentioned to you before that the

13    guy was asking me to do things that were pretty

14    disgusting, so I think he didn't like the fact that I

15    was objecting to him doing certain things that were

16    disgusting.  So, I think being the fact that I was

17    not being a -- you know, I think he let me go.  It

18    wasn't working out because I wasn't agreeing to,

19    like, rewash straws and leave them for the restaurant

20    to be used again.

21    Q.    And that was the reason you believe that he

22    fired you?

23    A.    Well, I don't know if it was just over

24    straws but, I mean, sometimes dynamics work and

1    sometimes they don't work and I don't think the

2    dynamic was working.  I certainly wasn't listening or

3    doing those kind of things, Attorney Barker.

4        Q.   The job at Unistress, how did you come to

5    leave that job?

6        A.   I was threatened by a manager there.  I

7    remember being up on the -- at Unistress it's a huge

8    building, it's a 600-foot building and there are

9    what's referred to as beds where the concrete is

10   poured in order to make the pieces for building

11   parking garages.  And the manager had told me to do

12   something that would have injured myself.

13            I had been injured there at Unistress

14   working around the rebar and everything; I had struck

15   the rebar and I had ripped off a nail and stuff, but

16   that was months before.  He wanted me to do something

17   again, and he threatened me.  And, you know, I had

18   had enough of the treatment and everything like that.

19   It was horrid.  It was a great exercise plan, I lost

20   a lot of weight.  I mean, I worked my tail off for

21   them.  I used to be a loader operator and I'd have to

22   shovel up the concrete and everything.  I worked very

23   hard for them but, you know, one doesn't want to work

24   in an environment where they're threatened.

1    that's relative to ...

2        Q.    Can you produce those?

3        A.    Here now?

4        Q.    No.  Whenever you produce documents.

5        A.    If I find them -- if I were to find them,

6    I'll produce them.  All my records are a mess, so ...

7        Q.    Your job at Sbarro's, how did you end up

8    leaving that job?

9        A.    Well, I was only there temporary, as a prep

10   cook and everything.  I was friends with the manager,

11   Brad.  So it wasn't really a leaving.  It was I

12   helped him out and everything like that.  I had

13   already had a full-time occupation, so it wasn't

14   like I would -- I quit, I mean, but not in the sense

15   that it was I quit and one storms out of the building

16   and things like that or, you know, "I'm not coming

17   back."  It was an amicable -- you know, it was during

18   the holiday time and he needed an extra person.

19       Q.    How did you end up leaving the job at

20   Electronics Boutique?

21       A.    I had given somebody a discount that I

22   shouldn't have given and they terminated me for it,

23   in short.

24       Q.    And how did you end up leaving the job at

1      A.    And so it was -- you know, one was based on

2  commission and sales or draw down or something, and

3  Ground Round was steady.  So, I mean, I left on my

4  own accord because one was more guaranteed than the

5  other.  One was steady employment and I knew that

6  I -- I had my obligations that I had to maintain.

7      Q.    And how did you end up leaving the job at

8  Combined Insurance Company of America?

9      A.    I left that one on my own accord, too,

10  because they -- when I started with Combined I was in

11  Sunderland, I think, and then from Sunderland I went

12  to Clinton for like a day.  I worked that area,

13  Clinton, Massachusetts.  They put us up in a hotel or

14  something, I think.  And then came back and was

15  constantly moving.

16          Finally, when I was told to go up to the

17  North Adams area, they wanted me then to go back to

18  Springfield, to commute every morning to Springfield.

19  And then, for the meeting, to come back to North

20  Adams to sell.  And I thought that was just

21  ludicrous.  That was just a waste of time and

22  everything like that, so I left on my own accord.

23      Q.    And how did you end up leaving the job at

24  D'Angelos as a cook?

1        A.    D'Angelo's, there was a customer complaint

2    or something.   A customer complained over a sub that

3    they got.

4        Q.    Okay.

5        A.    I think I was served divorce papers during

6    that time, so -- while I was at work.

7        Q.    Were you fired from D'Angelo's?

8        A.    I was let go from D'Angelo's.

9        Q.    Are you making a distinction between let go

10   and fired?

11       A.    I don't recall if I was fired or whether it

12   was let go or -- you know.   Am I making a

13   distinction?   Is there a distinction?

14       Q.    Not in my mind.   I was wondering if you

15   were making a distinction between them.

16       A.    Well, I don't recall exactly.   But I

17   remember there was a customer complaint and

18   everything, so I -- let go, terminated.

19       Q.    And how did you end up leaving Almaden?

20       A.    I don't remember.

21       Q.    And you worked for Electrolux selling

22   vacuum cleaners, and how did you end up leaving their

23   employ?

24       A.    I don't remember.

1    don't know.  I can't answer that question.  I mean, I

2    can answer the question that I have no knowledge of

3    him talking to them directly nor Haddad talking to

4    him directly.

5        Q.    That was what I asked you.

6        A.    Okay.

7        Q.    You had problems at some point in your

8    employment at Haddad with arriving late to work, is

9    that correct?

10       A.    Yes.

11       Q.    How often were you late to work when you

12   worked at Haddad?

13       A.    I think it came in ebbs and flows.

14   Sometimes it might have been a couple times a week,

15   sometimes it was once a week.  But I was working 70

16   or 80 hours there and I didn't have much time off

17   because I learned very early on that if you are not

18   there when a delivery occurs, you lose your

19   commission.

20            Johnson; I worked at Johnson.  And I worked

21   at a Nissan place.  I'm sorry.

22       Q.    These are jobs?

23       A.    I apologize.

24       Q.    That's alright.  When did you work at --

1    the Nissans and he made life hell for anybody that

2    tried to sell a Nissan in his quote/unquote building.

3    Poncho; I think his name was Poncho.

4        Q.    And how did you end up leaving that job at

5    Johnson?

6        A.    Well, those Nazi swastikas that were

7    written on the bathroom wall, and so there were

8    incidents that occurred because I was selling cars.

9    And at the time, if I remember correctly, at the time

10   I was on Depakote or -- this may have been when I was

11   on Depakote, and Depakote knocked me out.  It just

12   knocked me out.  I mean -- so, I may have been on

13   Depakote while I was there.  And while I sold it may

14   have -- the medicines can have a way of affecting

15   one's ability to think, to act, to do.  Depakote like

16   almost put things in slow motion at times.

17       Q.    Were you fired or let go from Johnson?

18       A.    I was let go/fired from Johnson.

19       Q.    After about five months?

20       A.    Yes.

21       Q.    And that's the Nissan job, there's not

22   another job at a separate Nissan dealer?  That's

23   what you're referring to as the Johnson job?

24       A.    No, there was a separate job, and I want to

1    clarify that.

2         Q.   Okay.  What was the other job?

3         A.   It was Bennington Motor Company.  And that

4    was a very short thing and I had stayed there a short

5    time.  He had a TV commercial on and it was a call-in

6    for credit, and I think we were violating laws and

7    stuff like that at the time.  It was just not kosher.

8    We were literally taking people's credit reports, I

9    think, without their signature, and there was fraud

10   involved and stuff.

11        I think I pointed that out and I don't

12   think they liked the fact that I kind of got wise to

13   what they were doing and stuff.  And I think

14   Bennington Motors was my first stint at really

15   selling cars, and I sold one and somebody -- I think

16   I sold one, and they drove -- one of their drivers

17   drove it out.  The whole dynamic of it was not on the

18   up and up at Bennington Motor Car.

19        Q.   Were you fired or let go from that job?

20        A.   I don't remember if I -- I think I left

21   them on my own accord.  I think somebody stole

22   something out of my car at the time.

23        Q.   Bennington Motors, is it in Bennington,

24   Vermont?

1    had a flat tire.

2         For whatever reason I didn't go down the

3    street to Haddad Ford at the time, I went to another

4    place to get my tire work done and I don't think

5    management liked that very well.

6         But it wasn't -- you know, it varied, so,

7    under 15 minutes, under 20 minutes.

8    Q.    So --

9    A.    It wasn't every day.

10   Q.    When you were late to work when you worked

11   at Haddad Motors, it was usually less than a half an

12   hour late, is that correct?

13   A.    It was usually less than 15 minutes late.

14   Q.    And you were sometimes later than that?

15   A.    There were occasions when I was later than

16   that.  You want an honest answer, I'm telling you the

17   honest truth.

18   Q.    When was it that Haddad management first

19   spoke to you about your tardiness when you worked at

20   Haddad?

21   A.    Well, I think there was nothing ever

22   written.  There were no written warnings prior to

23   November.

24   Q.    How about verbal; when did they first

106

1   for it and Michael Coggins denied my request. And
2   these are my notes from that time. I went back to my
3   desk and I had written these notes out. I was
4   keeping things on my laptop, and I repeat the
5   request, asking if I could put it in writing, and he
6   states "No".

7       So I couldn't even put it in writing. I
8   felt so humiliated and so denigrated that I didn't
9   just -- I just didn't take what I thought I could
10  just take and write it out and submit it and have it
11  somehow documented. I asked; respectfully I asked,
12  and he said no.

13      Q.  So what you asked for was flex time, is
14  that correct?

15      A.  Flex time.

16      Q.  You didn't ask for a specific period of
17  time that you could arrive late?

18      A.  Right. That's correct. I wasn't saying,
19  "Well, I can only have 15 minutes as opposed to 16
20  minutes." You know, bipolar disorder can cause
21  somebody to be early as much as it can be very late.
22  So --

23      Q.  What is the connection, that's the next
24  question; what is the connection between being

1    flex time or reasonable accommodation to accommodate

2    them if they're performing their job.  And I was

3    performing my job.  So if you're asking --

4        Q.   Did you think that flex time would -- did

5    you think that being allowed to arrive late to work

6    would have been a reasonable accommodation for your

7    disability?

8        A.   Yes.

9        Q.   And at some point did Haddad give you an

10   accommodation of being allowed to arrive late to

11   work?

12       A.   It was stated but it wasn't stated.

13   Because at the same time as we presented at the MCAD

14   hearings that Phyllis Mitchell was a part of, which

15   wasn't recorded to preserve my due process rights,

16   there was no recording and I don't believe I was

17   allowed to make a recording at that time.  I'm not

18   sure if you recall at that time.  But -- what was the

19   question?

20       Q.   Can I just tell you, just so you know, in

21   case you understand it.  Everything you say that

22   isn't responsive to my question will just get struck

23   later on.

24       A.   Why is that?

1      Therapy & Depression and it's been marked.

2      It's a two-page exhibit.  That has been marked

3      as Exhibit L.

4      Q.   Let me go back to the question that I was

5  on.

6      A.   Well, if it's going to be one of the

7  exhibits I would put it over here and I would just

8  need to get a copy back, if I could, please.

9      Q.   The question was, what was said at the

10  first meeting, and you started to answer that.  Is

11  there anything else that you remember was said?

12      A.   I'm sorry.

13      Q.   Do you remember anything else that was said

14  at the first meeting in November of 2002 with the

15  Haddad managers other than what you've testified to

16  so far?

17      A.   They asked me for a doctor's note.  They

18  asked me to get a doctor's note and how it affects my

19  being late.

20      Q.   And they asked you -- was the doctor's note

21  supposed to indicate the connection between your need

22  to be late and your bipolar disorder, is that what I

23  understand?

24      A.   I don't think it was a need to be late, but

1    how --

2         Q.   I'm sorry if I said that wrong.  Here's my

3    question:

4         A.   I think they were asking -- to answer your

5    question, I think -- go ahead, ask your question

6    again, but I think you've stated it wrong.  It wasn't

7    that I needed to be late.

8         Q.   You mentioned that arriving late was

9    something you were looking for as a reasonable

10   accommodation for your disability, is that correct?

11        A.   On occasion, if I arrived late, because

12   there were times that I arrived much earlier than the

13   scheduled time.  I remember coming in at 6:00 in the

14   morning in order to get six cars delivered for the

15   same day.

16        Q.   Really, I'm just finding out if that was

17   something you asked for as a reasonable accommodation

18   for your disability, being able to arrive late?

19        A.   Flex time, yes.

20        Q.   And did they ask you for a doctor's note

21   that would indicate that that would be something that

22   would be connected with your bipolar condition, being

23   arriving late or flex time, whichever it is?

24        A.   Yes, they asked me for a doctor's note.

1    Q.    Did you ever provide a doctor's note that

2    indicated that being able to arrive late would be a

3    reasonable accommodation for your bipolar condition?

4    A.    I can't tell -- I couldn't tell my doctor

5    what to write, obviously; that wouldn't be the

6    appropriate thing, and what my doctor wrote was the

7    doctor's note of 11/27/2002, which states, "I

8    encourage his employer to work with him as he

9    continues to improve."

10    Q.    So there was nothing --

11    A.    That's the second part of it.  The first

12    part says, "I'm a psychiatrist who treats Scott Stern

13    for bipolar disorder and he is definitely improving."

14    So at this time in November, I was doing better.  I

15    was on an upswing and I was selling --

16    Q.    Let me just go on with the question.  So

17    you're referring to Exhibit D, and that was the note

18    that you gave in response to Haddad's request for

19    some written documentation of your bipolar disorder

20    to Haddad, is that correct?

21    A.    Correct.

22    Q.    My question is a little bit more specific.

23    Did you ever give them a note, did you ever give

24    Haddad a note from your doctor that said you needed

1    to arrive late, or you should be allowed to arrive

2    late in connection with your bipolar disorder?

3        A.    Well, I think when I spoke with my doctor I

4    asked him, you know, the correlation and everything

5    like that.  I couldn't ask -- I couldn't dictate to

6    him what needed to be written in order to make it

7    exactly what Haddad was asking for.  But they were

8    asking for a doctor's note to say -- regarding my

9    bipolar disorder and they wanted to have some

10   connection.  I don't think it was a connection that

11   they were asking for bipolar causes tardiness.

12   But --

13       Q.    My question's pretty specific and you're

14   not answering it, so let me try it again.

15       A.    Okay.

16       Q.    Did you ever give Haddad any note that

17   indicated that, because of your bipolar disorder, you

18   needed to arrive later or should be permitted to

19   arrive late on occasion, any connection between

20   arriving late and your bipolar disorder?

21       A.    I gave them the note, the 11/27/2002, which

22   I would take to believe that the note written by the

23   doctor states that I have bipolar disorder and I

24   would encourage the employer to work with me.

1          Q.    So there's nothing more specific than that

2    note, which is at Exhibit D, about being able to

3    arrive late?

4          A.    Not that I submitted to Haddad, no.

5          Q.    Okay.  That was the question.

6          A.    Okay.

7          Q.    Let's go to the second meeting in November.

8    This is the November 27 meeting?

9          A.    We just talked about that meeting.

10         Q.    Okay.  Was there anything else said that

11   you haven't testified to at that second meeting?

12         A.    I remember certain things about the

13   meeting.  I remember -- I don't remember everything.

14         Q.    Just tell me whatever you remember, to the

15   best of your recollection.

16         A.    I remember crying.  I remember the blinds

17   being turned down.  And I would have to look at my

18   notes and everything.  I remember stepping out and --

19   maybe that was the day before and everything, so ...

20              I remember asking for flex time.  I

21   remember Tim Cardillo asking me "What does flex time

22   mean?  That you can be an hour and a half late?"

23              I said no, I wasn't looking for an hour and

24   a half late.  It wasn't a question of I need to be

1      A.   When I say "represented," Phyllis Mitchell,

2   a wonderful woman, was my advocate.

3      Q.   You're talking about this case against

4   Haddad, no other case?

5      A.   This case, that's correct.

6      Q.   Now, you talked with the MCAD on the day

7   before the first November meeting with Haddad, is

8   that correct?

9      A.   Correct.

10      Q.   So you talked with the MCAD on November 25

11   of 2002?

12      A.   Correct.

13      Q.   And that was before you had informed Haddad

14   that you had a disability, is that correct?

15      A.   That's correct.

16      Q.   Now, you then -- who was present at the

17   second meeting?

18      A.   Although, I did allude to, at the beginning

19   of May when I first started working at Haddad, that I

20   had, you know, an issue and everything, but I never

21   stated bipolar disorder.

22      Q.   Okay.  You said you had issues?

23      A.   Correct.

24      Q.   Who was present at the second meeting in

1   November, the November 27, 2002 meeting?

2        A.   I think it was just James Salvie and Tim

3   Cardillo.  But it's five years ago, so, I mean -- I

4   suggested Tim Cardillo, I meant Michael Coggins.

5   James Salvie and Michael Coggins.

6        Q.   Cardillo and Scibelli were not there?

7        A.   I don't think so, for the second meeting.

8   I remember handing the note to Jim Salvie, and then

9   it was brought in to -- by Coggins, or if there was a

10  meeting at all or anything.  I ...

11       Q.   Now, let me ask you, before the two

12  meetings in November 2002, had you already been

13  suspended from work for being late to work at Haddad?

14       A.   There had been an occasion, or more than

15  one occasion, where I was told not to show up when I

16  called in.

17       Q.   On how many occasions had you been

18  suspended for your tardiness before the November

19  meeting?

20       A.   Once or twice.  Maybe three at the most.

21       Q.   Okay.  Did Haddad Motors have a practice of

22  splitting commissions?  And let me explain what I'm

23  asking you about.  This is a practice of splitting

24  commissions between the salesperson who made the

1    answer when I ask you.

2        A.    Okay.  I appreciate that.

3        Q.    Did you ever follow a female customer home

4    from the dealership?

5        A.    No.

6        Q.    Did you receive a complaint about following

7    a female customer home?

8        A.    I never followed a customer home.

9        Q.    Was there a complaint from a Lorraine

10   Nelson about inappropriate remarks made by you when

11   you were working for Haddad?

12       A.    What date was that?

13       Q.    I don't have the date in my notes.

14       A.    A Lorraine Nelson?  I don't recall the name

15   but there was an incident in May where I did go to a

16   woman's house.  And I didn't do anything, I didn't

17   speak to her, I never had any interaction with her,

18   but I was -- and that was the incident that I alluded

19   to in the synapses, the first incident early on in

20   May and everything.  That was --

21       Q.    Okay, this is May of 2002?

22       A.    That's correct.

23       Q.    And you went -- was this woman a customer

24   or another salesperson at Haddad?

1      A.    She was a customer.

2      Q.    Was there a complaint filed with Haddad

3  about that incident?

4      A.    There was an issue brought up with it.  I

5  don't know if it was a formal complaint.  There was a

6  discussion with Mike Coggins and James Salvie, and

7  they had a laugh over it and everything, and they

8  laughed over it and they sent Scott on his way and

9  nothing ever happened like that again.  That was in

10  May of 2002.

11      Q.    Why was it that you followed her home?

12      A.    Why was it?

13      Q.    Yes.

14      A.    I think she gave her -- it was my

15  impression that she -- that she liked me or -- and it

16  was an inappropriate thing to do, and I was thankful

17  that Haddad never wrote me up, and I worked hard and

18  I was diligent and everything like that.

19            MR. BARKER:  The tape is almost

20        done, so let's take a break to change the

21        tape.

22            THE VIDEOGRAPHER:  Going off record

23        at 2:02 p.m.

24            Back on record at 2:03 p.m.

151

1       Q.    Not really.  Let me ask you the question.

2    I'm trying to isolate this factor.  If you could

3    arrive -- no, you answered that.

4            What would have been a reasonable time in

5    your opinion for you to have been able to arrive late

6    when you worked at Haddad?

7       A.    I would say within a half hour of the

8    scheduled time and everything like that.  Since I was

9    selling, I didn't really need the sales meetings, per

10   se.  I mean, I had one of the highest selling months

11   that Haddad -- well, I don't know months, but I was

12   the highest selling -- I was the highest selling

13   salesperson.

14      Q.    So you think that your performance in sales

15   means that you didn't need the sales meetings?

16      A.    I'm not saying that I didn't need

17   assistance by Tim Cardillo in the structure and

18   stuff like that, but --

19      Q.    Well, I'm specifically talking about the

20   sales meetings.

21      A.    No, I definitely didn't need the sales

22   meetings.  I didn't need those because they were --

23      Q.    Do you think --

24      A.    -- they were degrading.  They were just

1    terribly berating, they were --

2        Q.    You didn't like them, I understand that,

3    but it's now whether you need them or not.  Do you

4    think that the management thought that the

5    salespeople needed those meetings?

6        A.    I think it was a means by which to -- for

7    the sales managers, Jim Salvie in particular, was to

8    build himself up at the expense of others.

9        Q.    So you don't think there was any need for

10   them at all?

11       A.    I don't think there was any use for them.

12       Q.    Okay.  Let me get your treatment history.

13   When did you start treating for your bipolar

14   condition?

15       A.    '99, when I was diagnosed with bipolar.

16       Q.    Where or by whom were you diagnosed with

17   bipolar condition?

18       A.    It would have been the Brien Mental Health

19   Center in North Adams, and it was another doctor, not

20   Dr. Perlman.

21       Q.    Do you remember the name of the doctor?

22       A.    I'm trying to remember the name of the

23   doctor.  It was a woman.

24       Q.    And did she treat you for this condition at

1    the beginning?

2        A.    She did at the very beginning, and I'm not

3    remembering the medication but I remember what the

4    medication did.  The medication gave me a nasal drip

5    down the back of my throat, and when I told her about

6    it she said she didn't care.  So at that point in

7    time I think I had already known of Dr. Perlman

8    during divorce in the early '90s and everything like

9    that having seen Dr. Perlman, and when I called to

10   ask him, not knowing any other doctors in the area

11   and stuff, he actually stated his specialty was

12   bipolar disorder, and from that point on I've been

13   seeing Dr. Perlman.

14       Q.    Was that in 1999 that you started to see

15   Dr. Perlman?

16       A.    Approximately.  It could have been the fall

17   of '98.

18       Q.    Now, I thought you said you were diagnosed

19   in 1999 with bipolar.

20       A.    Well, for the Brien Center it could have

21   been fall of '98 or spring of '99.  I don't remember

22   the date exactly, Attorney Barker.

23       Q.    And you said you had heard of Dr. Perlman

24   through your divorce proceedings?

1  that it just really bothered me and it really irked

2  me that, here he is, plastering his face as if a good

3  deed. And he, you know, he didn't do me any good

4  deeds, screaming at me and pushing me out.

5       And here's another thing on 8/12/02 where

6  the discussion was presented to the salespeople about

7  a person named Kaz Smith, not management, but Kaz

8  Smith, regarding whether or not Kaz Smith should work

9  there or not but Scott wasn't entitled to be there

10 for this meeting and I was told to get out. And

11 these are my handwritten notes from 8/12/02. And

12 this is just one sample of multiple ways that Jim

13 Salvie demeaned, demoralized, denigrated, humiliated

14 me, and not just me but in front of other people, and

15 it was just a constant beratement. And these are

16 just three separate incidents of months of -- I don't

17 know if it was the Heritage conflict or the fact that

18 I was selling and his cousin, Pat Cody, wasn't. He

19 didn't like me and he just -- he made it known. He

20 made it known to me and he made it known to others.

21      Q.   What was name of the man at the YMCA that

22 you spoke with, Jim McGovern?

23      A.   Joe McGovern.

24      Q.   And he is the director or something? What

# EXHIBIT 5

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
WESTERN DIVISION

SPRINGFIELD, MA            CA NO. 3/05-CV-30160-KPN


SCOTT STERN,                    )
                     Plaintiff )
                                )
v.                              )            VOLUME II
                                )
HADDAD DEALERSHIPS OF THE       )
BERKSHIRES, INC.; JAMES SALVIE, )
GENERAL SALES MANAGER;          )
TIMOTHY CARDILLO, SALES         )
MANAGER; MICHAEL COGGINS,       )
GENERAL MANAGER, IN THEIR       )
PERSONAL AND OFFICIAL           )
CAPACITIES OF HADDAD            )
DEALERSHIPS OF THE BERKSHIRES,  )
                     Defendants )


CONTINUED DEPOSITION OF:  SCOTT STERN, taken

before Sharon R. Roy, Notary Public, Registered

Professional Reporter, pursuant to the applicable

provisions of the Massachusetts Rules of Civil

Procedure, at the law offices of BACON & WILSON, 33

State Street, Springfield, Massachusetts on October

25, 2007, commencing at 10:56 a.m.



Sharon R. Roy
Registered Professional Reporter

24

1    to -- and I'm not talking about like marital

2    relationships, but just a comradery and friendship

3    and things like that.

4        Q.    Sure.  How about Kaz Smith?

5        A.    Kaz Smith was an employee, he was also a

6    sales and leasing consultant, and whether or not he

7    was aware of whether or not he was voted out by the

8    other employees, because a meeting was held that I

9    was kicked out of where Kaz Smith was voted out.

10        Q.    Voted out as what?

11        A.    Where they had a vote concerning Kaz

12    Smith's employment.

13        Q.    And what was the purpose of the vote?  You

14    don't know.  Were you at the meeting?

15        A.    I was kicked out of the meeting.

16        Q.    And what was the outcome of the vote, do

17    you know?

18        A.    I don't know, it was clandestine.  No one

19    would tell me, no one told me what else was

20    discussed.  I could have been discussed too.  It was

21    unfair.

22        Q.    Did you ultimately see him working there

23    after that meeting?

24        A.    No, I don't believe he was.

```
 1    the sales meeting room, and he took me -- he took me

 2    by either the right, and then he got behind me.  He

 3    took me by the shirt.  So, holding my shirt by the

 4    back side of my shirt and everything like that, and

 5    kind of like moseyed me out.

 6         Q.   Of the room?

 7         A.   Of the room, yeah.  I didn't want to fight

 8    him, I didn't want to turn around and -- he was my

 9    manager, I didn't want to strike him.

10         Q.   What happened after that?

11         A.   Well, I was pretty upset and depressed and,

12    you know, I mean -- but I sat at my desk.  I was

13    bewildered.  I think I took notes on it and

14    everything.

15         Q.   And this was with Mr. Salvie, right?

16         A.   Mr. Salvie.  James Salvie.

17         Q.   Other than with Mr. James Salvie, is there

18    anyone else that you had any other physical contact

19    with while you were an employee of Haddad Motors?

20         A.   Well --

21         Q.   I'm just trying to figure out -- let me

22    make it easier for you.  Is there anyone else that

23    took you by the shirt, as you're alleging, or pushed

24    you out of a room in any way other than Mr. Salvie?
```

30

1       A.   I can't remember at this time.  There could

2   have been.  There could have been.  You know, I could

3   be blocking it out that I just can't --

4       Q.   As we sit here now can you remember any of

5   those other instances other than with Mr. Salvie?

6       A.   I can't remember.

7       Q.   Okay, that's fair enough.  Who's Ryan

8   Graham?

9       A.   You skipped two people.

10      Q.   Oh, I know.

11      A.   Do you ...

12      Q.   It's okay.

13      A.   Because there was a woman there, too, at

14   the meeting that witnessed it, too.  And then after

15   they saw what they saw, they never came back.

16      Q.   And you don't know her name?

17      A.   No, I don't remember.

18      Q.   Which is why you refer to her as Jane Doe?

19      A.   That's correct, I don't remember her name.

20   I want to get the records.  They worked like three

21   days.

22      Q.   Okay.  And Ryan Graham is who?

23      A.   Ryan Graham worked in the repair shop, the

24   automotive section, the auto section.

1          Q.   Anywhere.  I thought I read something in

2     your deposition that you had reached some type of

3     settlement.

4          A.   With Williams?

5          Q.   Yes.

6          A.   Yeah, they fired me.  You tell somebody

7     you're bipolar, forget it, you're done.

8          Q.   So you didn't --

9          A.   I never sued Williams College or anything

10    like that.  I've never been sued by Williams College.

11         Q.   Fair enough.

12         A.   There's been a lot that's happened to me.

13         Q.   Sure.  Other than this case, Mr. Stern,

14    with regard to Haddad, have you ever filed any other

15    actions with the MCAD or the EEOC for discrimination?

16         A.   Have I ever -- have I filed anything?  I

17    don't remember.  I may have in the early '90s, I may

18    have.

19         Q.   Who did you file against?

20         A.   And I'm thinking it might have been

21    D'Angelo's when I worked there in Amherst.  I don't

22    remember.

23         Q.   How did they discriminate against you?

24         A.   I don't remember.

```
 1    extent of your jobs.
 2              MR. SAWIN:  Let's take a five-minute
 3         break here, get some more coffee or a glass of
 4         water, and then we'll resume, okay?
 5              MR. STERN:  Okay.
 6         (Recess taken from 1:14 p.m. to 1:24 p.m.)
 7              MR. SAWIN:  Okay, we're back on.
 8         Q.   (By Mr. Sawin) Going back to some of the
 9    questions that you were asked in your first
10    deposition, Mr. Stern, at some point in time you --
11         A.   What?  What did you say before that?
12         Q.   Going back to your testimony from your
13    first deposition --
14         A.   Okay, I didn't hear that.
15         Q.   -- you had testified that you worked for a
16    company called DuBois Chemicals.
17         A.   It's a division of W.R. Grace, I remember.
18         Q.   Can you tell me why you left them?  Did you
19    leave voluntarily or were you fired from that job?
20         A.   I left because they tried charging me
21    commissions for a previous salesperson who had
22    installed some equipment.
23         Q.   So you left on your own or were you
24    terminated?
```

111

```
1          A.    I think it was more -- I don't remember.
2     It was either -- yeah, I left -- it was like mutual,
3     it was a mutual thing.  They wouldn't take away --
4     they were trying to charge me for commissions and
5     everything like that, and so -- I mean, I had an
6     attorney friend at that time that kind of guided me
7     and everything like that.  I don't know where he is
8     now.
9          Q.    You testified you worked for another
10    company call Electrolux.  Why did you leave them,
11    were you terminated or did you leave voluntarily from
12    that job?
13         A.    Are you talking about in '91?
14         Q.    I think so.
15         A.    I think I was terminated.
16         Q.    Do you remember the reason why?
17         A.    I don't remember the reason why.
18         Q.    Okay, fair enough.
19         A.    I'd have to ask the person if he remembered
20    the reason why.
21         Q.    I think you testified that in '94 that you
22    worked for a company called Combined Insurance
23    Company of America.  Did you leave there voluntarily
24    or were you terminated?
```

```
1           A.   Yeah, Doug.  He was the regional

2      supervisor.

3           Q.   He's the regional supervisor?

4           A.   Right.

5           Q.   And were you fired from that job?

6           A.   I left.

7           Q.   What was the result of the dispute with

8      Doug Cortina?

9           A.   I think it was regarding promotion in

10     management and he just came out and said "I don't

11     like you.  You do everything right, I just don't like

12     you," or something along that line.

13               I was the first manager to ever have a

14     profit at the store.  Corporate used it --

15          Q.   I'm not asking you about your performance

16     at that job.  What I'm asking you about is the

17     supervisor and then why you left.  It sounds like you

18     quit the job, is that correct, after your dispute

19     with Doug Cortina?

20          A.   Yes, I took -- I think I took my vacation

21     period and started another job.

22          Q.   Okay.  And --

23          A.   They called it job abandonment.

24          Q.   So you abandoned the job, is that the term
```

1    you used?

2          A.    That's the term they used.

3          Q.    I see.

4          A.    But I quit.  I mean, in my heart I quit.

5          Q.    Town Fair Tire, where was that located?

6          A.    West Springfield.

7          Q.    And who was your supervisor at that job?

8          A.    Kevin Sheehan.

9          Q.    Is it S-H-E-E-H-A-N?

10         A.    I think so.  That's what I remember.  Maybe

11   it's not Sheehan.

12         Q.    Whatever your best memory is, that's fine.

13         A.    I know the first name's Kevin.

14         Q.    And where was the job that you had at

15   Electrolux; where was Electrolux located?

16         A.    At the time -- well, it was -- it was out

17   of Pittsfield, but there was a satellite office in

18   Greenfield which I ended up running.

19         Q.    Did you have employees other than yourself?

20         A.    I think I did.  Yes, I did.

21         Q.    Salespeople?

22         A.    Yes.

23         Q.    How long did you work at Electrolux?

24         A.    I don't recall at this point.  I mean, I'd

1  sequence.  I can't remember exactly but I know that

2  the short guy -- he was very short, he was like five

3  foot two, he threatened me when I was up there about

4  job loss and stuff if I didn't whack this -- it was a

5  huge 6-foot bar that we held to break apart the part

6  of the form structure.  I can't --

7      Q.  Do you remember if you were fired from that

8  job?

9      A.  I think it was a mutual thing where I quit

10  and they fired me.

11      Q.  Okay.  Where is Johnson Ford and Nissan

12  located?

13      A.  That was Pittsfield.

14      Q.  What was the name of your immediate

15  supervisor at that job?

16      A.  I remember his first name.  His name was

17  Bucky.  I don't remember Bucky's last name.

18      Q.  Bennington Motor Company is in Bennington,

19  Vermont, I believe you testified.  Do you remember

20  the name of your --

21      A.  It was actually Bennington Motor Car.  I

22  don't remember my immediate supervisor, any of them,

23  but I'm sure I have paperwork that might tell me

24  stuff.

1      Q.    So you've never lost shared custody of any

2      of your children, is that right?

3      A.    Well, no, I have not.  However, because of

4      the Probate & Family Court denying fathers the right

5      to bring contempt actions against their exes when

6      their exes violate agreements in contracts, in a way,

7      even though I have shared legal custody, I've been

8      denied shared legal custody, so I'm trying to answer

9      your question according to what you're asking.  So

10     has it ever been taken away by the Court, no,

11     Attorney Barker, it has not.  However --

12     Q.    That was the question.  I'm not asking you

13     about --

14     A.    But the Court turns cheek --

15     Q.    -- your politics about fathers' rights.

16     A.    And the enforcement of our right to have

17     rights.  Does that make sense to you?

18     Q.    Yes.  The meeting at Haddad that concerns

19     Kaz Smith you mentioned, you testified previously

20     that you were excluded from that meeting, is that

21     correct?

22     A.    Yes.

23     Q.    Did you feel that you had a right to be at

24     that meeting?

161

1      A.    So I know -- not I believe, but I know --

2      Q.    That's the meeting I'm talking about.

3      A.    -- there were other employees there and

4   they weren't removed forcibly.  That I was.  And

5   being the fact that he brought up that context and

6   how he brought it up, James Salvie, to vote on

7   whether or not Kaz Smith can stay employed there, I

8   have the belief that there could be the probability

9   that I was also discussed because I was removed

10  physically from being in that meeting.  Does that

11  answer your question?

12     Q.    So you believe you were removed because you

13  were discussed at that meeting?

14     A.    I know that Kaz Smith was about to be

15  discussed.  I can't say that I know for sure until I

16  have my interrogatories answered from your client.

17  Does that answer your question?

18     Q.    Not really, no, and your interrogatories

19  are gone, the deadline's long gone, so forget about

20  those.

21     A.    No, the judge said I could still file

22  interrogatories.

23     Q.    No, he did not.  You look at the order.

24     A.    I didn't get an order.

1      A.   Yes.

2      Q.   And what was that right based on?

3      A.   I was an employee just as much as the other

4    employees were employees.   That I should have been

5    entitled to participate and not be selectively

6    discriminated against been by James Salvie because he

7    had such a visceral hatred for me and he did it on a

8    day to day --

9      Q.   I'm not asking about other discrimination,

10   I'm asking about this one meeting.

11     A.   Yes.

12     Q.   And you believe that your right to be at

13   that meeting was because you were an employee of

14   Haddad, is that correct?

15     A.   Say that again.

16     Q.   Yes.   Your right to be at the meeting where

17   you believe Kaz Smith was discussed was based on the

18   fact that you were an employee of Haddad, is that

19   right?

20     A.   Let me correct you on something.   I know

21   that he was discussed because the question came up

22   prior to the fact that I was forcibly removed from

23   the meeting.

24     Q.   Okay.

```
1              Q.    All I'm asking about is why you think you

2       had a right to be at that meeting, and it sounds like

3       what you're saying is it's because you were an

4       employee of Haddad, and all the other employees

5       got -- or some other employees got to be at that

6       meeting, is that right?

7              A.    What?  Say it again.

8              Q.    The meeting at which Kaz Smith was

9       discussed, it sounds to me as though what you're

10      saying is some employees were at that meeting so you

11      felt you had a right to be at that meeting also

12      because you were an employee of Haddad.

13             A.    That's correct, it wasn't just a management

14      meeting.  There were other sales and leasing

15      consultants there besides management.  So it wasn't

16      Scott in a meeting with a manager or two managers and

17      they asked me to step out.  I was physically removed

18      from --

19             Q.    You've already testified about that.  I'm

20      asking about why --

21             A.    I want to make sure its emphatic that you

22      understand that, because apparently you don't get it

23      yet.

24             Q.    You testified about it so there's no reason
```

# EXHIBIT 6

Michael S. Pearlman
September 17, 2007

1

UNITED STATES DISTRICT COURT

For The District Of Mass.

of the Trial Court

C.A.No.: 0/05-CV-30160-KPN


SCOTT STERN

        PLAINTIFF

vs.


HADDAD DEALERSHIP OF THE BERKSHIRES,

ET ALS.

        DEFENDANTS




--------------------------------------------------

    DEPOSITION OF:  MICHAEL S. PEARLMAN

--------------------------------------------------




        Taken before Roxanne C. Costigan, Certified

Merit Reporter, Notary Public, pursuant to Rule

30 of the Massachusetts Rules of Civil

Procedure, at the law offices of BACON & WILSON

P.C., 33 State Street, Springfield, MA, on

September 17, 2007.




        Roxanne C. Costigan

7

1    year 2000.  I believe there was -- and I provided you

2    with the record since 2000 as I was directed by the

3    Court.  But I believe there was also some time prior

4    to that that I -- and I believe it was starting about

5    1992.

6        Q.    Was there an interruption of your

7    treatment of Scott Stern?

8        A.    I don't remember.  I mean, I think there

9    was an interruption, but the amount of the

10   interruption, I'm not sure at this time and that is

11   the amount of time I'm not sure about.

12       Q.    Are you still treating Scott Stern?

13       A.    Yes.

14       Q.    You're sure that at least you have

15   treated him continuously from 2000 through the

16   present?

17       A.    Yes.

18       Q.    What is it that you're treating him for?

19       A.    He -- if you're asking, I assume you're

20   asking the diagnosis?

21       Q.    Sure.  Let's start with that.

22       A.    In my opinion, he has certainly Bipolar

23   NOS, which is bipolar disorder not otherwise

24   specified.  In my opinion, he also has attention

**Michael S. Pearlman**
**September 17, 2007**

8

1    deficit disorder, hyperactive.  And in my opinion, he

2    has Bipolar Disorder I, Roman Numeral I.

3        Q.    When you say Bipolar NOS and bipolar

4    Roman Numeral I, are those different diagnoses?

5        A.    Yes.

6        Q.    Can you explain the difference?

7        A.    Sure.  Bipolar NOS is something that I

8    diagnosed him as having probably around the year

9    2000, and in that, someone has some features of

10   bipolar disorder but does not meet the criteria for

11   Bipolar I.  In order to meet the criteria for Bipolar

12   I, a person has to have had a manic episode, lasting

13   at least seven days in their life, in their lifetime.

14        A person who has Bipolar NOS without

15   Bipolar I hasn't had a manic episode, even for

16   more -- four days or more, but they have other signs

17   like racing thoughts or manic episodes that last less

18   than four days.

19        I should also say, to be more complete in

20   terms of my answer about the diagnosis, that I think

21   he has a chronic hypomanic personality.  That is, his

22   personality style is that of someone who is

23   hypomanic.

24        Q.    Have you treated him for any condition

1    other than these conditions that you just listed?

2         A.    As part of his bipolar disorder, he has

3    at times been depressed, and as far as I remember, I

4    have treated him for depression in the past.

5    Whether -- well, I would stop there.

6         Q.    So, the depression is separate from the

7    bipolar disorder?

8         A.    Well, what goes up must come down.  So,

9    usually when somebody has highs, they also have lows,

10   but the American Psychiatric Association does have

11   separate diagnostic categories for different forms of

12   depression.

13        Q.    Was there a particular category that

14   Mr. Stern's depression fit into?

15        A.    Not that I remember.

16        Q.    Let me, if I could, just show you once

17   again Exhibit B, which I showed you just briefly

18   before the deposition started, and ask you, if I

19   could, can you authenticate that those are the

20   records that you sent to me a couple of weeks ago in

21   connection with this lawsuit?

22        A.    Well, these are many, many pages, so, but

23   it certainly appears to me that these are the records

24   that I sent to you.

Michael S. Pearlman
September 17, 2007

12

1          and B-2, the letter that does appear to have

2          the PS.

3          Q.    (By Mr. Barker)  These letters both read,

4    in the second paragraph, "In my opinion, he" --

5    referring to Scott Stern -- "is disabled and unable

6    to hold a job on a permanent basis due to his

7    illness."  Have I read that correctly?

8          A.    Yes.

9          Q.    Is that your or was that your opinion at

10   the time you wrote these letters?

11         A.    Yes.

12         Q.    Is that still your opinion now?

13         A.    Yes.

14         Q.    Was that your opinion or would that have

15   been your opinion back from the time you started

16   treating him in 2000?

17         A.    No.

18         Q.    When was it in your opinion that he

19   became incapable of holding a job?

20         A.    I don't know.  I don't know.  If I may

21   explain a little bit my answer?

22         Q.    Yes.

23         A.    Because your question was, I believe you

24   said would that have been your opinion when you first

13

1   started treating him.  I think I wasn't sure at that

2   time and I hadn't made up my mind.  So, it's not as

3   if he necessarily has become disabled at some point

4   between 2000 and now.  It's just that I hadn't

5   decided that he was permanently disabled until a

6   certain point.

7        Q.    Okay.  So, if I can ask you this:  Is

8   part of what you're saying that he actually could

9   have been incapable of holding a job back in 2000 but

10  you might not have had that opinion yet?

11       A.    Correct.

12       Q.    Thank you.  What do you base this opinion

13  on?  Sort of give me a list of everything you base

14  the opinion on if you could.

15       A.    Well, he has a mood which is irritable,

16  at times euphoric with racing thoughts, such that he

17  tends to be impulsive.  He tends to stay up late at

18  night, often until four or five in the morning, and

19  therefore doesn't get enough sleep and therefore

20  doesn't make it in to work.

21            He will readily fly off the handle and

22  get angry and feel angry and express anger toward

23  people he is working with including superiors, and

24  often in an inappropriate way, and he doesn't have

Michael S. Pearlman
September 17, 2007

14

1   very good judgment as to what's appropriate in those

2   circumstances.

3              And I believe those flaws in judgment and

4   his mood disorder are all connected to his bipolar

5   disorder.

6        Q.    When you treated Mr. Stern in the period

7   of 2000 to 2002, which is sort of the period I'm

8   going to focus on for a minute, during that period,

9   was he -- did he display these symptoms of

10  irritability?

11       A.    May I look at the chart to --

12       Q.    Absolutely, please.

13       A.    -- refresh my memory on that?

14       Q.    Let me just ask you, for the record,

15  you're referring to a folder that I can see includes

16  handwritten notes.  Is it true that that folder is

17  the same as the documents that you have produced?

18       A.    Yes.

19       Q.    Thank you.

20       A.    So, the first time I saw him in 2000, on

21  March 28, 2000, he stated that he has a professor at

22  Rutgers that says that he is manic depressive and has

23  been pressing him to take medication.

24              I asked him about -- I asked him a bunch

**Accurate Court Reporting**
**(413) 747-1806      (413) 747-1818**

**Michael S. Pearlman**
**September 17, 2007**

15

1    of questions to see whether he had -- he was or had

2    been mania.  He said that sometimes he has pressive

3    speech.  This is in response to my direct question,

4    when I asked him about racing thoughts, that his

5    thoughts going rapidly through his head, he said,

6    yes, I have a lot of ideas.  My thoughts race.

7                I asked him about taking risks that he

8    shouldn't be taking.  He talked about a number of

9    different risks that he had taken in the past.

10               And so, I thought he was, at that time I

11   thought, I write down possible hypomanic personality.

12          Q.    Okay.  When you talk about risk taking,

13   is that similar to what you meant by impulsive?

14          A.    I wouldn't -- yes and no.  Impulsive

15   means that somebody does something without really

16   resting briefly and thinking through the consequences

17   of the action.  Yeah.  And yes, risk taking is

18   somebody who takes action without considering the

19   negative consequences.

20          Q.    Is it fair to say that you found

21   Mr. Stern to be impulsive back in 2000?

22          A.    Absolutely.

23          Q.    Do you know that he -- whether or not he

24   engaged in the behavior that you were talking about

Michael S. Pearlman
September 17, 2007

16

1   of staying up late, not getting enough sleep, and not

2   making it in to work or not making it in to work on

3   time back in that period of 2000 to 2002?

4        A.    Well, I'll look through my notes and see

5   if I can find evidence of that or not.

6        Q.    Thanks.

7        A.    He said on that day, March 28, 2000, I'm

8   like both the road runner and wily coyote, I want to

9   take the devious route and not take time.  So, he was

10  acknowledging to me that he was impulsive on that

11  day, in that he --

12       Q.    Right.

13       A.    So, if you would like, I can go through

14  other parts of my notes, but I assume that's

15  sufficient.

16       Q.    Actually, what I'm actually doing is sort

17  of taking some of the symptoms that you set forth

18  previously and I'm kind of going one by one or at

19  least in groups.

20       A.    Good.

21       Q.    And I'm trying to ask you if those were

22  displayed back in the period of 2000 to 2002.

23       A.    Would you like me to go through session

24  by session, and I mean, I'd be happy to do that if

Michael S. Pearlman
September 17, 2007

17

```
 1   you want me to?

 2        Q.    Sure.  It probably -- you probably don't

 3   need to quite do that, but maybe if you would take a

 4   moment just to review your notes at least from that

 5   period.

 6        A.    Oh, sure.

 7        Q.    And then I'll ask you the questions or

 8   the --

 9        A.    Sure.

10        Q.    -- symptoms?

11        A.    And when you say 2000, would you like me

12   to stop at January 1st, 2002, or the end of 2002?

13        Q.    No.  Actually, if you don't mind going

14   through the end of 2002, that's sort of the pertinent

15   period.

16        A.    Sure.

17        Q.    Thank you.

18        A.    Okay.

19        Q.    Thank you.  Let me ask you about these

20   symptoms.  I think you already testified that during

21   this period of 2000 to 2002, that Mr. Stern had

22   already been experiencing some of the symptoms such

23   as racing thoughts, impulsivity, and irritability, am

24   I correct?
```

Michael S. Pearlman
September 17, 2007

18

| | |
|---|---|
| 1 | A.    Correct.  Yes. |
| 2 | Q.    Then I was going to ask you about the |
| 3 | symptom of staying up late, not getting enough sleep, |
| 4 | and therefore not making it in to work the following |
| 5 | day. |
| 6 | A.    My memory is that that occurred during |
| 7 | that time, yes. |
| 8 | Q.    Then the next symptom you mentioned was |
| 9 | symptoms of anger and sort of flying off the handle |
| 10 | at times when it was inappropriate, for instance, |
| 11 | with superiors at a job.  Is that a symptom that |
| 12 | would have manifested during this period of 2000 to |
| 13 | 2002? |
| 14 | A.    Yes.  My memory is that that definitely |
| 15 | would have. |
| 16 | Q.    And then the last symptom that you |
| 17 | mentioned was with displaying poor judgment under the |
| 18 | circumstances, and I think that was in the context of |
| 19 | work? |
| 20 | A.    Mm-hmm.  Yes. |
| 21 | Q.    Is that a symptom that manifested in |
| 22 | Mr. Stern during this period of 2000, 2002? |
| 23 | A.    My memory is yes, that that happened. |
| 24 | Q.    Let me also show you this other -- I |

1  should have shown you first -- letter from Exhibit B

2  from your records which is a February, 2001, letter.

3  Let me see if I can find it.  You can mark this as

4  B-3.

5                    (Exhibit B-3, marked)

6        Q.    (By Mr. Barker)  Let me show you what's

7  been marked as Exhibit B-3, which appears to be a

8  letter from you or at least appears to be on your

9  stationery?

10       A.    Yes.

11       Q.    That is dated February 12, 2001.  Do you

12  want to read that for a minute?

13       A.    Sure.

14       Q.    If you haven't.  Thank you.

15       A.    I've read it.

16       Q.    First of all, is this a letter that you

17  wrote?

18       A.    Yes.

19       Q.    Did you write it on or about the date

20  it's dated, February 12, 2001?

21       A.    Yes.

22       Q.    Is that your signature on the letter?

23       A.    Yes.

24       Q.    I want to ask you about the second

Michael S. Pearlman
September 17, 2007

20

```
1   paragraph, I believe, which I think reads this
2   illness -- sorry -- that illness impairs his ability
3   to obtain and retain steady employment.  Have I read
4   that correctly?
5        A.    Correct.
6        Q.    This refers to the bipolar disorder in
7   the previous line?
8        A.    Yes.
9        Q.    So, is this an inability or a difficulty
10  with retaining employment that Mr. Stern had back in
11  2001, is that what this letter is referring to?
12       A.    Absolutely.
13       Q.    Does this sort of change your opinion or
14  refresh your recollection as to whether or not he had
15  the ability to retain steady employment during this
16  period, during the period of 2000 and 2002?
17       A.    Yes.
18       Q.    Tell me what your memory of that is now.
19       A.    Based on this letter, it was obvious that
20  I had strong concerns that he was having difficulty
21  obtaining and retaining steady employment on that
22  date.  I did say that the medications were partially
23  successful but clearly only partially.
24       Q.    Thank you.  And that's in 2001?
```

21

1        A.      February 12, 2001, yes.

2        Q.      Do you know what the medications were?

3   This letter refers to combination of mood

4   stabilizers.

5        A.      I can check in the record, I mean,

6   because there were a number of different medications

7   that he was on in that period.  In order to answer

8   correctly, I think I'd like to check the notes from

9   that date.

10       Q.      Okay.

11       A.      Yeah.  At that time, he was on Depakote,

12  250 milligrams, two in the morning, and he was also

13  on Topamax, 25 milligrams, at night.

14       Q.      I'm actually going to come back to the

15  medications a little bit later.

16               Let me ask you about one very specific

17  thing which I wanted to ask, and that is, if you look

18  at your notes of August 28 of 2000, let me mark that

19  as B-4 in Exhibit B.

20               (Exhibit B-4, marked)

21               MR. BARKER:  Thank you.

22       Q.      (By Mr. Barker)  So, let the record

23  reflect that I've marked one page of handwritten

24  notes as part of Exhibit B as sub Exhibit B-4.  Dr.

**Michael S. Pearlman**
**September 17, 2007**

22

1  Pearlman, are you referring to your notes that are

2  the original of Exhibit B-4?

3       A.    Yes.  Yes.

4       Q.    Thank you.  If you look about

5  three-quarters of the way down, there appears to be a

6  notation, "I was fired from my job at Burger King."

7  Do you see where it's --

8       A.    Yes.  Yes.

9       Q.    Have I read that correctly?

10      A.    Yes.

11      Q.    Is this something that Mr. Stern would

12  have said to you, that's why it's in these notes?

13      A.    Absolutely.

14      Q.    Were you aware that, including Burger

15  King and also the Haddad Motors dealership which I'm

16  representing, that Mr. Stern has been fired from at

17  least seven jobs?

18      A.    I didn't know the number of jobs, but I'm

19  not surprised.

20      Q.    Okay.  These -- this is simply from his

21  deposition basically when we went through his job

22  history and how he left each job.

23      A.    Mm-hmm.

24      Q.    So, it is actually according to him.  I

1    mean, I have not independently verified the jobs that

2    he was fired from, or for that matter, I have not

3    independently verified the jobs that he said he

4    wasn't fired from and quit in protest was one of

5    them.

6              The first of these was back in the 1990s

7    from D'Angelo's, then there was the Burger King one,

8    and then there were a couple in the late 1990s and

9    early -- in 2001 from Electronic Boutique and another

10   one from Johnson Nissan.

11             Is that pattern of difficulty holding a

12   job consistent with your psychiatric opinions about

13   Mr. Stern's condition at those times?

14        A.    Yes.

15        Q.    Let me show you, if I could, Exhibit C

16   through F.  I want to go through each one.  If I

17   could first show them to you and ask you to review

18   them and then I'll ask you some general questions

19   about them first.

20        A.    Sure.

21        Q.    These are four notes that appear to be on

22   your prescription pads, is that true?

23        A.    I believe the last one --

24        Q.    Actually, strike that.

**Michael S. Pearlman**
**September 17, 2007**

53

```
 1   thing that you would have made notes about during

 2   your sessions with Mr. Stern, contemporaneous notes,

 3   I mean?

 4        A.     Not necessarily.  I mean, because I

 5   might -- I would tend to be focussing on his mood and

 6   the treatment that I -- for instance, I assume that

 7   at that time -- I mean, he may have come in quite

 8   late for a 45 to 50 minute appointment.  So, we might

 9   not have very much time.  So, the answer is under

10   ideal circumstances, yes, obviously.

11            But if you're in a situation where you

12   have five or ten minutes to see somebody, and you

13   have to think about what are your priorities, you

14   focus on trying to get a general assessment of their

15   mood and a general assessment as to how you should

16   treat them.

17        Q.     Was that something that happened often,

18   Mr. Stern would be late for his appointments with

19   you?

20        A.     That's my memory.

21        Q.     Is paranoia a symptom of bipolar

22   condition?

23        A.     Sometimes.

24        Q.     Is that something that affected Mr. Stern
```

Michael S. Pearlman
September 17, 2007

54

1   in your opinion?

2        A.    He tends to be more suspicious than the

3   average person.

4        Q.    Are you using suspicious as a different

5   word from paranoia; why that word choice, Doctor?

6        A.    Well, sometimes when people talk about

7   paranoia, they mean anxiety, sometimes they mean

8   suspiciousness, and sometimes they mean

9   suspiciousness to the extent of delusional, you know.

10  So, that's why I was trying to be more precise about

11  that.

12       Q.    Where on that continuum would you say

13  that Mr. Stern fell?

14       A.    He tends to be suspicious.

15       Q.    Is that a quality that he has had for

16  several years; for instance, would he have had that

17  back in 2000 to 2002, in that period?

18       A.    Yes.  Yes.

19       Q.    If you want to take a break at any time,

20  let me know.

21       A.    I'm fine.

22       Q.    I don't have too much more.

23       A.    No.  I'm fine.

24       Q.    Could I ask you to find the original of

Michael S. Pearlman
September 17, 2007

67

1              So, I believe it was after my meeting

2      with her that she began paying at least partly for

3      the treatment.

4              Q.    Was that up until Mr. Stern was granted

5      SSI income that she paid for the treatment with you?

6              A.    Until I believe he started getting

7      Medicare when I -- in other words, even though he is

8      getting SSI income, that's not an insurance company

9      that I can bill to.  So, then after a while, after a

10     while after he started getting SSI income, he gets

11     Medicare, and I can then bill them.

12             Q.    Is part of Mr. Stern's condition

13     overreacting to situations, is that accurate?

14             A.    Yes.  Definitely.

15             Q.    Would it be likely that he would perceive

16     criticism, for instance, at work in a different way

17     than a person without this condition would perceive

18     such criticism?

19             A.    Yes.

20             Q.    Can you tell me how that would -- what

21     that difference is in your opinion?

22             A.    Well, it would hurt -- any kind of

23     criticism would tend to hurt him more.  And he would

24     tend to at least verbally move into action quicker

Michael S. Pearlman
September 17, 2007

68

1   than some people because of that, than many people.

2          Q.     When you say verbally move into action,

3   you mean in an aggressive or defensive way?

4          A.     In some way that would be not helpful to

5   him.

6          Q.     Do you have any sense of how his

7   condition affected his relationships with people at

8   Haddad Motors?

9          A.     I don't have specific data on that.

10                MR. BARKER:  I think that may be

11         all.  Let's take a break and let me make a

12         phone call and I think that's all I have.

13                MR. STERN:  Okay.  Great.

14                     (A recess was taken)

15                MR. BARKER:  Back on the record.

16         Q.     (By Mr. Barker)  Dr. Pearlman, in your

17  opinion, because of Mr. Stern's condition, would he

18  take criticism badly at any employment?

19         A.     Obviously it would depend on the

20  individual situation, but in general, he would tend

21  to have a difficult time with criticism, especially

22  if he doesn't have an alliance or a sense of trust in

23  the employer.

24         Q.     Because of Mr. Stern's condition, is it

Michael S. Pearlman
September 17, 2007

69

```
1    possible that he would perceive things that weren't

2    necessarily meant to be harsh criticism as harsh

3    criticism from his employer?

4          A.     It's certainly possible, yes.

5          Q.     Is it likely because of his condition?

6          A.     It's more likely than the average person

7    would do.

8                      MR. BARKER:  I think that's all I

9          have.  Thank you.

10                     THE WITNESS:  Good.  Thank you.

11         Thank you.

12                         (Witness excused)

13                         (Deposition concluded)

14

15

16

17

18

19

20

21

22

23

24
```