UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
WESTERN DIVISION

SPRINGFIELD, MASSACHUSETTS                   CIVIL ACTION No.05-30160-MAP

SCOTT STERN,                              )
            Plaintiff,                    )
        vs.                               )
                                          )
HADDAD MOTOR GROUP, INC.; JAMES           )
SALVIE, GENERAL SALES MANAGER,            )
TIMOTHY CARDILLO, SALES                   )
MANAGER, DAVID MICHAEL COGGINS,           )
GENERAL MANAGER, GEORGE                   )
HADDAD, in their Official and Personal    )
Capacities of HADDAD MOTOR GROUP,         )
INC.                                      )
                                          )
        Defendants                        )

### PLAINTIFF"S OPPOSITION, IN PART, TO DEFENDANT'S REQUEST FOR ADMISSIONS TO PLAINTIFF

Now comes plaintiff Scott Stern, Sui Juris, and hereby prays for the following

answers to be submitted into the record of this Honorable Court and does hereby oppose

certain and specific requests by the defendants which are incongruous statements

submitted by the defendants, James Salvie, David Michael Coggins, Timothy Cardillo,

George Haddad, in their personal and official capacities of Haddad Motor Group, Inc.

(collectively the "Haddad Defendants") as factual.

1. Admit, Plaintiff was a full-time employee of Haddad Motor Group, Inc., d/b/a

Haddad Dealerships of the Berkshires between April of 2002 and February 3, 2003. By

and because of defendants wrongful termination of plaintiff, plaintiff began various

prescriptions of medication from his Doctor, Doctor Michael Perlman. Consequently, the

Complaint filed with the Massachusetts Commission Against Discrimination had some

PLAINTIFF'S OPPOSITION TO DEFENDANTS REQUEST FOR ADMISSIONS

1

blatant, obvious errors, that, plaintiff, did not clearly read, including, but not limited to, item #6, that stated "last week of February 2003" which is obviously incorrect, since plaintiff was terminated on February 3, 2003. For all intents and purposes, plaintiff did not "pen" the complaint; the complaint was written by an intern at the Massachusetts Commission Against Discrimination whom plaintiff had wrongfully entrusted to protect plaintiff's rights, liberties and privileges. Subsequently, the errors plaintiff did not clearly read were due to plaintiff's dosage of prescribed medication and documented disability, bipolar disorder, and AADD (Adult Attention Deficit Disorder) and the negative affects of the depression resulting from defendants egregious treatment of plaintiff.

    2. Deny, Defendants request for admission states that plaintiff's disability no longer exists by the phrase "was", plaintiff's disability is prevalent and continuing, on a day to day basis, and, by and because of the acts, actions, policies and practices of the defendants, has become worse by having to relive the anguish that the defendants intentionally inflicted upon plaintiff. Additionally, the defendants deposed plaintiff's Doctor, whom, upon questioning by defendants Attorney John Barker, stated plaintiff suffered from more than one disability. (See deposition of Dr Perlman)

    3. Admit; Plaintiff does suffer from bipolar disorder during the period of time plaintiff was employed at Haddad Motor Group, Inc. d/b/a Haddad Dealerships of the Berkshires between April 2002 and February 3, 2003.

    4. Deny; Plaintiff is under the belief, after having reviewed the notes of Phyllis Mitchell, Massachusetts Office on Disability that are herein attached as an exhibit, that plaintiff indicated to Phyllis Mitchell, a Civil Rights Advocate in the Massachusetts
PLAINTIFF'S OPPOSITION TO DEFENDANTS REQUEST FOR ADMISSIONS

2

Office on Disability, that plaintiff informed the Haddad defendants as early as May of 2002, during a meeting regarding a singular event that plaintiff was not written up for, nor does any documentation by defendants exist for this event to which they seem to falsely aver occurred on more than one occasion.

5. Deny: Plaintiff is not knowledgeable of what the defendants know, knew or attempt to lead this Honorable Court to believe. Consequently, plaintiff denies this allegation and assertion by the defendants averment in this statement.

6. Deny; Deny adamantly; Defendants submit a false averment to this Honorable Court. The documents plaintiff herein submits as documentary evidence clearly state the opposite, including, but not limited to; plaintiff's ability to sell vehicles, master the required tests, perform daily requirements, and satisfy customers by his personal and professional service; defendants mandated and forced upon plaintiff, singular and unique to plaintiff, job conditions, denied him access to his family (children), demanded that plaintiff could not work a shift in lieu of Sundays in order to participate in court-ordered visitation (only Sundays) to visit plaintiff's children, while defendant James Salvie's relative, Pat Cody, was granted and assisted with extra sales in order to go golfing each and every Sunday, regardless of the weather for golfing, which said assistance came at the expense of plaintiff's sales leads and database without his permission, knowledge and consent, in order to deprive plaintiff of income and the right to earn a living at defendants establishment, all while being subjected to a hostile work environment by other employees and management. Defendants treated plaintiff differently, not equally as other sales people, which resulted in disparate treatment towards plaintiff, including, but not limited to, discrimination by defendants acts, actions, inactions and polices, practices and

PLAINTIFF'S OPPOSITION TO DEFENDANTS REQUEST FOR ADMISSIONS

3

procedures that held plaintiff to a different standard than plaintiff's co-workers and other Haddad Motor Group, Inc.'s employees. Defendants do not provide this Honorable Court with Exhibits that were received by defendants at the deposition of Scott Stern, including, but not limited to, Exhibit M and Exhibit U which are herein attached to show the "Hostile Work Environment" that plaintiff was subjected to and that was an on-going, continuous issue that defendants failed to correct. (See Exhibit M; Exhibit N; Exhibit O- All three are interrelated, the same writing by plaintiff on the day the incident occurred at Haddad Motor Group, Inc. d/b/a Haddad Dealership of the Berkshires. Defense Counsel purposely labeled these three documents separately in order to make the documentation of providing documents to this Honorable Court more difficult of proving "Hostile Work Environment." Exhibits M, N, and O are, in fact, the same incident. Note Exhibit U, a five (5) page document, of an email from plaintiff to James Wilcox, in care of Phyllis Mitchell, Civil Rights Advocate whom is blind, is not identified and marked for each of its pages by defense counsel.).

7.  Deny; Plaintiff sought "Flex Time" as plaintiff was directed to request by Phyllis Mitchell, Civil Rights Advocate, Massachusetts Office on Disability. Plaintiff clearly recalls the question being asked by Timothy Cardillo, defendant in this manner regarding the term "Flex Time", defendant Cardillo stated, "What do you mean by "Flex Time?" To which plaintiff responded "That the term meant flexibility in allowing plaintiff to arrive sometimes later than scheduled shifts, and, should plaintiff not arrive at the scheduled time, by and because of plaintiff's documented disability (which, defendants were knowledgeable, aware and cognizant of, having read a Doctor's note the previous day, November 26, 2002 see Affidavit of James Salvie-reference to "Bipolar"

PLAINTIFF'S OPPOSITION TO DEFENDANTS REQUEST FOR ADMISSIONS

4

and not knowing what it was), plaintiff would not be disciplined because of plaintiff's documented disability under the Americans with Disabilties Act which plaintiff invoked during the meeting of November 27, 2002 as his right, but defendants received plaintiff's protected activity as a "threat of a lawsuit." (See affidavit of Timothy Cardillo-and misperception of "documented disability" as a "disease", which said terminology is a stigma and an indicator of managements insensitivity and unawareness of the disabled and their rights.) Likewise, at plaintiff's deposition on August 30, 2007, plaintiff submitted Exhibit L which discusses "Light Therapy" and "Depression and the body clock" in that "depression sufferers also had difficulty sleeping and generally felt worse in the morning."

    8. Deny; Plaintiff sought "Flex Time" and the "grace period" of "fifteen (15) minutes" was not "reasonable" nor "accommodating" if, after the "fifteen (15) minute grace period", plaintiff would be disciplined for arriving past this "grace period." The cost to the Haddad Defendants for plaintiff's "reasonable accommodation" would have been zero (0) dollars. (See Case law Reasonable Accomodation should not be disciplinary action) Certainly, had they followed their own Employee Handbook, it would have saved them thousands of dollars in litigation and attorney's fees. Of course, defense counsel, having falsely averred various statements, would be disinclined to tell the truth, not only to the MCAD tribunal, but also, this Honorable Court, by and because it would directly and adversely affect their income and ability to derive a profit from representing the defendants, individually and collectively, for defendants wrongful, egregious, intentional, discrimination, of plaintiff. (Of course, defendants could sue counsel in the event they lose this litigation for legal malpractice for counsels false and

PLAINTIFF'S OPPOSITION TO DEFENDANTS REQUEST FOR ADMISSIONS

fraudulent statements.) Additionally, defendants own Employee Handbook, of which, defendants fail to admit into evidence, avers defendants alleged adherence to the United States Act entitled "Americans with Disabilities Act-1990", which, by their policy, practice and procedure, of denying plaintiff's reasonable accommodation, resulted in discrimination against plaintiff, which warranted, ultimately, an action in this Honorable Court. In addition, defendants act, actions, inactions and policies, practice and procedure could be construed as an unfair trade practice pursuant to the understanding plaintiff had beginning employment with Haddad Motor Group, Inc., d/b/a Haddad Dealerships of the Berkshires in April of 2002.

9. Deny; Plaintiff did not request a "fifteen (15) minute" so called "grace period" but rather, requested "Reasonable Accomodation" under the term and terminology known as "Flex Time", as was suggested by Phyllis Mitchell, Civil Rights Advocate, of the Massachusetts Office on Disability.

10. Deny; Plaintiff presented defendants with a Doctor's note, at their request from a meeting that transpired on November 26, 2002. (See Doctor's note of Dr. Michael Perlman) that states: "I'm a psychiatrist who treats Scott Stern for bipolar disorder. He is definitely improving. I encourage his employer to work with him as he continues to improve." This doctor's note was on medical transcription paper, and, at the top of the center of the page is the name, address, city and state of the Doctor and reads as follows: "Michael S. Perlman, M.D., 57 Gothic Street, Northampton, Massachusetts 01060" Below this heading, on the right side of the note the date is written as 11/27/2002. This note was obtained on the day of the Doctor's visit by request of defendant Haddad Motor Group, Inc. d/b/a Haddad Dealerships of the Berkshires. In addition, plaintiff
PLAINTIFF'S OPPOSITION TO DEFENDANTS REQUEST FOR ADMISSIONS

6

reiterates that plaintiff sought a "reasonable accommodation" discussed with defendants as "Flex Time" and not a "fifteen (15) minute" grace period as the defendants sought to impose upon plaintiff with the threat of disciplinary action should plaintiff arrive past this "fifteen (15) minute" period of time. The topic of the Americans with Disabilities Act at the meeting of November 27, 2002 invoked plaintiff's rights, liberties, privileges and immunities under the Americans with Disabilites Act and defendants sought to impose new, rigid, strict standards on plaintiff, after the meeting of November 27, 2002, including, but not limited to, revamping plaintiff's schedule to all early shifts; defendants knowing, purposely that this was an intention to "set up" plaintiff for "failure" and "dismissal" while mandated the taking of "product tests", instituted on November 27, 2002, which were not even discussed during plaintiff's first seven (7) months of employment with defendants. Plaintiff's co-workers sales associates were not scrutinized over the non participation to the tests and the taking of the tests. A new policy of using the "time clock" for commissioned sales people, contrary to defendants "Employee Handbook", was instituted in order to terminate plaintiff, holding plaintiff to a different standard than other employees, which resulted in discrimination and unequal treatment by defendants against plaintiff. In addition, plaintiff was required to have management sign off on plaintiff's timecard when hours were written in, while other sales people were not under the same requirement, thus holding plaintiff to a different standard than plaintiff's co-workers. (See Exhibit U)

11. Deny; Defendants did not request from plaintiff a note that stipulated that plaintiff was "mentally disabled."

12. Deny; Defendants did not request from plaintiff a note that stipulated that PLAINTIFF'S OPPOSITION TO DEFENDANTS REQUEST FOR ADMISSIONS

plaintiff's "alleged mental disability was a bipolar condition."

13. Deny; Haddad Defendants, individually, or collectively, never submitted anything in writing, or verbally stated, to plaintiff that "plaintiff provide them with a doctor's note or letter that an accommodation permitting plaintiff to arrive up to 15 minutes late to work each day, would assist plaintiff's alleged disability."

14. Deny; Plaintiff provided two separate and distinct documents written by Dr. Michael Perlman, on two separate dates, one on November 26, 2002, the second on November 27, 2002. Each of these meetings between the Haddad defendants and plaintiff occurred in defendant David Michael Coggins Office; the following defendants were present at the aforementioned meetings on each day, David Michael Coggins, James Salvie, Timothy Cardillo, and Joseph Scibelli. Defendant George Haddad was not present at either meeting on November 26, 2002 and November 27, 2002.

15. Deny; Plaintiff provided two separate notes to defendants, one of which defendants have submitted as a "true and accurate copy" but does not utilize the term "work with Scott". The aforementioned term is a paraphrase by defendant Timothy Cardillo in defendant Cardillo's affidavit that was submitted to the Massachusetts Commission Against Discrimination prior to the law firm of Michenzie & Sawin, LLC., being retained by Haddad Motor Group, Inc. d/b/a Haddad Dealerships of the Berkshires. Notwithstanding this inaccurate paraphrase, the Massachusetts Commission Against Discrimination intern also incorrectly paraphrased the language used by Doctor Michael Perlman, to wit, the intern wrote "my employer should work with me being the fact that I was showing signs of improvement" which differs greatly from the actual written, note by Doctor Michael Perlman  aforementioned in paragraph ten (10) above.

PLAINTIFF'S OPPOSITION TO DEFENDANTS REQUEST FOR ADMISSIONS

8

16. Admit; The note at Exhibit D that defendants submit to this Honorable Court is a true and accurate copy of the note that plaintiff presented to defendants on November 27, 2002.

17. Deny; Plaintiff personally handed the note aforementioned in paragraph sixteen (16) to defendant James Salvie outside of defendant David Michael Coggins door whom proceeded to walk away from plaintiff, down the hall, toward the copier, with said aforementioned note in his hand. Plaintiff believed that defendant James Salvie made a copy thereof of said note and then returned it to plaintiff, which, after said copy was made, a meeting took place between the Haddad defendants (excluding George Haddad) and plaintiff.

18. Deny; Plaintiff retrieved from plaintiff's wallet on November 26, 2002 a Doctor's note issued by Doctor Michael Perlman (which plaintiff intimated Exhibit C and E in plaintiff's original complaint was similar to the note of November 26, 2002) with the United States District Court, but the original note was submitted before the tribunal and Fair Employment Practice Agency, known as the Massachusetts Commission Against Discrimination, which receives an incentive to close discrimination cases, and has an inherent conflict of interest in receiving bonuses for closing discrimination cases rather than an investigation on the merits of the charge. Plaintiff herein submits the actual, true and accurate copy of the note that was retrieved from plaintiff's wallet on November 26, 2002. Plaintiff herein attests that this is the actual note herein referred to as "Actual Note") because plaintiff had folded said note and placed it within plaintiff's wallet for safekeeping for an extended period of time along with another note from Doctor Michael Perlman that was also in plaintiff's wallet.

PLAINTIFF'S OPPOSITION TO DEFENDANTS REQUEST FOR ADMISSIONS

19. Admit; Plaintiff received notes at Exhibits C, E and F from Doctor Michael Perlman responsive and relative to plaintiff's documented disability known as bipolar disorder.

20. Admit; The notes at Exhibits C, E, and F were not discussed with defendants, prior to plaintiff's wrongful termination by defendant James Salvie, General Sales Manager of Haddad Motor Group, Inc. d/b/a Haddad Dealerships of the Berkshires on February 3, 2003. (Note Exhibit C dated: 3/20/03; Exhibit E dated: 2/18/2000, Exhibits C and E, plaintiff avers herein were intended to represent the note (Actual note dated 3/28/2000 is herein attached, and is the "true and accurate" color copy of that which plaintiff handed to defendants on November 26, 2002-that note, plaintiff found after the date of the deposition and telephoned Attorney Richard Sawin to inform him of such, but, Attorney Richard Sawin did not return plaintiff's repeated phone calls relative to this as well as to settlement of this case; Exhibit F dated: 5/10/04-Massachusetts Commission Against Discrimination requested plaintiff produce a doctor's note and presented to the defendants at the May 19, 2004 hearing before the MCAD.

21. Deny; Plaintiff did not agree "to arrive at work at Haddad no later than 15 minutes late every day he worked at Haddad." Plaintiff sought a "reasonable accommodation" by and through "Flex Time" and was denied a "reasonable accommodation" that would have cost the defendants zero (0) dollars to implement in order to accommodate plaintiff's documented disability known as bipolar disorder.

22. Deny; Plaintiff does not understand the meaning and intent of this question as it is written.

PLAINTIFF'S OPPOSITION TO DEFENDANTS REQUEST FOR ADMISSIONS

10

Dated: _January 2, 2008_

_Scott Stern_

Scott Stern
Sui Juris
All Rights Reserved without Prejudice
400 West Main Street
North Adams, Massachusetts 01247

## **CERTIFICATE OF SERVICE**

I, Scott Stern, hereby certify that I have on this _2_ day of January 2008, answered the Request for Admissions, propounded by defendants, by their attorney, John C. Barker, by mailing a copy of same, postage prepaid, to the following:

Michienze & Sawin, LLC
John C. Barker
745 Boylston Street, 5th floor
Boston, Massachusetts 02116

_Scott Stern_

Scott Stern
Sui Juris
All Rights Reserved without Prejudice
400 West Main Street
North Adams, Massachusetts 01247

PLAINTIFF'S OPPOSITION TO DEFENDANTS REQUEST FOR ADMISSIONS

11

## LIGHT THERAPY & DEPRESSION

EXHIBIT  L
Stern
8-30-07
S. ROY, RPR

### How Does Light Therapy Help Depression?

Since the beginning of time, people have realized the healing power of light. We feel rejuvenated when we're in sunshine, and we literally whither in the dark. In the early eighties, researchers discovered that specialized bright light (20 times brighter than normal indoor light), was the most effective treatment for winter depression. Now tests are confirming that this light is effective for non-seasonal depression as well.

It turns out that light is more than psychological. Light actually produces hormones and neurotransmitters that affect our mood and well being. One of these hormones, serotonin, is thought to be a major factor in depression. One recent study that was reprinted in *The Lancet*, showed that bright light significantly increased serotonin levels, while dark or cloudy days caused serotonin to plummet.

Dozens of clinical, placebo controlled studies have been done using light therapy to treat depression. These studies confirm that light is not only as effective as other methods, but it causes no long-term side effects. Additionally, people responded within a week to light instead of several weeks with medications, and different medication trials were needed before an effective regimen was found.

### More Effective Than Medication Alone

Studies also suggest that the most effective treatment for depression may be a *combination of light and medication*. Both light and medication elicited a quicker and higher quality response than either light or medication alone. More people responded, and they experienced fewer side effects. These studies have led leading researchers to comment,

"It appears that bright light combined with wake therapy and medication might produce a much better antidepressant response much more rapidly than our available antidepressant drugs."

-- Daniel Kripke, MD

Journal of Affective Disorders, 1998

This revelation is highly significant, because medications have never been the panacea people hoped they would be. Medications seem to only cover some symptoms of depression and cause a multitude of unwanted side effects. Most people feel that medications aren't completely helpful, and they are very difficult to discontinue using.

The reason light is so effective is that it appears to correct some of the root causes of depression. One reason people become depressed is because their brain center that controls these hormone cycles has malfunctioned. This brain center is called the Suprachaismatic Nucleus or body clock, and it can easily become imbalanced from trauma, stress, surgery, age or the lack of light. When the body clock becomes imbalanced, it produces the wrong hormones, causing insomnia, energy and mood problems.

### Depression and the Body Clock

Because depression sufferers also had difficulty sleeping and generally felt worse in the morning, researchers realized that depression may be related to the body clock. Knowing that specialized light effectively regulates the body clock, researchers applied light to depression studies. These studies show that Specialized bright light causes an antidepressant response in three ways:

1. Bright light activates the production of brain serotonin. In 2002, the *Lancet* reported that exposure to bright light immediately increased brain serontonin, while dark and cloudy days depleted serotonin levels.
2. Bright light regulates the Suprachaismatic Nucleus, or body clock. With the discovery of specialized light in 1984, researchers discovered that the body clock, located in the hypothalamus, was responsible for sleep/wake and energy/mood cycles. In addition to becoming imbalanced from the lack of light (As with Seasonal Affective Disorder, researchers have also learned that the body clock can easily become imbalanced from stress, trauma, surgery, age, etc. Many people who suffer from depression also have a body clock problem, as they suffer from sleep problems and feel worse at a particular time of day.

3. Bright light suppresses the hormone melatonin. Melatonin is released in the evening time as a signal for the body to withdraw and prepare for sleep. Melatonin is converted from serotonin, and so lowers available serotonin. It also causes feelings of irritablity, withdrawl and sadness. Melatonin is important as a nighttime hormone but daytime or too much melatonin can cause mood problems.

Several studies have documented the advantage of specialized light for depression. Patients responed to light within a week verses several weeks for medication, and light posed no long-term negative side effects. A review of light therapy in Archves of General Psychiatry concluded the following:

"The evidence is in that light is an active neurobiological agent. But light therapy has little chance to be widely and properly used for a variety of ills, as long as it appears to the policymakers and grantgivers to lie uncomfortably between pharmaceutical company neglect (for obvious reasons) and the molecular reductionism of academe. These attitudes strikingly contrast with patients' acceptance of light therapy. Light therapy is easy to administer in outpatient settings, lacks major side effects, and, importantly, is cost-effective. Whatever its mode of action, it demands inclusion in the antidepressant armamentarium, now."

—Archives of General Psychiatry, October 1998

## More Effective Than Medication

Although light has been found to be effective by itself, studies show that a combination of light and medication is more effective than either method alone. Patients responded much quicker with a higher quality of response. Sleep problems improved as well.

In addition to standard light therapy, a novel new treatment, called wake therapy offers relief within 24 hours. Wake therapy involves partial sleep deprivation and morning light therapy to sustain the anti depressant effects of wake therapy. As with standard light therapy treatment, a combination of wake therapy, bright light and medication is most effective.

## Offical Recommendation

Specialized bright light is recommended by the American Psychiatric Association (APA) as well as the American Acadamy of Sleep Medicine. In January 2004, the Cochrane Medical Library issued the Cochrane Review of all depression related light therapy studies, and recommends light therapy for depression treatment. (Cochrane is considered by the medical industry to be the gold standard in medical review.)

## Wilcox, James (MOD)

**From:**      slshwg [slshwg@yahoo.com]
**Sent:**      Tuesday, December 30, 2003 10:51 PM
**To:**        Wilcox, James (MOD)
**Subject:**   Re: Rebuttal

EXHIBIT  U
Stern
8-30-07
S. ROY, RPR

Phyllis

Excellent summation.  Thank you for taking the time to
provide such a clear perspective on what transpired.
I never thought about it the way you did.  It just
never occurred to me as you state, and yes, in fact,
you are correct.

There are some things  that are wrong however.  In
November, prior to November 27th, there was a meeting,
at which time I removed a note, with my Doctor's name
and address on it, it was actually a prescription for
medicine, or bloodwork, from 2001, I believe , I
happened to have had it in my wallet since the time
the doctor gave it to me.  It was frayed at the edges,
but it was not so illegible that my condition, nor my
doctor, nor the patient, could not be read.  My doctor
does not have terrible handwriting.  This note was
passed among the four managers.  In the meeting at the
time was, Joseph Scibelli, sitting to my left,
standing was James Salvie and Timothy Cardillo, and
behind his desk was David Michael Coggins.  It was
from this meeting that a request was made of myself to
produce a note from Doctor stating that Bi-Polar
disorder was the reason I was late.  On November 27th,
I had a meeting with my Doctor and discussed it with
him, his note is what it is.  When I went into work, I
showed the note to James Salvie and Michael Coggins,
but it was not acceptable to them.  I asked if I could
put my request for Reasonable Accomodation in writing,
Michael Coggins adamantly said "NO" and said that
their would be no further discussion on the subject.

Other relevant matters:

Several employees were jealous and envious at the fact
that I had this incredible ability to find customers.
These same employees created an inhospitable
atmosphere for a work environment.

One of these individuals was James Acor, a close
personal friend of James Salvie.  This person could do
no wrong, nor ever get in trouble or be penalized when
his actions were not appropriate.  On the day that he
threated to kill me, and repeated it three times, I
was so scared and upset, that I called 911.  Randy
Farmer, the finance Manager, overheard what was going
on, and insisted that I hang up the  phone.  James
Salvie, Randy Farmer, Jim Acor and myself were called
into the Sales Room to have a chat about the incident.
 I was so upset. Jim Salvie screamed at us and told us
to stop, between the two of us.  Jim Acor laughed it
off as if nothing happened, which got to me even more
which prompted me to scream at James Acor for his
prior actions.  James Salvie attempted to reconcile
the differences between us, of which I knew of none,
but James Acor had a grudge  against me, my clothes,

1

and my person. We tried to resolve the issue and I
even extended my hand as a gesture of good will, but
he walked away from it.

You probably will not find this incident in James
Acor's folder, you may find something in mine, but if
you didn't find it in either, why? I mean, why would
the threat of bodily harm from one employee against
another be not reduced to writing and included in
their folder?

In another incident, Peter Haven, another Salesperson,
accused me, in front of Timothy Cardillo, a inept
parttime Police Officer for the Town of Great
Barrington, that I tried to take some food of his
which I had no idea what he was talking about.  Well,
Peter Haven for several minutes, while I was near the
Sales Desk, in front of Timothy Cardillo, got directly
in my face, threatened me, and became so belligerent,
almost went as far as pushing me.  It was Peters
childish behavior to try to "get me going" but it
failed.  I walked away.  But I was extremely upset, I
was also upset at Timothy Cardillo, Sales Manager, for
"just standing there" as it occurred, and not doing
one thing.  Only minutes later did Timothy Cardillo,
come over to my desk, and apologize for Peter's
actions and tell me that he had a talk with Peter and
told Peter that what he did was wrong.  It was at that
time that I realized that Timothy had turned the
fence, so to speak, and became oblivious to what
people did against me.

Will you find this in my folder?  Maybe.  But will you
find it in Peter Havens?  Probably not.  And if you
don't find it in either, what does that tell you about
the dealership?  It would tell me that they pick and
choose the incidents they wanted to document and to
which employees that felt they needed to document.

Is there documentation showing that Johnny Van Zant
was hours late on a snow day in the winter of
2002-2003?

Or that George Fricke was occasionally late from his
long drive from New York?

Did other employees have to have their time card
"signed off" or only Scott Stern's?  I can't answer
that.

Why were time cards forged for the first 3 or 4
months, maybe longer?  Why were they copied as if we
worked the same shifts week after week?  Why did
Haddad knowingly allow such false record keeping
occur?  Should we have been paid for overtime, if we
did not meet a sales quota?

Should our actual hours been noted according to
Massachusetts State and Federal Labor Law?

Why was it acceptable for Peter Haven to miss three
days of work for alcohol and drug related issues, and
still keep his job?  He was given a one week
suspension for missing work, but allowed to return to
work after he got out of some rehab clinic.  Why was I denigrated, humiliated, and
demoralized in front of employees for being late, but other individuals, such as Van Zant,
were not?  It was because James Salvie tried to give the impression that he liked me but

2

did everything in his power to make my life a living hell.

Why did he take away dozens of even hundreds of sales
leads I was working on? To demoralize me, to cripple
my ability to make an income, of which I was doing a superlative job at.  But where did
these particular leads go?  They went to his first cousins husband, Patrick Cody.   Why?
He certainly had enought staff to give them to.  He had to ensure that Patrick was going
to make a paycheck, and as he once told me, Patrick was a baby, and had to be handled as
such.  Some of the Salespeople couldn't wipe their own ass, unless
James Salvie gave them the paper to wipe it with.   My
customer base was targeted because James figured that
I was pretty good at what I did, was making good
money, and did not want me to have that kind of
income.  His excuse was that I was not talking to my
customers on a every 3 day regular basis.  But I
learned long ago how to handle customers, and it was
not to inundate them with phone calls and over pitch
them.  I have proof to show that my base was larger
then cutdown and taken away.  I can also show that at
one point my list was smaller than others, but others
were not treated the same way.
James Salvie, was always pissed that the older
salespeople did not spend extra time working, nor that
they tended to not get up out of their desk area.   Two
of these people were James Acor and Patrick Cody.   For
whatever reason, James Salvie had this insatiable need
to feed these people their sales and their leads and
their income.  While others had to scratch and sniff
out customers, James Salvie would just take it upon
himself to garnish leads and then redistribute them as
he saw fit.


On other occassions, leads of mine that should have
been split, or handed over to me were stolen by James
Salvie, the General Sales Manager, and given to other Salespersons.  Leads and customers
that if it were me, I would be responsible for splitting the deal or handing it over.
James Salvie played "God" when determining who got what, when and how with customers.   It
proved to me that it was not what you know, or what you did, but who you know.  It paid to
be on James Salvies goodside, and, for all we know, he may have been getting a cut on the
side.  I know that one of the Finance Managers requested such a cut against prospective
commissions given to salespeople.

Peter Haven missed a delivery.  It was announced
several times at the meetings, that if you miss your
delivery, half the sale would go to the person that
delivered the vehicle.  I did such for Peter.  I was
asked to.  As a good employee, and an attempt to be a
"Team Player" I did deliver his vehicle.  It was a
Chevy Truck, I believe.  Did I get half? NO.  The last
weekend I was sent home, Edna Crewdson, whom I had an appointment with on Saturday, came
in for me, but because I was sent home, I could not help this "sale".  I had already
demoed the vehicle prior, and was in regular contact with her.  When they bought the car,
I should have received half the commission.  Michael Coggins announced in the next
Saturday Sales Meeting, that there would no longer be split commissions if you were not
available or something.  It was directed against me, and I approached him afterward of
such, he denied this.  But I lost the sale and at least half the commission.  I also lost
another that weekend.
Haddad's Management would write and rewrite rules as
they saw fit to serve their needs but to punish me.

Their goal was to hope that their actions would make
me quit.  However, I was not going to just quit.  I
was doing well, IN SPITE OF THEIR DETRIMENTAL,
INHOSPITABLE, ABUSIVE, and INTOLERANT attitudes and
behaviors.  They realized this when I just put my head
to the grindstone and continued to do my tests and

3

work, that I did not grumble amongst my co-workers and
brrng myself to the decision to quit their employment.

James Salvie, on more than one occassion, told Timothy
Cardillo that he couldn't handle me anymore and that
Tim had to handle me. When Tim began as a Sales
Manager, he sat down with me, and talked with me, and
suggested structure for me.  In the beginning, Tim was
an exceptional manager and extremely accomodating,
however that would be short-lived because it was
against what James Salvie wanted.


Scott Stern
December 30, 2003


--- "Wilcox, James (MOD)"
<James.Wilcox@modi.state.ma.us> wrote:
> Attached is your rebuttal, prepared by Phyllis.
> Please review it and
> respond to her by email ASAP with any corrections or
> additions.   Thanks.
> Jim Wilcox, Unit Clerk
>
>

> ATTACHMENT part 2 application/msword
name=sternrebuttal.doc


Do you Yahoo!?
Find out what made the Top Yahoo! Searches of 2003 http://search.yahoo.com/top2003

Business Certificate # _9198_

FILING FEE: $25.00

## COMMONWEALTH OF MASSACHUSETTS
### City of Pittsfield

July 7 2006

In conformity with the provisions of Chapter one hundred and ten, Section five of the General Laws, as amended, the undersigned hereby declare(s) that a business under the title of

_Signature Series Pre Owned Vehicles a d/b/a of Berkshire Auto Group LLC_    is conducted at **768 East Street**, Pittsfield, by the following persons:

**Full Name and Residence**

| | |
|---|---|
| **Patrick Sheehan** | **45 Main Street, Dalton MA 01226** |
| **Anthony Mazzeo** | **57 Winesap Road, Pittsfield MA 01201** |
| **James Salvi** | **28 Kathy Way, Pittsfield MA 01201** |

Signature

(SIGNATURE)

(SIGNATURE)

(SIGNATURE)

(SIGNATURE)

## COMMONWEALTH OF MASSACHUSETTS

Berkshire, SS:

July 7 2006

Then personally appeared before me the above-named _Patrick Sheehan, Anthony Mazzeo and James Salvi_, proved to me through satisfactory evidence of identification, which was _Personal Knowledge_, to be the person whose name is signed on the preceding or attached document, and acknowledged to me that he/she signed it voluntarily for its stated purpose.

A certificate issued in accordance with this section shall be in force and effect for four years from the date of issue and shall be renewed each four years thereafter so long as such business shall be conducted and shall lapse and be void unless so renewed.

Notary Public

Expiration Date of Certificate: July 6 2010

RICHARD B. JOHANSEN
MY COMMISSION EXPIRES
JUNE 16, 2011
NOTARY PUBLIC
COMMONWEALTH
MASSACHUSETTS

## CERTIFICATE OF SERVICE page 1

I, Scott Stern, Pro-Se Plaintiff, in this action of Scott Stern v. Haddad Motor Group, Inc., et. al., in the United States District Court, Case Number 05-30160-MAP, certify that I have caused a copy of the foregoing documents:

Copy of "PLAINTIFF'S OPPOSITION, IN PART, TO DEFENDANTS REQUEST FOR ADMISSIONS TO PLAINTIFF"

Copy of "Exhibit Q"

Copy of "Exhibit  T"

Copy of "Exhibit  S"

Copy of "Exhibit R"

Copy of "Exhibit P"

Copy of "Exhibit M"

Copy of "Exhibit N"

Copy of "Exhibit O"

Copy of "Exhibit L"

Copy of "Exhibit U"

Copy of "CERTIFICATE OF SERVICE, page 1"

Copy of "CERTIFICATE OF SERVICE, page 2"

to be delivered, postage prepaid, first class mailing, United States Postal Service, to the defendants, at their respective counsel's address this 2nd day of January 2008.

Michenzie & Sewin, LLC
Richard Sawin, Resident Agent and Manager
John Barker
745 Boylston Street
Boston, Massachusetts 02116-2636

## CERTIFICATE OF SERVICE page 2

to be delivered, by hand to:

United States District Court
1550 Main Street
Springfield, Massachusetts 01103
Attn; Clerk of Courts

_____
Scott Stern
Sui Juris
All Rights Reserved without Prejudice
400 West Main Street
North Adams, Massachusetts 01247

January 2, 2008
Date

EXHIBIT Q
Stern
8-30-07
S. ROY, RPR

J. Salvie
T. Cardillo
J. Scibelli
R. Farmer
F. Foley
M. Madza
Dale Cease
Jim D Newguy
Jim Acor
Pat Cody
Stephen Cohen
John VanZandt
Becky    New Girl

Kicked out of meeting
when Doug arrived late
those in attendance
J Salvie kicked me out of
the meeting. Claimed I
was 7 minutes late when
it was Doug that was late.
He used it as an excuse to
ostracize me. 3 people stating
that Saturday did not come
back to work ever again.

CLIENT SERVICES CASE DATA FORM
**********************************************************************
    I&R - COUNSELING - BRIEF SERVICE: to be completed for all cases
Case Number:  41511   Status (O=Open, C=Closed): O Date Received: 02/05/2003
Intake Worker: MEF Transmit:            Entered by:   Date Entered:
Advocate PJM  Prior Advocate, if any MEF  Client, Caller, or Both? CLIENT
\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\
CLIENT INFORMATION
Sal: Mr.  Name: Scott          Stern             Suffix:
Street Address: 400 West Main Street
Department:
Company:
City/State/Zip:  North Adams      , MA 01247-
Phone Numbers - Home: [413]664-7805 Work:         Extension:
\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\
CALLER INFORMATION
Title:      Name:         ,                     Suff:
Street Address:                    Relationship:
Department:
Company:
City/State/Zip:             ,        -
Phone Numbers - Home:        Work:          Extension:
REFERRAL INFORMATION
How did the individual find out about MOD? CLIENT, FORMER OR CURRENT
Were CAP and VR services explained? N
**********************************************************************
INITIAL MEMO: (Enter initial problem and agreed upon actions):
Client called reporting that he works for Haddad Dealership in Pittsfield, is
a person with Bi Polar, and is having a problems with his employer,
particularly his General Manager regarding his working conditions.
Client has been working there since late April early May of 2002, due to a
situation on the job, he was called to the office for a meeting at which time
he did tell them he was Bi Polar.
Client has had other small situations come up but the main issue is that he
is constantly late but "just a few minuts" each time.  Client reports that GM
did say to him one time that "he would try to accomodate" client but he needs
to be on time.  Client reports that this was not in writting.  Advised client
to but need for flex time in writting with med letter support and should he
be denied, call the office back.  Sent out employer and employee information.
 Should he be denied, he will call back.
02/05/2003===Client called back today reporting that he was terminated on
Monday 2/3/ Also reports that he did attemted to provide RA to Boss with (doc
letter which is poor) but employer would not accept it back then.  Checked
PJM advised to update note, re open and assign.
Client is saying now that back in May, his empoyer would not "let him put an
RA in writting.  Gave him a two week time frame for call back.

CASE INFORMATION:
        (Complete only for cases when full representation.)
%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%
CLIENT's DEMOGRAPHICS
Sex: M  Race:          Birth Date: 03/12/1962 Age Range:
Disability: MENTAL HEALTH DISORDER       TBI: N Hispanic Origins: (H or O) O
\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\|
OPPOSING AGENCY   Social Security Number:
what agency is involved problem?
What is the agency's Case Number?
\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\
IS THIS AN RSA BILLABLE CASE? N

EXHIBIT ___I___
Stern
8-30-07
S. ROY, RPR

EXHIBIT  S
Stern
8-30-07
S. ROY, RPR

10/22/02

walked outside after discourse
w/ Jim Salvie returned punched time on
time clock to verify proximity of
time and his actions to my arrival
time.

EXHIBIT R
Stern
8-30-07
S. ROY, RPR

8/12/02

Discussion of Whether or not Kaz Smith should be hired back; Discussion began prior to 8:30 Clock Microwave to be determined punctuality JS began speaking

① Jo
prior to 8:30; Door to Meeting Room Closed Kaz speaks - Stern missed Kaz's remarks Stern arrived to meeting room @ 8:30 According to Microwave clock. (Sing or not) - JS has his opini

① Joe S; Tim L; Irregardless of what Mgmt thinks it's to the Sales Staff. (What else is now occurring behind closed door

"Okay Scott" "Get Out"

"You do this to me every morning"

"No, I don't"

Door closes behind me

EXHIBIT _P_
_Stern_
_8-30-07_
S. ROY, RPR

8/12/02

Discussion of whether or not Kaz Smith should
be hired back; Discussion began prior to 8:30. Clock
Microwave to be determined ~~by~~ punctuality. ~~Will~~ JS began speaking
to Jo

prior to 8:30; Door to Meeting Room Closed
Kaz speaks - ~~Stern~~ missed Kaz's remarks Stern
arrived to meeting room @ 8:30 According to
Microwave Clock. (Sting or not) - JS has his opinion
① ~~stay~~ Joe S.; Tim L.; Irregardless of what Mgmt thinks it's up
to the Sales Staff. (What else is now occurring behind closed doors

Okay Scott "Get Out"

"Yu do this to me every morning"

"No, I don't"

Door closes behind me



EXHIBIT M
Stern
8-30-01
S. ROY, RPR

Walking by the Copy room he Jim Ako began by saying "Shut up" and again in the office he commented something unintelligible. At this I said that his comments were not ~~going to be~~ "mouth is not going to runneth over" at this he began to spew in front of Randy and threatened me multiple times in front of R.F.



SMART LEASE

by GMAC

EXHIBIT N
Stern
8-30-07
S. ROY, RPR

Upon the 1st time
I acknowledged the Threat
then he continued, then
he did it a second time

Comments such as,
"I'm gonna hit you"

"Shut the Fuck up"

"I've got a lot a dirt on
you"

Then I counted 6-7, times I'mgonna
hit you then changed it to I'mgonna

GMAC 6562 Ptd in USA 4-94



EXHIBIT    O
Stern
8-30-07
S. ROY, RPR

*MARTLEASE*
by GMAC

Kill you"

I proceeded to dial a 911 for the Police when Randy asked me to put the phone down. After he asked me 3x I obliged him and told him I would settle it in court. Which I will.