SLS EXHIBIT 46
FILED IN CLERK'S OFFICE
2008 JAN 18 P 3:51
U.S. DISTRICT COURT
DISTRICT OF MASS

Phillips

On Friday 28th because things were so incredibly busy the delivery was pushed to the convenience (the Phillips home). Randy was off this day. This day the contracts were readied but just before I was ready to leave Frank noticed a mistake in the paperwork. Apparently the 6th points had been credited twice to the Phillips' contract. Frank + Joe had to analyze and rework the #'s and I believe they may have called Jimmy S. to confirm. The Phillips had then been called to let them know I was about at the door and they encountered this discrepancy. The payment was changed because the 6th points had been credited twice by Randy by mistake. After they agreed to the correction and Joey S. called to explain to them and the contract would be redone. I arrived at their house at ~~~~~ later than had agreed and showed the vehicle. After explaining the features fully to Diane we sat to sign up the paperwork. At this time Mr. Phillips noticed that the town was incorrect on the paperwork and it all had to be redone. We signed the titles to each of the vehicles and agreed

paperwork wrote Hits up to them for 11 AM. I for Frank knowing full well to see huge on a manila folder and knowing how I had an extremely busy day Soley on himself sometimes this one has to rely "a showroom" to remove Stock # 14737 02 Buick LeSabre to clean before the morning meeting for delivery as well and # 14973 paperwork was wrong and that I mentioned to Frank In the minutes to help get the paperwork up to them. I tried to call several people to arrange a runner paperwork up because of my delivery to run the versatile guy Hector was told to do situations, our could not be pulled from this the lawn and up rearranging the delivery schedule I ended you to help the Phillips left at Kathleen to arrive @ 12:20 to have the paperwork 11:45 signed off (By the time the paperwork had been finally correct It took them 5 times to get the #15 I address correct — nothing on my part or what I entered on DCS) At this time that the key promised Diane + Gary Phillips at about 11am this in the card would be to them got back to Monday morning When I equivocally told the "OO" Dealership I was by Randy Hurt

he would not oblige them or me. I further asked if there was anything I could do to help expedite this process. And I was wrong for doing that which I did to over promise to these customers that they would have this transfer this [scribbled out]. We don't start doing them until 11AM. I was so livid I didn't know what to do so I couldn't do or say anything to anyone really. Frank already knew because it was inside the folder. I've been yelled at so much that I didn't want to cause any more conflict when Diane called in and I went to check and the paperwork hadn't even made it to the back then you to got wind of the situation. Randy in the meantime began faxing the info to the insurance company but had been using the wrong #. At the same time the RMV system went down. I called my girlfriend up to the dealership to run the card back as soon as it would be ready but because Randy had been faxing to the wrong # it never got done in time

Tuesday I looked for the card the registry.

Solutions

① Transfers or New Plates

I realize you have extremely capable persons however At Johnson we (the Salespeople) had to submit docs to women an that did this and could help reduce the backlog for the F+I people.

We had assembled a checksheet of what allowed her to make it easier and to get this in a much shorter time frame! process the paperwork

See attached copy.

OCT-01-2002 18:03   SLS EXHIBIT 47   P.01

Paul & Carrie Margrave
28 Cottage Street
Great Barrington, MA 01230

# facsimile transmittal

| To: | Michael Coggins | Fax: | 413-443-0517 |
|---|---|---|---|
| From: | Carrie Margrave | Date: | 10/01/02 |
| Re: | Complaint | Pages: | 6 incl. cover |

Carrie and Paul Margrave
28 Cottage Street
Great Barrington, MA 01230
September 30, 2002

Michael Coggins
General Manager – Haddad Toyota
130 Pittsfield-Lenox Road
Pittsfield, MA 01201
Via facsimile and U.S.P.S.

Dear Mr. Coggins:

On September 5th, my husband and I picked up a new Toyota Highlander we bought from your dealership, and while we are pleased with the vehicle, I'm afraid we cannot say the same for your dealership. Specifically, we are displeased with your finance man, Tom Anderson. Our experience with Toyota has always been a good one until this date. The product is a fabulous one, though how we can take any joy in ownership after this experience is beyond us. We never expected gross incompetence from anyone employed by Toyota, though that was relatively tolerable, in comparison with being lied to deliberately.

Briefly, I came in Saturday, August 31, to look over the Highlander. I met your salesman Chris Moyer. He was extremely pleasant and professional; I would buy another car from him but for my subsequent treatment by this representative of your finance department. At any rate, I decided to purchase the Highlander. Having arrived at a price, Chris turned me over to Tom Anderson. Chris had explained to him and I reiterated that my objective was two-fold: one, to maintain approximately the same monthly rate I was currently paying on my Honda and two, to meet or better the rate I had found on the internet of 6.49%.

I stopped back on Tuesday after Labor Day to speak with Mr. Anderson and he declared to me "Good news, Toyota will give you 7%, it's only two dollars more than the rate you found on the Internet." I found what he said peculiar, but every time I attempted to speak more directly about it he changed the subject to his father or his child's kindergarten and her first day of school. I

Page 1 of 5

thought he was just odd and enjoyed the sound of his own voice, but I later realized this was his way of deflecting inquiry, a method of practiced obfuscation. I thought perhaps the relative ease of financing through the dealer was worth the ½ percent, so I didn't quibble further. He told me I was financing close to $28,000, explaining the excess over the 25,550 sales price was taxes and registration fees. He did not go over the actual component amounts. He asked if I wanted new plates and I agreed, figuring it would be easier as we were not trading our Honda in and we still needed to drive it. We went back and forth about when I would pick up the car, another completely confusing interlude, with an agreement finally of late afternoon, early evening September 5th. (I also have a saved voicemail to that effect from him at my workplace.) He then jotted my name down and Chris' on the calendar above his desk on the 5th. I provided him with my insurance information and the telephone number for USAA so that he could contact them for the RMV-1 form stamp, he wrote it down on the back of my folder.

I called the dealership on the 5th and no one knew I was coming to get the car. Anderson was not in and he had told no one, not even Chris Moyer. I was told by one of the managers named Joe that although Anderson had not prepared for the pick-up, that he, Joe, would take care of everything and that we should come in at 5:00 and the car would be ready. We came in at 5:00 and to my surprise Anderson was in.

He called my husband and I into his office and everything went downhill from there. Not a single form had been prepared, we spent the next two hours watching as Anderson acted out a part in a play. He folded and shuffled and folded and shuffled again, turning all the documents over on his desk, not allowing us to proceed with the process. I began to think I was watching the shell game. He would not allow us to look at any of the paperwork, and told us we would not be able to pick up the car because the registration was not complete, which was upsetting. (I had to wonder why I had bothered to give him my insurance information and why we had bothered with that little dance two days earlier. At that point, Joe came in and assured us that we would be able to get the car. He asked another of your employees to stay on and assist). Anderson's secrecy made me uncomfortable, why couldn't we review documents we were meant to sign? Finally, we started to sign documents, but to my mind, it was done in reverse order, we still had not seen the

breakdown of figures. One of the documents was for an extended warranty that he tried to get us to sign without explanation. His surreptitious attempts to pad our contract with extras without so much as an explanation, only served to further alienate us. Had we not questioned his presumptuous additions, we would have paid an additional $1500 to $2000, which I find astounding inasmuch as he was aware that I was trying to keep the monthly cost down. He then lied to my husband and I about the warranty, stating he had spoken to me about adding on the additional warranty, he said he told me it would only add another $12 to the payment. (He had NOT – he had not discussed any particulars – other than the 7% financing figure.) He then became clearly agitated as he tore up the financing agreement (He had already torn up what turned out to be the actual sales contract without showing it to us earlier.)

I was sufficiently worried by his behavior at this point that I asked him for a full disclosure, i.e., where is the contract and what is the finance charge? I asked him three times if the interest rate was in fact the 7% as he had indicated previously and he just kept evading. Neither my husband nor I could believe that he would not answer our very simple question, one which, given his position, he should have been able to answer immediately. Finally he said, oh look – the computer printed 7.5% (as though he had nothing to do with it!) I told him this was not what he had indicated to me previously, he then lied again saying he had not told me it was 7%, but "in the 7's" and that he had run the numbers right there in front of me and had told me that the rate was only $2 dollars different than the rate I had found on the internet. I reminded him that the computer screen was not turned toward me at the time, and that he had me at a disadvantage there, but he had clearly stated 7%. He denied it again, repeated the "in the 7's" comment (You have to wonder why he would not just say 7.5% when speaking to a customer about financing, unless his objective was to mislead them. Who in their right mind would accept a rate of "in the 7's"? Had he said that to me, I absolutely would have asked for the precise rate!) I do remember his "$2 difference" comment, which, in retrospect, had I examined it more closely on Tuesday, I would have known he was lying to me then. Only a .02% difference would amount to a $2 difference, not .5% and certainly not a full percentage point which actually added $45 a month to the payment. Then he was asking us to sign the finance agreement, saying, "Well, what's it going to be?" My husband wanted to leave, and we should have

I asked to see the sales contract, to review the figures, which should have been the first document he provided to us. I then noticed two more figures which I wasn't previously aware of – the GAP insurance fee of $500 and the documentation fee of $160. I asked for an explanation of both. I can't repeat what he said, it was that convoluted and incoherent. Again, I believe this is his method to try to confuse the customer and hide the ball. I read out loud to him the word "optional" next to the GAP insurance and he said it did not mean that we could turn it down, in other words it wasn't optional according to him, he spoke in circles for another 5 minutes until he finally took it off the contract. Adding insult to injury was the $160 documentation fee for the registration etc. that we could have done for free, especially as we had been tortured for two hours watching him prepare documents that should have been prepared before our arrival, tear them up and prepare them again and again.

And finally, adding insult to injury, we receive today from the Toyota Credit Corporation a letter stating they will not honor the terms of the contract we signed on the 5th because they cannot verify our employment! We signed a contract, it is binding, this is not something open to unilateral change. Reviewing our creditworthiness was something that should have occurred and something we believe had occurred before we drove off the lot. Neither my husband's employer nor mine were contacted which leads us to believe that vital information was not passed on. (I am the Director of Human Resources at Hotchkiss, and I am the one who receives the employment verifications, so I know for a fact the School was never asked about my employment and my husband checked with the owners of his company as well. Between the two of us we make in excess of $100,000, according to our bank my husband's credit is superb. Having driven off the lot under a certain set of terms, higher than those originally stated, and NOW receiving this letter is truly a deceptive trade practice. We would have chosen another dealer, another financer, another anything than to put up with what this man's incompetence has put us through.

I thought it only fair to let you know of our treatment as I intend to file a complaint not only with the Toyota Corporation regarding this deceptive financial bait and switch tactic used by your employee, but also with the Attorney General's office. I believe it is in violation of Massachusetts

Unfair Trade Practices Act and/or the Consumer Protection Act. Additionally, I will be filing a complaint with the Better Business Bureau and lastly, of course, we will neither buy another car from Haddad nor will we recommend your dealerships to anyone. Two of your managers attempted to apologize for our treatment, for which we are grateful, and again Chris Moyer was a very good, polite salesman, but in the end we were dealt with shabbily and no attempt was made to rectify the financial impact Anderson's professional misconduct and deception will have on us.

Regrettably,

*Carrie & Paul Margrave*

Carrie and Paul Margrave

SLS EXHIBIT
Copy    48

Business Certificate # 9198

FILING FEE $25.00
IN CLERK'S OFFICE

## COMMONWEALTH OF MASSACHUSETTS
City of Pittsfield

2008 JAN 18 P 3: 51

July 7 2006

U.S. DISTRICT COURT
DISTRICT OF MASS

In conformity with the provisions of Chapter one hundred and ten, Section five of the General Laws, as amended, the undersigned hereby declare(s) that a business under the title of

*Signature Series Pre Owned Vehicles a d/b/a of Berkshire Auto Group LLC* is conducted at **768 East Street**, Pittsfield, by the following persons:

**Full Name and Residence**

Patrick Sheehan           45 Main Street, Dalton MA 01226
Anthony Mazzeo            57 Winesap Road, Pittsfield MA 01201
James Salvi               28 Kathy Way, Pittsfield MA 01201

Signature

_____          _____
(SIGNATURE)                       (SIGNATURE)

_____          _____
(SIGNATURE)                       (SIGNATURE)

## COMMONWEALTH OF MASSACHUSETTS

Berkshire, SS:                                    July 7 2006

Then personally appeared before me the above-named _Patrick Sheehan, Anthony Mazzeo and James Salvi_, proved to me through satisfactory evidence of identification, which was _Personal Knowledge_, to be the person whose name is signed on the preceding or attached document, and acknowledged to me that he/she signed it voluntarily for its stated purpose.

A certificate issued in accordance with this section shall be in force and effect for four years from the date of issue and shall be renewed each four years thereafter so long as such business shall be conducted and shall lapse and be void unless so renewed.

_____
Notary Public

Expiration Date of Certificate: July 6 2010

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

## CLERK'S NOTICE

The image of this document is not viewable because it is either SEALED or filed EX PARTE.

```
                    CLIENT SERVICES CASE DATA FORM
*****************************************************************
         I&R - COUNSELING - BRIEF SERVICE: to be completed for all cases
Case Number:   41511    Status (O=Open, C=Closed): O Date Received: 02/05/2003
Intake Worker: MEF Transmit:          Entered by:       Date Entered:
Advocate PJM  Prior Advocate, if any MEF  Client, Caller, or Both? CLIENT
\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\
CLIENT INFORMATION
Sal: Mr.  Name: Scott           Stern              Suffix:
Street Address: 400 West Main Street
Department:
Company:
City/State/Zip:  North Adams            , MA 01247-
Phone Numbers - Home: [413]664-7805 Work:           Extension:
\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\
CALLER INFORMATION
Title:       Name:                                       Suff:
Street Address:                          Relationship:
Department:
Company:
City/State/Zip:
Phone Numbers - Home:           Work:          Extension:
REFERRAL INFORMATION
How did the individual find out about MOD? CLIENT, FORMER OR CURRENT
Were CAP and VR services explained? N
*****************************************************************
INITIAL MEMO: (Enter initial problem and agreed upon actions):
Client called reporting that he works for Haddad Dealership in Pittsfield, is
a person with Bi Polar, and is having a problems with his employer,
particularly his General Manager regarding his working conditions.
Client has been working there since late April early May of 2002, due to a
situation on the job, he was called to the office for a meeting at which time
he did tell them he was Bi Polar.
Client has had other small situations come up but the main issue is that he
is constantly late but "just a few minuts" each time.  Client reports that GM
did say to him one time that "he would try to accomodate" client but he needs
to be on time.  Client reports that this was not in writting.  Advised client
to but need for flex time in writting with med letter support and should he
be denied, call the office back.  Sent out employer and employee information.
 Should he be denied, he will call back.
02/05/2003===Client called back today reporting that he was terminated on
Monday 2/3/ Also reports that he did attemted to provide RA to Boss with (doc
letter which is poor) but employer would not accept it back then.  Checked
PJM advised to update note, re open and assign.
Client is saying now that back in May, his empoyer would not "let him put an
RA in writting.  Gave him a two week time frame for call back.

                        CASE INFORMATION:
           (Complete only for cases when full representation.)
%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%
CLIENT's DEMOGRAPHICS
Sex: M  Race:         Birth Date: 03/12/1962 Age Range:
Disability: MENTAL HEALTH DISORDER       TBI: N Hispanic Origins: (H or O) O
\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\
OPPOSING AGENCY    Social Security Number:
what agency is involved problem?
What is the agency's Case Number?
\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\
IS THIS AN RSA BILLABLE CASE? N
```

EXHIBIT T
Stern
8-30-07
S. ROY, RPR

## MISSION STATEMENT

Haddad's is an automobile dealerhip engaged in the sale and service of passenger cars and trucks. We believe that "our people are our greatest asset". As an employee, we want you to be assured that your individual effort is an integral part of our dealership.

It is the desire of the Company to establish and continue a relationship of cooperation with its employees whereby the mutual interests of the Company and its employees may be promoted satisfactory so as to produce the best possible quality of product and service for our customers.

Haddad Motors is a leader as Berkshire County's source for General Motors, Toyota, and Chrysler Jeep/Eagles automotive related products and services as well as financial services. Our mission is to improve continually our products and services to meet our customers transportation needs, and provide sales and service better than our competition. Thus, allowing us to prosper as a business and to provide a reasonable return.

**VALUES** – How we accomplish our mission is as important as the mission itself. Fundamental to the success of the Company are these basic values.

People – Our people are the source of our strength. They provide our corporate intelligence and determine our reputation and vitality. Involvement and teamwork are our core human values.

Products – Our products are the end results of our efforts, and they should be the best in serving our customers. As our products are viewed, so are we viewed.

Profits – Profits are the ultimate measure of how efficiently we provide customers with the best products for their needs. Profits are required to survive and grow.

GUIDING PRINCIPLES

<u>Quality comes first</u> – To achieve customer satisfaction, the quality of our products and service must be our number-one priority.

<u>Customers are the focus of everything we do</u> – Our work must be done with our customers in mind, providing better products and services than our competition.

<u>Continuous improvement is essential to our success</u> – We must strive for excellence in everything we do: in the safety and value of our products, our services, our human relations, our competitiveness, and our profitability.

6

<u>Employee involvement is our way of life</u> — We are a team. We must treat each other with trust and respect.

<u>Manufacturers and suppliers are our partners</u> — The Company must maintain mutually beneficial relationships with manufacturers, suppliers, and our other business associates.

<u>Integrity is never compromised</u> — The conduct of our Company must be pursued in a manner that is socially responsible and commands respect for its integrity and for its positive contributions to society. Our doors are open to men and women alike without discrimination and without regard to ethnic origin, personal beliefs, or disabilities.

The Haddad team will:

Place top priority on understanding and satisfying the needs and wants of the customer.

Foster an environment where all individuals on the Haddad team are encouraged to be innovative in order to accomplish Haddad's objectives and conduct our business in a competent aggressive ethical and socially responsible manner.

This handbook has been prepared to publish ongoing Company Policies, to answer questions about your employment with Haddad Motor Group Inc. and to ensure that you fully understand our employer and employee responsibilities.

We value your membership on the "Haddad Team" and working together we will continue to grow and prosper in our mutual endeavors.

Best wishes to you in your employment with Haddad Motor Group Inc.

This Employees' Handbook and Policy Manual is effective June 16, 1994 and supercedes any Haddad Motor Group Inc. handbook or policies previously published.

*George L. Haddad*
George L. Haddad
President

GENERAL INFORMATION

## DISABILITY ACT

The Americans with Disabilities Act of 1990, as amended, prohibits discrimination on the basis of disability, and protects qualified applicants and employees with disabilities from discrimination in hiring, promotion, discharge, pay, job training, fringe benefits, and other aspects of employment. The law also requires that covered entities provide qualified applicants and employees with disabilities with reasonable accomodations that do not impose undue hardship.

## EQUAL EMPLOYMENT OPPORTUNITY

The policy of this dealership is to afford equal opportunity for employment to all individuals regardless of sex, sexual orientation, race, religion, age, national origin, color, veteran, or disability status.

Management recruits, hires, trains, and promotes persons in all job titles without regard to sex, sexual orientation, race, religion, age, national origin, color, veteran, or disability status.

Compensation plans, benefits, transfers, lay-offs, recalls, company-sponsored training, education, tuition assistance, social and recreational program are administered without regard to sex, race, religion, age, national origin, color, veteran, or disability status.

## EXAMINATIONS

The employee understands that the Company reserves the right to require the employee to submit to a test for the presence of drugs in their system prior to employment and at any time during their employment, to the extent permitted by law. The employee also understands that any offer of employment may be contingent upon the passing of a physical examination, and a test for the presence of alcohol in their system, performed by a doctor selected by the Company. Further, the employee understands that at any time after the employee is hired, the Company may require the employee to submit to a physical examination, and an alcohol test to the extent permitted by law. The employee consents to the disclosure of the results of the physical examinations and related tests to the Company. The employee also understands that the employee may be required to take other tests, such as personality and honesty tests, prior to employment and during the employee's employment.

The employee understands that the Company may investigate the employee's driving record and criminal record and that an investigative consumer report may be prepared whereby information is obtained through personal interviews with the employee's neighbors, friends, and others with whom the